MJC/LJW201700153

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

2019 NOV 14 PM 3:27

**UNITED STATES OF AMERICA**

v.

**CATHERINE ELIZABETH PUGH,**

Defendant.

CLERK'S OFFICE
AT BALTIMORE

BY _____ Deputy

**UNDER SEAL**

Criminal No. DCK-19-0541

:
:
:
:
:
:
:
:
:
:

**(Conspiracy to Commit Wire Fraud,**
**18 U.S.C. § 1349; Wire Fraud, 18**
**U.S.C. § 1343; Conspiracy to**
**Defraud the United States, 18 U.S.C**
**§ 371; Tax Evasion, 26 U.S.C. § 7201;**
**Forfeiture, 18 U.S.C. § 982(a)(2)(A))**

...oOo...

**INDICTMENT**

**COUNT ONE**

**(Conspiracy to Commit Wire Fraud)**

The Grand Jury for the District of Maryland charges that:

**Introduction**

At all times relevant to this Indictment:

1.     Defendant **CATHERINE ELIZABETH PUGH ("PUGH")** was a resident of Baltimore, Maryland.

2.     From approximately 2007 until 2016, **PUGH** was a senator in the Maryland State Senate where she served on various legislative committees, including the Senate Health Committee. **PUGH** won her seat in the Senate after elections held in 2010 and 2014. In 2011, **PUGH** campaigned to become the mayor of Baltimore City, but lost in the primary election on September 13, 2011. In September 2015, **PUGH** announced her intention to run again for mayor of Baltimore City. After winning the primary election on April 26, 2016, and the general election on November 8, 2016, **PUGH** assumed the position of mayor of Baltimore City on December 6,

2016.

3.      **PUGH** was the sole owner of Healthy Holly, LLC ("Healthy Holly"), a company

formed in Maryland on January 14, 2011.   **PUGH** used the company to publish and sell children's

books that she had written.   Healthy Holly's principal business address was PUGH's residence in

Baltimore, Maryland.

4.      On or about the following dates, Healthy Holly published four illustrated children's

books: (1) June 21, 2011, *Healthy Holly: Exercising is Fun*; (2) March 8, 2013, *Healthy Holly: A*

*Healthy Start for Herbie*; (3) August 25, 2015, *Healthy Holly: Fruits Come in Colors Like the*

*Rainbow*; and (4) August 18, 2017, *Healthy Holly: Vegetables are not just Green*.   The cover of

each book listed "Catherine Pugh" as the author.   The overwhelming number of books published

by Healthy Holly were not sold through retail or wholesale vendors; rather, they were marketed

and sold directly to non-profit organizations and foundations, many of whom did business or

attempted to do business with Maryland state government and Baltimore City.

5.      Catherine E. Pugh and Company, Inc. (the "Pugh Company"), was a marketing and

public relations consulting company organized in Maryland in 1997.   **PUGH** was the sole

proprietor of the business, and its principal address was her residence in Baltimore, Maryland.

6.      **PUGH** was the sole signatory on Healthy Holly's bank account ending in 8269 and

the Pugh Company's bank account ending in 1653.   **PUGH** did not maintain a personal bank

account, choosing instead to commingle her personal and business finances in her business

accounts.

7.      **PUGH** filed U.S. Individual Income Tax Return, Form 1040, for tax years 2015

and 2016, which included Internal Revenue Service ("IRS") Form Schedule C, Profit or Loss From

a Business (Sole Proprietorship).   **PUGH** used Form Schedule C to calculate the net taxable

business income she received from Healthy Holly during those years.

8.      GARY BROWN, JR. ("BROWN") was a resident of Baltimore, Maryland.

9.      BROWN served as a legislative aide to **PUGH** when she was a state senator. BROWN served as a campaign aide to **PUGH** during her 2016 mayoral election campaign. Following **PUGH's** election as mayor of Baltimore City in November 2016, BROWN was hired as the Deputy Director of Special Events in the mayor's office.   BROWN had an office in City Hall on the same floor as **PUGH**.   In December 2016, the Maryland Democratic Central Committee nominated BROWN to fill a vacancy in the Maryland House of Delegates created by **PUGH's** mayoral victory.

10.     BROWN was the sole owner and operator of Stricker Abstracting, LLC, and GB Abstracting, LLC - two Maryland companies that purported to be title-abstracting businesses. BROWN was the sole owner and operator of a Maryland consulting business called GBJ Consulting, LLC.   BROWN ran all three companies from his residence.   BROWN also freelanced as a tax return preparer.

11.     BROWN helped **PUGH** solicit non-profit organizations and foundations to purchase children's books published by Healthy Holly.   BROWN also assisted **PUGH** in the transportation and storage of Healthy Holly books, and the drafting of invoices and other documents to account for book sales.   The assistance BROWN provided to **PUGH** in the promotion and distribution of Healthy Holly books sometimes took place during work hours while BROWN was serving as **PUGH's** legislative aide and mayoral staff member.   BROWN referred to himself as Healthy Holly's Chief Operating Officer; however, BROWN was not an employee of Healthy Holly.   None of BROWN's companies actually provided services to or on behalf of Healthy Holly.

12.     BROWN filed U.S. Individual Income Tax Return, Form 1040, for tax year 2016, which included IRS Form Schedule C, Profit or Loss From a Business (Sole Proprietorship).

3

BROWN used Form Schedule C to calculate the net taxable business income from his companies for those years, including income purportedly received for services rendered on behalf of Healthy Holly.

13.   **PUGH** caused Healthy Holly to issue a 2016 IRS Form 1099 to report approximately $64,325 in payments to BROWN's company, GBJ Consulting, for purported "outside services" that his company provided to Healthy Holly.

14.   The Internal Revenue Service of the Department of Treasury ("IRS") was an agency of the United States government responsible for enforcing the nation's revenue laws and collecting federal income taxes.

## The Scheme to Defraud

15.   From in or about November 2011 until in or about March 2019, in the District of Maryland and elsewhere, the defendant,

### CATHERINE ELIZABETH PUGH,

did knowingly devise and intend to devise a scheme and artifice to defraud purchasers of Healthy Holly books and to obtain money and property from such purchasers by means of materially false and fraudulent pretenses, representations, and promises, that is, the defendant promised to print and deliver books commensurate with what purchasers paid for them when, in truth and fact, the defendant accepted payments with the intent to (1) not provide the books to purchasers, (2) print and provide the books to purchasers, but later convert the books to her own personal use, and (3) provide purchasers with books that had already been sold and delivered to a different purchaser (hereinafter, "the scheme to defraud").

4

### The Conspiracy Charge

16.    From in or about November 2011 until in or about March 2019, in the District of Maryland and elsewhere, the defendant,

### CATHERINE ELIZABETH PUGH,

did knowingly and willfully conspire, combine, confederate, and agree with BROWN to commit wire fraud, that is, to knowingly execute and attempt to execute the scheme to defraud through the use of interstate wires in violation of Title 18, United States Code, Section 1343.

### The Purpose of the Conspiracy

17.    The purpose of the conspiracy to defraud was for **PUGH** and BROWN to unlawfully enrich themselves, promote **PUGH's** political career, and fund her electoral campaign for mayor.

### Manner and Means of the Conspiracy

It was part of the conspiracy to defraud that:

18.    **PUGH** and BROWN falsely promised to sell and deliver an agreed-upon quantity of Healthy Holly books to organizations at a certain price per book.   After accepting payments for the books, **PUGH** and BROWN intentionally did not deliver the books as promised.

19.    After accepting payments for Healthy Holly books and delivering them to a third party on behalf of a purchaser, **PUGH** and BROWN converted some or all of the purchased books to their own use without the purchaser's or third party's knowledge and consent, thereby fraudulently acquiring an inventory of books at no cost to **PUGH**.

20.    **PUGH** and BROWN stored quantities of fraudulently obtained Healthy Holly books at various locations, including **PUGH's** residence in Baltimore City; **PUGH's** state legislative offices in Annapolis and Baltimore City; **PUGH's** mayoral office at City Hall; the War

5

Memorial building in Baltimore City; and a public storage locker used by **PUGH's** mayoral campaign.

21.     As a way to promote **PUGH**, her books and her political campaigns, **PUGH** and BROWN gave away fraudulently obtained Healthy Holly books during government functions and campaign events, sometimes with the assistance of other members of **PUGH's** legislative and mayoral staffs.

22.     **PUGH** and BROWN intentionally double-sold Healthy Holly books by selling books purchased by one buyer to a different buyer without either buyer's knowledge or consent.

23.     **PUGH** used some of the proceeds from the sale of fraudulently obtained Healthy Holly books to fund straw donations to **PUGH's** mayoral election campaign, funds that BROWN caused to be deposited into the bank account for the "Committee to Elect Catherine E. Pugh."

24.     **PUGH** and BROWN used other members of **PUGH's** legislative and mayoral staffs to facilitate the sale and delivery of fraudulently obtained Healthy Holly books, including the acquisition and transportation of books that had been in storage at a warehouse used by the Baltimore City Public Schools.

25.     **PUGH** used some of the proceeds from the sale of fraudulently obtained Healthy Holly books to fund the purchase and renovation of a house in Baltimore City.

26.     **PUGH** and BROWN transmitted and caused to be transmitted interstate wire communications during and in furtherance of the negotiation, sale, and delivery of fraudulently obtained Healthy Holly books.

6

**Acts in Furtherance of the Conspiracy**

I.      **The Fraudulent Conversion of Books Sold to Purchaser A**

  A.      **The Printing and Sale of Book One**

27.     In or about December 2010, **PUGH** negotiated the sale of 20,000 Healthy Holly books for $100,000 to Purchaser A, a nonprofit healthcare organization based in Maryland.   The book was titled *Healthy Holly: Exercising is Fun* ("Book One").   At **PUGH's** suggestion, Purchaser A agreed to buy Book One on the condition that the purchase be on behalf of, and for distribution to, school children in the Baltimore City Public Schools ("BCPS" or "the school system").   The purchase was also contingent on **PUGH** delivering the donated books to the school system for distribution to students.

28.     In or about January 2011, **PUGH** approached the Chief Executive Officer for BCPS about accepting the donation of Book One from Purchaser A.   The BCPS CEO agreed to accept the books, but first had members of his staff copy-edit the book.   The BCPS staff identified various grammatical and spelling errors, which **PUGH** corrected.   The BCPS CEO decided not to make the book part of the curriculum; instead, the BCPS CEO authorized giving a copy of the book to all age-appropriate students for the students to take home.   **PUGH** helped arrange a letter of agreement between Purchaser A and BCPS regarding the donation of Book One.

29.     On or about February 17, 2011 and May 20, 2011, **PUGH** accepted two $50,000 checks from Purchaser A for the sale of Book One.   The checks were deposited into a bank account designated by **PUGH**.   On March 11, 2011, BROWN emailed a "corrected invoice" to Purchaser A.

30.     On or about March 2, 2011 and June 2, 2011, **PUGH** paid a printing company a total of $13,480 to print and deliver 22,110 copies of Book One, which was the only edition of Book One ever printed.   **PUGH** made arrangements to have approximately 20,020 copies of the

7

books delivered to the Baltimore City Board of Education at 200 E. North Ave., Baltimore, Maryland, and another 2,090 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, Maryland.

31.     On or about June 6, 2011, the 20,020 copies of Book One were delivered to the mail room at 200 E. North Avenue, Baltimore, Maryland.   BCPS employees moved the books to a warehouse used by the school system located at 5300 Pulaski Highway, Baltimore, Maryland ("City Warehouse").

32.     Beginning in or about October 2011, **PUGH** and BROWN arranged for thousands of copies of Book One to be removed from the City Warehouse for **PUGH's** personal use and benefit.   Sometimes BROWN enlisted the help of a Baltimore City employee to remove and transport the books.   On other occasions, **PUGH** paid associates of BROWN to remove and transport the books.   **PUGH** and BROWN arranged for the books to be delivered to various locations in Baltimore City where they were stored, including **PUGH's** residence in Baltimore City; **PUGH's** state legislative offices in Annapolis and Baltimore City; **PUGH's** mayoral office at City Hall; the War Memorial building in Baltimore City; a public storage locker used by **PUGH's** mayoral campaign; **PUGH's** personal and governmental vehicles; and vehicles belonging to BROWN and other members of **PUGH's** staff.   **PUGH** and BROWN used the cached copies as giveaways at various events in order to promote Book One and **PUGH's** political campaigns.   Neither Purchaser A nor BCPS authorized **PUGH's** and BROWN's conversion of Book One to their own use.

**B.     The Fraudulent Delivery of Book Two to PUGH's Legislative Office**

33.     On or about August 22, 2012, **PUGH** negotiated the sale of 20,000 more Healthy Holly books to Purchaser A for $100,000.   The title of the second book was *Healthy Holly: A Healthy Start for Herbie* ("Book Two").   As with the first purchase, Purchaser A agreed to buy

8

Book Two on behalf of, and for distribution to, BCPS school children.   The purchase of Book Two was also contingent on **PUGH** delivering the donated books to the school system for distribution to the students.   During discussions with Purchaser A about the sale of Book Two, **PUGH** failed to disclose the fact that Book One had not been distributed to BCPS students in accordance with the terms of its purchase.

34.     In or about August of 2012, the BCPS CEO agreed to accept Purchaser A's donation of 20,000 copies of Book Two.   Members of the CEO's staff identified grammatical and spelling errors, which **PUGH** corrected.   The BCPS CEO decided to give a copy of the non-instructional book to all age-appropriate students for them to take home.   **PUGH** helped arrange a letter of agreement between Purchaser A and the school system regarding the donation of Book Two.

35.     On or about July 10, 2012, BROWN emailed an invoice to Purchaser A for 20,000 copies of Book Two.   On or about November 6, 2012, Purchaser A gave **PUGH** a $100,000 check payable to Healthy Holly for the purchase of 20,000 copies of Book Two.   **PUGH** deposited the check into Healthy Holly's bank account on November 19, 2012.

36.     On or about December 12, 2012, **PUGH** sent an email from cepughco@aol.com with instructions for the publisher about how to split up the order, stating, "Let's make that 18500 [for the] schools and 1500 [for] Me."

37.     On or about December 19, 2012 and March 20, 2013, **PUGH** issued two Healthy Holly checks to pay a printing company a total of $14,325 to print and deliver 20,100 copies of Book Two, which was the only edition of Book Two ever printed.   **PUGH** made arrangements to have 18,600 copies of the books delivered to the Baltimore City Board of Education at 200 E. North Ave., Baltimore, Maryland, and another 1,400 of the books delivered to "Senator Catherine

E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, Maryland. The books were distributed to the respective locations on or about March 19, 2013.

38. Purchaser A had no knowledge that **PUGH** had delivered 1,400 copies of its books to **PUGH's** legislative office instead of giving them to the school system. In so doing, **PUGH** unlawfully converted 1,400 copies of Book Two to her own personal use without Purchaser A's consent. The fraudulent conversion provided **PUGH** and BROWN with a free inventory of books that they used as giveaways at various events in order to promote Book Two and **PUGH's** political campaigns.

### C.   The Fraudulent Delivery of Book Three to PUGH's Legislative Office

39. On or about January 24, 2015, **PUGH** negotiated the sale of 20,000 more Healthy Holly books to Purchaser A for $100,000. The title of the third book was *Healthy Holly: Fruits Come in Colors Like the Rainbow* ("Book Three"). As with the first two purchases, Purchaser A agreed to buy Book Three on behalf of, and for distribution to, BCPS school children, and **PUGH** agreed to deliver them. During discussions with Purchaser A about the sale of Book Three, **PUGH** failed to disclose the fact that Books One and Two were not distributed to BCPS students in accordance with the terms of those purchases.

40. On or about January 26, 2015, BROWN emailed an invoice to Purchaser A for 20,000 copies of Book Three. On or about March 18, 2015, Purchaser A gave **PUGH** a $100,000 check payable to Healthy Holly for the purchase of Book Three. **PUGH** negotiated the check and deposited most of the funds into Healthy Holly's bank account on April 23, 2015.

41. On or about June 5, 2015 and October 2, 2015, **PUGH** paid a printing company a total of $15,275 to print and deliver 21,000 copies of Book Three, which was the only edition of Book Three ever printed. **PUGH** made arrangements to have 19,500 copies of the books delivered to the Baltimore City Board of Education at 200 E. North Ave., Baltimore, Maryland,

and another 500 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, Maryland.   The books were distributed to the respective locations on or about September 4, 2015.

42.   Purchaser A had no knowledge that **PUGH** had delivered 500 copies of its books to PUGH's legislative office instead of giving them to the school system.   In so doing, **PUGH** unlawfully converted 500 copies of Book Three to her own personal use without Purchaser A's consent.   The fraudulent conversion provided **PUGH** and BROWN with a free inventory of books that they used as giveaways at various events to promote Book Three and **PUGH's** mayoral campaign.

**D.     The Fraudulent Resale of Books One, Two, and Three to Other Purchasers**

43.   Beginning in or about October 2011, **PUGH** and BROWN began selling to unwitting purchasers copies of Healthy Holly Books One, Two and Three, which had already been sold to Purchaser A and donated to BCPS.   To that end, **PUGH** and BROWN used a Baltimore-based public charity ("Charity") to facilitate the resale and distribution of the books to new purchasers.   The new purchasers entered into an agreement with **PUGH** whereby they agreed to buy Healthy Holly books through the Charity to support a worthy cause.   Neither the Charity nor the new purchasers knew that **PUGH** and BROWN were double selling the books.

44.   Pursuant to the Charity's agreement with **PUGH**, the Charity kept a percentage of the purchase price paid by the new purchasers, and forwarded the balance to **PUGH**.   **PUGH** then had copies of the books delivered to the Charity, which, in turn, agreed to deliver the books to children's programs on behalf of the new purchasers.   BROWN facilitated the delivery of the books from either the City Warehouse or **PUGH's** legislative offices.

11

### 1.   The Resale of Book One to Purchaser B

45.   On or about October 7, 2011, **PUGH** discussed the sale of Healthy Holly books with Purchaser B, a nonprofit healthcare insurer based in the Baltimore-Washington DC area.   As part of its community outreach program, Purchaser B agreed to buy the books through the Charity for $7,000.   However, **PUGH** falsely represented to the Charity that Purchaser B had agreed that she, **PUGH**, would receive $6,000 of the $7,000 donation when, in fact, Purchaser B had made no such agreement.   On or about October 24, 2011, Purchaser B sent the Charity a check for $7,000. The Charity retained $1,000 of the payment and forwarded $6,000 to **PUGH**, which **PUGH** applied to pay down a home equity line of credit.   To fill the book order, on or about November 27, 2011, **PUGH** and BROWN took 1,000 copies of Book One from the shipment of books that Purchaser A had donated to the school system in June 2011.   Neither Purchaser A nor the Baltimore City Public Schools authorized the fraudulent resale of those books to Purchaser B. BROWN delivered the 1,000 copies of Book One to the Charity, which, in turn, delivered them to daycare centers.

### 2.   The Resale of Book Two to Purchaser C

46.   On or about August 27, 2013, **PUGH** called the President and CEO of the Charity to say that three organizations had agreed to purchase copies of **PUGH's** "second children's book." **PUGH** told the Charity that Purchaser B had agreed to buy 1,000 copies; Purchaser C, an automobile insurance fund based in Maryland, had agreed to buy 1,000 copies; and Purchaser D, an investment firm with offices in Chicago, had agreed to purchase 400 copies.

47.   On or about August 29, 2013, **PUGH** texted the President and CEO of the Charity to confirm that Purchaser C would be sending a check to the Charity to buy "one thousans [sic] books."   **PUGH** confirmed that the Charity would "deduct $1,000" from the payment for itself and the balance would be given to **PUGH** via a check payable to Healthy Holly, which she would

12

"pick up." Ultimately, Purchaser C paid the Charity $5,000 for the purchase of only 556 copies of Book Two. The Charity kept $552 of the payment and gave **PUGH** the balance via a check for $4,448 payable to Healthy Holly, which **PUGH** deposited into Healthy Holly's bank account on or about October 14, 2013.

48.     **PUGH** advised the Charity that she would deliver Purchaser C's books to daycare centers instead of having the Charity handle the delivery. However, the only source of 1,000 copies of Book Two to fill Purchaser C's book order was the shipment of Book Two that Purchaser A had donated to the school system in March 2013. Neither Purchaser A nor BCPS authorized the fraudulent resale of those books to Purchaser C.

### 3.     The Resale of Books One and Two to Purchaser D

49.     On or about August 6, 2013, a member of **PUGH's** legislative staff helped coordinate the sale of 400 Healthy Holly books to Purchaser D. As the sponsor of the 2013 Black Corporate Director's Conference to be held on September 6-8, 2013, in Laguna Beach, California, Purchaser D wanted to include a copy of the books in its "swag" gift bag to be handed out to conference attendees. **PUGH** told Purchaser D to order the books through the Charity's CEO.

50.     On or about August 12, 2013, **PUGH** arranged for the delivery of 400 Healthy Books to Purchaser D, which included 200 copies of Book One and 200 copies of Book Two. A member of **PUGH's** legislative staff sent confirmation of the delivery to Purchaser D via email account "Catherine.Pugh@senate.state.md.us." A copy of each book, valued at $9 per book, was included in the gift bags that were handed out at the conference. The conference agenda listed "State Senator Catherine E. Pugh" as one of the panelists. Purchaser D paid **PUGH's** travel and lodging expenses totaling approximately $4,664.

51.     On or about September 12, 2013, **PUGH** sent a Healthy Holly invoice to Purchaser D seeking payment for the shipped copies of "Healthy Holly: Exercising is Fun!" and "Healthy

Holly: A Healthy Start For Herbie."  The invoice directed all inquiries to BROWN and requested that a check be made payable to "[the Charity] Attn: Healthy Holly."  On or about September 26, 2013, a legislative staff member sent an email to Purchaser D stating, "Senator Pugh wanted to get an update for the payment that will be going to [the Charity] for the books."

52.     On or about October 4, 2013, Purchaser D sent a check to the Charity for $3,680. On or about October 17, 2013, the Charity forwarded the full amount to **PUGH** via a check payable to Healthy Holly, which **PUGH** deposited into the company's bank account on October 24, 2013.

53.     To fill the book order for Purchaser D, **PUGH** took 200 copies of Book One from the shipment of books that Purchaser A had donated to the school system in June 2011, and 200 copies of Book Two from the shipment of books that Purchaser A had donated to the school system in March 2013.   Neither Purchaser A nor BCPS authorized the fraudulent resale of the books to Purchaser D.

### 4.     The Resale of Book Two to Purchaser B

54.     On or about December 3, 2013, **PUGH** contacted Purchaser B about purchasing 1,000 copies of Book Two through the Charity for $7,500.   As she did in 2011, **PUGH** falsely represented to the Charity that Purchaser B had agreed that she, **PUGH**, would receive $6,500 of the $7,500 donation when, in fact, Purchaser B had made no such agreement.  On or about February 12, 2014, Purchaser B issued a $7,500 check to the Charity to buy the books.   The Charity kept $1,000 of the payment, and forwarded the balance of $6,500 to **PUGH** via a check made payable to Healthy Holly, which **PUGH** deposited into the company's bank account on March 26, 2014.   BROWN delivered the 1,000 copies of Book Two to the Charity, which, in turn, delivered most of them to youth-related organizations.

55.     To fill Purchaser B's book order, **PUGH** and BROWN took 1,000 copies of Book Two from the shipment of books that Purchaser A had donated to the school system in March

2013.   Neither Purchaser A nor BCPS authorized the fraudulent resale of those books to Purchaser B.

### 5.   The Resale of Books One, Two, and Three to Purchaser F

56.   On or about December 17, 2015, **PUGH** discussed the sale of Healthy Holly Books with Purchaser F, a nonprofit healthcare foundation with offices in Maryland.   Purchaser F agreed to purchase the books as part of its community outreach program, which included giving away free literature at events that promoted healthy lifestyles.   On or about December 21, 2015, BROWN sent Purchaser F a Healthy Holly invoice seeking $25,000 for 5,000 unspecified Healthy Holly books.   Purchaser F sent **PUGH** a $25,000 check payable to Healthy Holly on January 21, 2016, which **PUGH** deposited into the company's bank account on February 1, 2016.   On or about June 27, 2016, BROWN sent Purchaser F another Healthy Holly invoice seeking $25,000 for 5,000 more unspecified Healthy Holly books.   Purchaser F sent **PUGH** a $25,000 check payable to Healthy Holly on or about September 13, 2016, which **PUGH** deposited into the company's bank account on or about September 19, 2016.

57.   To fill the foregoing book orders totaling 10,000 books, **PUGH** and BROWN took approximately 1,000 copies of Book One from the shipment of books that Purchaser A had donated to BCPS in June 2011; approximately 1,000 copies of Book Two from the shipment of books that Purchaser A had donated to the school system in March 2013; and approximately 7,500 from the shipment of books that Purchaser A had donated to the school system in August 2015.   Neither Purchaser A nor BCPS authorized the fraudulent resale of those books to Purchaser F.   BROWN facilitated the delivery of the books to Purchaser F's offsite storage facility.

## II.   False Promises to Induce Advance Payments for Books Never Delivered

### A.   The Non-Delivery of Book Two to Purchaser C

58.   On or about August 2, 2012, **PUGH** negotiated the sale of 1,000 copies of Book

Two to Purchaser C via the Charity for $7,500. On or about August 20, 2012, the Executive Director for Purchaser C sent an internal memo authorizing the purchase of the books via the Charity using funds from the company's charitable-distributions budget. However, on or about August 24, 2012, Purchaser C sent **PUGH** a $7,500 check made payable to Healthy Holly instead of the Charity. **PUGH** deposited the check into Healthy Holly's account on September 7, 2012. The Charity did not receive a percentage of the sale. Neither the Charity nor Purchaser C ever received the 1,000 copies of Book Two for further distribution to a charitable cause.

      **B.**    **The Non-Delivery of Book Three to Purchaser E**

     59.    On or about December 14, 2016, Purchaser E, a trust fund based in Maryland, sent the Charity a check for $50,000, which the Charity allocated for the purchase of 5,000 copies of Healthy Holly books. However, prior to the Charity receiving any funds from Purchaser E, **PUGH** learned that Purchaser E had planned to give the $50,000 donation to the Charity, and **PUGH** falsely represented to the Charity that the purpose of Purchaser E's donation was to purchase Health Holly books. Specifically, **PUGH** told the Charity that Purchaser E had agreed that she, **PUGH**, would receive $45,000 of the $50,000 donation, when, in fact, the Fund had made no such agreement.

     60.    On or about December 22, 2016, BROWN issued an invoice to the Charity requesting a payment of $45,000 for an "assortment of books," which took into account the price of the books minus the Charity's fee of $5,000. On or about December 23, 2016, the charity sent **PUGH** a $45,000 check payable to Healthy Holly, which **PUGH** deposited into the company's bank account on or about December 28, 2016.

     61.    BROWN delivered 500 copies of Book Three to the Charity, which the Charity then distributed to an affiliate office for further distribution to youth-related groups. In reference to the other 4,500 books donated by Purchaser E, the Charity requested an explanation from **PUGH**

about how the books were going to be distributed.   On or about February 1, 2017, BROWN sent the Charity a letter claiming that "Healthy Holly LLC will be delivering 5000 [copies of] *Healthy Holly: Fruit [sic] Come in the Colors Like the Rainbow* [Book Three] to the Baltimore City Public Schools."  The letter noted that the books would be delivered to the City Warehouse so the school system could "distribut[e] the books to their students."

62.    Despite depositing Purchaser E's $45,000 into Healthy Holly's bank account, **PUGH** never delivered 5,000 copies of Book Three to the City Warehouse for distribution to BCPS students.   Instead, **PUGH** kept the money and did not print any more copies.

**C.     The Non-Delivery of Books Four and Five to Purchaser F**

63.    On or about October 16, 2017, the Director of Community Health for Purchaser F had a conversation with **PUGH** about obtaining copies of Book Four, titled *Healthy Holly: Vegetables are not just* [sic] *Green,* to hand out at various community events.   That same day, members of **PUGH's** mayoral staff sent an email to the Director discussing how to get copies of the book and asking for details about Purchaser F's plan to have **PUGH** attend the company's upcoming community events to sign her books and conduct a reading.

64.    On or about October 31, 2017, BROWN sent Purchaser F a message from email account healthyholly@healthyholly.com with an attached invoice seeking payment of $14,000 for 2,000 copies of Book Four.   On or about November 24, 2017, Purchaser F sent **PUGH** a check for $14,000 made payable to Healthy Holly, which **PUGH** deposited into the Healthy Holly bank account on or about November 30, 2017.   However, **PUGH** and BROWN never delivered the 2,000 copies of Book Four to Purchaser F.   In addition, one year later, on or about October 21, 2018, BROWN sent a new invoice to Purchaser F seeking $25,000 for 4,000 copies of an unpublished Healthy Holly book (Book Five) to be titled *Healthy Holly: Walking with My Family is Fun.*   Not knowing about the non-delivery of Book Four, Purchaser F sent **PUGH** a $25,000

ACH payment to Healthy Holly's account to pay for Book Five. **PUGH** and BROWN never delivered copies of Book Five to Purchaser F.

### D.     The Non-Delivery of Books Four and Five to Purchaser A

65.     On or about October 17, 2016, **PUGH** negotiated the sale of 20,000 copies of Book Four to Purchaser A for $100,000. During discussions with Purchaser A about the sale of Book Four, **PUGH** failed to disclose the fact that the first three books were not distributed to BCPS students in accordance with the terms of those purchases. More specifically, **PUGH** never told Purchaser A about the fraudulent acquisition and use of those books over the preceding five years, including **PUGH's** and BROWN's diversion of books to **PUGH'S** legislative offices, the use of the books as promotional and political giveaways, and the resale of thousands of books to new purchasers for their own financial gain. On or about October 17, 2016, BROWN emailed Purchaser A an invoice seeking $100,000 for 20,000 copies of Book Four.

66.     On or about November 3, 2016, Purchaser A sent **PUGH** a check for $100,000 payable to Healthy Holly for the purchase and delivery of 20,000 copies of Book Four on behalf of BCPS. **PUGH** deposited the check into Healthy Holly's bank account on November 9, 2016, part of which **PUGH** used to purchase a new house on December 13, 2016. However, as of April 2019, **PUGH** and BROWN never delivered nor printed the 20,000 copies of Book Four for which Healthy Holly had been paid.

67.     On or about September 12, 2018, **PUGH** approached Purchaser A about buying 20,000 copies of a new Healthy Holly book (Book Five) for $100,000. During those discussions, **PUGH** failed to disclose the fact that the first four books were not distributed to BCPS students in accordance with the terms of those purchases. On or about September 12, 2018, BROWN emailed Purchaser A an invoice seeking $100,000 for 20,000 copies of Book Five. On or about November 14, 2016, Purchaser A sent **PUGH** a check for $100,000 payable to Healthy Holly for

the purchase and delivery of 20,000 copies of Book Five on behalf of BCPS.  On or about November 27, 2018, **PUGH** deposited the check into Healthy Holly's account.  **PUGH** and BROWN never delivered nor printed the 20,000 copies of Book Five for which Healthy Holly had been paid.

### E.   The Non-Delivery of Books to Purchaser G

68.     In or about March 2016, approximately one month before the mayoral primary election, **PUGH** contacted Purchaser G, the owner of a Maryland-based financing company that did business with Baltimore City.  Purchaser G's company had purchased 2,000 copies of Book One back in 2011 for $14,000.  **PUGH** told Purchaser G that she needed to raise more money for her campaign and she asked for Purchaser G's help.  **PUGH** explained to Purchaser G that she had been making money by selling her Healthy Holly books to various organizations that donated the books to BCPS students.  **PUGH** asked Purchaser G for $50,000 to purchase books for BCPS students.  Purchaser G understood that **PUGH** would use the money to produce and distribute the Healthy Holly books, with the balance of the money going toward her mayoral campaign.  Purchaser G knew that providing money to **PUGH's** campaign via **PUGH's** company was a violation of Maryland's election laws.

69.     On or about March 7, 2016, BROWN went to Purchaser G's residence and picked up a check for $50,000 payable to Healthy Holly.  BROWN delivered the check to **PUGH**, and she deposited it into Healthy Holly's bank account on March 9, 2016.  However, **PUGH** never used any of those funds to print or deliver Healthy Holly books for BCPS students.

70.     In or about October 2016, approximately one month before the general election, **PUGH** told Purchaser G that she wanted to buy a larger house so she could entertain people when she became mayor.  PUGH had a specific house in mind and took Purchaser G to see it.  PUGH also told Purchaser G that she needed money in order to buy the house.  Purchaser G asked **PUGH**

19

how he could help.  As in March 2016, **PUGH** suggested that Purchaser G write a check to Healthy Holly, this time for $100,000.  However, **PUGH** failed to disclose the fact that none of the funds provided by Purchaser G in March 2016 were used to print and deliver books to BCPS students.

71.     On or about October 13, 2016, Purchaser G wrote a check from his company's bank account for $100,000 payable to "Healthy Holly" with the notation "book donation" in the memo line of the check.  As in March 2016, Purchaser G understood from **PUGH's** representations to him that **PUGH** would use the money to produce and distribute Healthy Holly books, with the balance of the money going toward the purchase of a new house.  On or about October 17, 2016, **PUGH** deposited the check into Healthy Holly's bank account.  However, **PUGH** never used any of those funds to print or deliver Healthy Holly books for BCPS students.

18 U.S.C. § 1349

## COUNTS TWO THROUGH EIGHT

### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 15, and paragraphs 18 through 67, of Count One are realleged and incorporated by reference as though fully set forth in these Counts.

2.     On or about the dates listed below, in the District of Maryland, the defendant,

### CATHERINE ELIZABETH PUGH,

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communications, certain writings, signs, signals, and sounds, as set forth below:

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 2 | 8-27-15 | Email sent from cepughco@gmail.com stating that the "CEO's" address on the publisher's bill of lading for the shipment of Book Three was the "wrong address" and, instead, the books should be shipped "to the warehouse where they shipped before." |
| 3 | 12-22-15 | Email sent from healthyholly@healthyholly.com to an employee of Purchaser F with an attached "updated invoice" seeking payment of "$25,000" for "5,000" copies of "Healthy Holly Books." |
| 4 | 6-30-16 | Email sent from healthyholly@healthyholly.com to an employee of Purchaser F with an attached invoice seeking payment of "$25,000" for an additional "5,000" copies of "Healthy Holly Books." |
| 5 | 10-17-16 | Email sent from healthyholly@healthyholly.com to an employee of Purchaser A with an attached invoice seeking payment of "$100,000" for "20,000" copies of Book Four. |
| 6 | 12-28-16 | Transmission of an electronic image of a check issued by the Charity in the amount of $45,000 payable to Healthy Holly for its share of the sale of 5,000 copies of Book Three to Purchaser E for $50,000. |
| 7 | 11-1-17 | Email from healthyholly@healthyholly.com to an employee of Purchaser F with an attached "invoice for 2000 Healthy Holly Books" for $14,000. |
| 8 | 9-12-18 | Email sent from healthyholly@healthyholly.com to an employee of Purchaser A with an attached invoice seeking payment of "$100,000" for "20,000" copies of Book Five. |

18 U.S.C. § 1343

**COUNT NINE**

**(Conspiracy to Defraud the United States)**

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 14 of Count One are realleged and incorporated by reference as though fully set forth in this Count.

**A.     The Misrepresentation of Campaign Donations as Healthy Holly Business Expenses**

2.     During calendar year 2016, Healthy Holly received approximately $345,000 from the sale of Healthy Holly books.   **PUGH** deposited the sale proceeds into the Healthy Holly bank account.

3.     BROWN formed GBJ Consulting on or about February 5, 2016.   The Articles of Organization listed the purpose of GBJ Consulting as "Fundraising and Political Consulting."

4.     On or about July 29, 2016, BROWN opened a bank account in the name of GBJ Consulting.

5.     On or about March 19, 2018, **PUGH** filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016, which included Form Schedule C to report Healthy Holly's profit or loss for that year.   On Schedule C, **PUGH** reported $79,745 of expenses for "Outside Services." Of that amount, $64,325 was purportedly paid to BROWN's company GBJ Consulting, including $62,100 in Healthy Holly checks made payable to BROWN.

6.     **PUGH** caused Healthy Holly to file with the IRS a 2016 IRS Form 1099 to report $64,325 in payments that year to BROWN's company, GBJ Consulting.

7.     For tax year 2016, BROWN filed a Schedule C for GBJ Consulting to report $64,325 in gross receipts for services purportedly provided to Healthy Holly.

8.   Under Maryland law, the maximum contribution that any one person or entity can contribute to a single candidate in an election cycle is $6,000.  MD ELECTION LAW § 13-226(b)(1).  Furthermore, it is illegal to make a campaign contribution to a candidate in someone else's name, commonly referred to as a straw donation.  MD ELECTION LAW § 13-602(a)(5).

9.   On or about the following the dates, **PUGH** issued Healthy Holly checks payable to BROWN for the purpose of funding straw donations to the Committee to Elect Catherine Pugh.

| DATE OF HEALTHY HOLLY CHECK | AMOUNT OF HEALTHY HOLLY CHECK |
|---|---|
| January 11, 2016 | $3,025 |
| January 13, 2016 | $6,000 |
| January 13, 2016 | $6,000 |
| February 29, 2016 | $7,500 |
| March 9, 2016 | $10,000 |
| April 11, 2016 | $9,800 |

10.   None of the foregoing checks issued to BROWN were deposited into a bank account.  Instead, BROWN went to the bank where Healthy Holly's account was located and cashed the checks at the teller's window.   BROWN then used the untraceable cash to fund money orders, debit cards and personal checks in the names of straw donors totaling approximately $35,800.  The straw donations purchased with the cash were then deposited into the bank account for the Committee to Elect Catherine Pugh.

11.   Beginning in or about September 2016, and despite state authorities questioning the source of the funds for the straw donations, **PUGH** and BROWN continued the cashing-out scheme to maintain the pretense of a legitimate business relationship between BROWN and Healthy Holly.  **PUGH** issued more Healthy Holly checks to BROWN who, in turn, created false

23

invoices to correspond to those payments.   BROWN took the checks to the bank where Healthy Holly's account was located and cashed the checks at the teller's window.   BROWN gave the untraceable cash to **PUGH**.   In total, BROWN and **PUGH** cashed out approximately $62,100 of Healthy Holly checks, all of which went to **PUGH** or straw donors.

12.     On or about January 11, 2017, BROWN was charged with, and ultimately convicted of, violating Maryland's election laws for funneling $18,000 of the above-described straw donations to **PUGH's** campaign.   After BROWN was charged, the Committee to Elect Catherine Pugh issued five checks in the names of three of the straw donors.   The memo line on each of the checks stated "returned contribution."   However, none of the persons in whose names the donations had been made received any of the returned money.   Instead, **PUGH** instructed BROWN to use the money to pay for his legal defense in the pending state election-law prosecution, a case that had legal implications for **PUGH**.   Pursuant to **PUGH's** request, BROWN arranged to have the five checks cashed, then used the money to fund multiple payments to his attorneys totaling approximately $18,000.   BROWN did not cooperate with investigative authorities in the state prosecution, and state authorities were unable to identify Healthy Holly as the source of the funds for the straw donations.

## The Conspiracy Charge

13.     From in or about December 2015 through in or about October 2018, in the District of Maryland and elsewhere, the defendant,

### CATHERINE ELIZABETH PUGH,

did knowingly and willfully conspire, combine, confederate, and agree with BROWN to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of income taxes.

### The Purpose of the Conspiracy

14.     The purpose of the conspiracy to defraud the United States was to evade the assessment of taxes for income generated from the sale of Healthy Holly books and to financially enrich **PUGH** and BROWN.

### Manner and Means of the Conspiracy

It was part of the conspiracy to defraud that:

15.     **PUGH** and BROWN created the pretense of an ongoing business relationship between Healthy Holly and GBJ Consulting in order to conceal from the IRS the fact that **PUGH** created false business expenses to offset the income she received from the sale of books;

16.     **PUGH** issued Healthy Holly checks to BROWN even though neither BROWN nor GBJ Consulting provided any services or products to Healthy Holly;

17.     BROWN converted the Healthy Holly checks into cash to make the funds untraceable;

18.     **PUGH** and BROWN coordinated the expenditure of the Healthy Holly funds on matters unrelated to any legitimate business endeavors between GBJ Consulting and Healthy Holly, including paying for fraudulent campaign donations;

19.     To support the pretense of the deductibility of the checks as business expenses, BROWN, at **PUGH's** request, created a fake GBJ Consulting billing statement and backdated invoices;

20.     **PUGH** and BROWN told an accountant hired to prepare **PUGH's** 2016 income tax return that the checks written to BROWN from the Healthy Holly bank account were payments for services provided by GBJ Consulting to Healthy Holly;

21.     To further support the pretense of the deductibility of the checks as business expenses, **PUGH** caused the issuance of a 2016 IRS Form 1099 - Miscellaneous Income, to falsely

report to the IRS payments made to GBJ Consulting for services related to Healthy Holly's publishing business;

22. **PUGH** filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016, including a Schedule C for Healthy Holly, LLC, that falsely reported the Healthy Holly payments to GBJ Consulting as expenses for "Outside Services," which substantially reduced the income tax due and owing by **PUGH**;

23. To bolster **PUGH's** fraudulent deduction of Healthy Holly business expenses for "Outside Services" on her 2016 income tax return, BROWN filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016, including a Schedule C for GBJ Consulting, that falsely reported the Healthy Holly payments as business income;

24. To avoid paying income taxes on the fictitious business income that BROWN claimed GBJ Consulting received from Healthy Holly, BROWN deducted fictitious business expenses on GBJ Consulting's 2016 Schedule C in an amount that exceeded the falsely reported business income, thereby creating a nontaxable, net business loss; and

25. To substantiate the deduction of the fictitious GBJ Consulting business expenses that BROWN claimed on his 2016 income tax return, BROWN issued fraudulent Form 1099s in the names of various individuals who had never worked for BROWN's company.

### Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts were committed in the District of Maryland, and elsewhere:

26. On or about the dates set forth below, **PUGH** deposited into Healthy Holly's bank account the following checks payable to Healthy Holly for the purported sale of children's books:

| DATE OF DEPOSIT | AMOUNT OF CHECK |
|---|---|
| February 1, 2016 | $25,000 |
| March 9, 2016 | $50,000 |
| September 19, 2016 | $25,000 |
| October 17, 2016 | $100,000 |
| November 9, 2016 | $100,000 |
| December 28, 2016 | $45,000 |

27.     On or about the dates set forth in paragraph 9, among others, **PUGH** issued checks to BROWN from the Healthy Holly bank account.

28.     On or about the dates set forth in paragraph 9, among others, BROWN cashed Healthy Holly checks made payable to him.

29.     In or about September 2016, **PUGH** and BROWN advised **PUGH's** tax preparer that the Healthy Holly checks issued to BROWN related to work provided by BROWN's company, GBJ Consulting.

30.     In or about February 2017, **PUGH** issued and caused to be issued to BROWN an IRS Form-MISC 1099 to report $64,325 of Healthy Holly payments to GBJ Consulting. The form was sent to the IRS and BROWN.

31.     On or about March 1, 2017, BROWN filed a 2016 Income Tax Return Form 1040, Schedule C that reported gross receipts for GBJ Consulting of $64,325 and total expenses of $68,160, resulting in a loss of $3,835.

32.     On or about March 19, 2018, **PUGH** filed a 2016 Income Tax Return Form 1040, Schedule C that reported total expenses of $79,745 for "Outside Services," of which $64,325 was paid to GBJ Consulting.

18 U.S.C. § 371

## COUNT TEN

### (Tax Evasion - 2016)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 14 of Count One, and paragraphs 2 through 12, and 15 through 32 of Count Nine, are realleged and incorporated by reference as though fully set forth in this Count.

2.      From on or about January 1, 2016 through on or about March 19, 2018, in the District of Maryland and elsewhere, the defendant,

### CATHERINE ELIZABETH PUGH,

did willfully attempt to evade and defeat a large part of the income tax due and owing by her to the United States of America for calendar year 2016 by committing the following affirmative acts, among others:

a.      prepared and caused to be prepared, and signed and caused to be signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service.   In that false income tax return, **PUGH** stated on line 43 that her taxable income for the calendar year was the sum of $31,020, and that the amount of tax due and owing thereon as stated on line 47 was the sum of $4,168.   In fact, as **PUGH** then and there knew, her taxable income for the calendar year was approximately $322,365, upon which taxable income there was owing to the United States of America an income tax of approximately $102,444;

b.      wrote checks to BROWN to create false business expenses for purported outside services performed for Healthy Holly;

c.      issued and caused to be issued an IRS Form 1099 to GBJ Consulting, LLC, that misrepresented the purpose of the Healthy Holly checks issued to BROWN;

d.      advised her tax preparer that a $100,000 check from a book purchaser was a loan and, thus, not reportable as taxable income;

e.      advised her tax preparer that a $45,000 check from the Charity for book sales was a loan repayment and, thus, not reportable as taxable income;

f.      provided her tax preparer with a total cost for printing and graphic expenses for Healthy Holly of $80,782 when, in truth and fact, the total cost was $1,250, thereby fraudulently overstating the total cost by approximately $79,532; and

g.      provided her tax preparer with a total cost for outside services to Healthy Holly of $79,745 when, in truth and fact, the total cost was fraudulently overstated by approximately $64,325, the amount Healthy Holly purportedly paid to GBJ Consulting.


26 U.S.C. § 7201

## **COUNT ELEVEN**

### **(Tax Evasion - 2015)**

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 14 of Count One, and paragraphs 2 through 12 and 15 through 32 of Count Nine, are realleged and incorporated by reference as though fully set forth in this Count.

2. From on or about January 1, 2015 through on or about December 4, 2016, in the District of Maryland and elsewhere, the defendant,

### **CATHERINE ELIZABETH PUGH,**

did willfully attempt to evade and defeat a large part of the income tax due and owing by her to the United States of America for calendar year 2015 by committing the following affirmative acts, among others:

      a. prepared and caused to be prepared, and signed and caused to be signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service. In that false income tax return, **PUGH** stated on line 43 that her taxable income for the calendar year was the sum of $39,001, and that the amount of tax due and owing thereon as stated on line 47 was the sum of $5,550. In fact, as **PUGH** then and there knew, her taxable income for the calendar year was approximately $76,175, upon which taxable income there was owing to the United States of America an income tax of approximately $14,940; and

      b. concealed from her tax preparer the receipt of a $100,000 check from a book purchaser by not depositing the check into Healthy Holly's bank account, and, instead, cashing the check at a bank teller window, depositing only $60,000 of the cash into the Healthy Holly account,

31

and then using the balance of $40,000 in cash to pay down the outstanding balances of a personal credit card and a home equity line of credit.

26 U.S.C. § 7201

## FORFEITURE ALLEGATIONS

The Grand Jury for the District of Maryland further finds that:

1.      The allegations contained in Count One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence.

3.      Upon conviction of the offense in violation of Title 18, United States Code, Sections 1343 and 1349 set forth in Counts One through Eight of this Indictment, the defendant,

### CATHERINE ELIZABETH PUGH,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.   The property to be forfeited includes, but is not limited to, the following:

a.      All title, rights and interest in the house and real property located at 3413 Ellamont Road, Baltimore, MD, 21215, and

a.      A sum of money equal to the value of the property obtained by the scheme to defraud, which amount is at least $769,688.

4.      If any of the property described above, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

  e.  has been commingled with other property which cannot be divided without

    difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section

2461(c), up to the value of the forfeitable property described above.


18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853

Robert K. Hur
United States Attorney
District of Maryland


A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson         Date  11/14/19