FILED ENTERED
LOGGED RECEIVED

NOV 21 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY DEPUTY

## Attachment A - Stipulation of Facts

**The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have called witnesses and introduced other evidence to prove the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.**

From approximately 2007 until 2016, the defendant, Catherine Elizabeth Pugh ("PUGH"), was a senator in the Maryland State Senate where she served on various legislative committees, including the Senate Health Committee. PUGH won her seat in the Senate after elections held in 2010 and 2014. In 2011, PUGH campaigned to become the mayor of Baltimore City, but lost in the primary election on September 13, 2011. In September 2015, PUGH announced her intention to run again for mayor of Baltimore City. After winning the primary election on April 26, 2016, and the general election on November 8, 2016, PUGH assumed the position of mayor of Baltimore City on December 6, 2016.

PUGH was the sole owner of Healthy Holly, LLC ("Healthy Holly"), a company formed in Maryland on January 14, 2011. PUGH used the company to publish and sell children's books that she had written. Healthy Holly's principal business address was PUGH's residence in Baltimore, Maryland.

On or about the following dates, Healthy Holly published four illustrated children's books: (1) June 21, 2011, Healthy Holly: Exercising is Fun; (2) March 8, 2013, Healthy Holly: A Healthy Start for Herbie; (3) August 25, 2015, Healthy Holly: Fruits Come in Colors Like the Rainbow; and (4) August 18, 2017, Healthy Holly: Vegetables are not just Green. The cover of each book listed "Catherine Pugh" as the author. The overwhelming number of books published by Healthy Holly were not sold through retail or wholesale vendors; rather, they were marketed and sold directly to non-profit organizations and foundations, many of whom did business or attempted to do business with Maryland state government and Baltimore City.

Catherine E. Pugh and Company, Inc. (the "Pugh Company"), was a marketing and public relations consulting company organized in Maryland in 1997. PUGH was the sole proprietor of the business, and its principal address was her residence in Baltimore, Maryland.

PUGH was the sole signatory on Healthy Holly's bank account ending in 8269 and the Pugh Company's bank account ending in 1653. PUGH did not maintain a personal bank account, choosing instead to commingle her personal and business finances in her business accounts.

PUGH filed U.S. Individual Income Tax Returns, on Form 1040, for tax years 2015 and 2016, which included Internal Revenue Service ("IRS") Form Schedule C, Profit or Loss From a Business (Sole Proprietorship). PUGH used Form Schedule C to calculate the net taxable business income she received from Healthy Holly during those years.

From approximately September 2011 until December 2016, Gary Brown, Jr. ("BROWN"), worked as a legislative aide to PUGH. BROWN actively campaigned for PUGH's reelection to the State Senate in 2014.

BROWN served as PUGH's campaign aide during her 2016 mayoral election campaign. Following PUGH's election and inauguration as mayor of Baltimore City in December 2016, BROWN was hired as the Deputy Director of Special Events in the mayor's office. BROWN and PUGH had offices on the same floor in City Hall. In December 2016, the Maryland Democratic Central Committee nominated BROWN to fill a vacancy in the Maryland House of Delegates created by PUGH's mayoral victory. However, BROWN never served in that position because the Governor withdrew his nomination after BROWN was indicted for election law violations in January 2017.

BROWN was the sole owner and operator of Stricker Abstracting, LLC, and GB Abstracting, LLC, both Maryland companies that purported to be title-abstracting businesses, and GBJ Consulting, LLC, a Maryland consulting business. BROWN ran all three companies from his residences in Baltimore. BROWN also freelanced as a tax return preparer.

Between approximately March 2011 until March 2019, BROWN helped PUGH promote and sell the Healthy Holly books. While PUGH paid an illustrator and a graphic artist to help publish her books, PUGH and BROWN were the only people who organized the sale and distribution of the books. As the company's Chief Operating Officer, BROWN oversaw the transportation and storage of the books, drafted invoices, and corresponded with purchasers. Much of BROWN's work on behalf of Healthy Holly occurred during work hours while serving as PUGH's legislative aide and mayoral staff member. BROWN was not an employee of Healthy Holly and received no salary or compensation until approximately mid 2016 when he started to get sales commissions. None of his companies received compensation for services purportedly provided to Healthy Holly.

## I. Count One - The Scheme to Defraud Book Purchasers

From in or about November 2011 until in or about March 2019, BROWN and PUGH participated in a scheme to fraudulently sell and distribute tens of thousands of Healthy Holly books. Over that period, they executed the scheme in a variety of ways. First, PUGH and BROWN promised a certain number of books at a given price to a variety of purchasers and then kept the money and did not provide the books to the purchasers as promised. Second, they resold books that had been previously purchased and donated to the Baltimore City Public Schools.

### A. The Fraudulent Conversion of Books Sold to the University of Maryland Medical System

#### 1. The Printing and Sale of Book One

In or about December 2010, PUGH negotiated the sale of 20,000 Healthy Holly books for $100,000 to the University of Maryland Medical System ("UMMS"), a nonprofit healthcare organization based in Maryland. The book was titled *Healthy Holly: Exercising is Fun* ("Book One"). At PUGH's suggestion, UMMS agreed to buy Book One on the condition that the purchase be on behalf of, and for distribution to, school children in the Baltimore City Public School system ("BCPS"). The purchase was also contingent on PUGH delivering the donated books to BCPS. UMMS decided to purchase the book, in part, to further the mission of its community outreach program.

In or about January 2011, PUGH approached the Chief Executive Officer ("CEO") for BCPS about accepting the donation of Book One from UMMS. The CEO agreed to accept the books, but first had members of his staff copy-edit the book. They identified various grammatical and spelling errors for PUGH to correct. Ultimately, the CEO decided not to include the book in BCPS's curriculum; instead, he authorized giving a copy of the book to all age-appropriate students for them to take home. PUGH helped arrange a letter of agreement between UMMS and BCPS regarding the purchase and donation of Book One.

On or about February 17, 2011 and March 10, 2011, PUGH accepted two $50,000 checks from UMMS for the sale of Book One. The checks were deposited into a bank account. On or about May 10, 2011, BROWN sent an email to UMMS stating, "please find attached the corrected invoice." On or about March 2, 2011 and June 2, 2011, PUGH paid a printing company a total of $13,480 to print and deliver 22,110 copies of Book One, which was the only edition of Book One ever printed.

PUGH made arrangements to have approximately 20,020 copies of Book One delivered to the headquarters for BCPS located at 200 E. North Ave., Baltimore, MD, and another 2,090 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, MD. On or about June 6, 2011, the 20,020 copies of Book One were delivered to the mail room at 200 E. North Avenue, Baltimore, MD. Pending a determination about how best to deliver the books to the students, BCPS employees moved the books to a warehouse used by BCPS, which was located at 5300 Pulaski Highway, Baltimore, MD ("City Warehouse").

Beginning in or about October 2011, PUGH and/or BROWN arranged for thousands of copies of Book One to be removed from the City Warehouse for resale to various organizations. Sometimes BROWN enlisted the help of other City employees to remove and transport the books. On other occasions, PUGH paid associates of BROWN to remove and transport the books. PUGH and BROWN arranged for the books to be delivered and stored at various locations in Baltimore City, including her residence in Baltimore City; her state legislative offices in Annapolis and Baltimore City; her mayoral office at City Hall; at BROWN's office in City Hall; the War Memorial building in Baltimore City; PUGH's campaign office on N. Charles Street in Baltimore; a public storage locker used by the mayoral campaign; PUGH's personal and governmental vehicles; and vehicles belonging to BROWN and other members of PUGH's staff. BROWN oversaw the logistics of storing, accessing, transporting, and delivering the books. Neither UMMS nor BCPS authorized the resale of Book One to other organizations.

**2. The Fraudulent Delivery of Book Two to PUGH's Legislative Office**

On or about August 22, 2012, PUGH negotiated the sale of 20,000 more Healthy Holly books to UMMS for $100,000. The title of the second book was *Healthy Holly: A Healthy Start for Herbie* ("Book Two"). As with the first purchase, UMMS agreed to buy Book Two on behalf of, and for distribution to, school children in BCPS. The purchase of Book Two was also contingent on PUGH delivering the donated books to BCPS for distribution to the students. During discussions with UMMS about the sale of Book Two, PUGH failed to disclose the fact that Book One had not been distributed to BCPS students in accordance with the terms of its purchase.

In or about August of 2012, the CEO for BCPS agreed to accept UMMS's donation of 20,000 copies of Book Two. The CEO had members of his staff copy-edit the book to correct various grammatical and spelling errors. The CEO decided to give a copy of the non-instructional

book to all age-appropriate students for them to take home. PUGH helped arrange a letter of agreement between UMMS and BCPS regarding the donation of Book Two.

On or about August 22, 2012, BROWN drafted and sent an invoice to UMMS. On or about November 6, 2012, UMMS gave PUGH a $100,000 check payable to Healthy Holly for the purchase of 20,000 copies of Book Two. PUGH deposited the check into Healthy Holly's bank account on November 19, 2012.

On or about December 12, 2012, PUGH sent an email from cepughco@aol.com with instructions to the printer about how to split up the order, stating, "Let's make that 18500 [for the] schools and 1500 [for] Me."

On or about December 19, 2012 and March 20, 2013, PUGH issued two Healthy Holly checks to a printing company totaling $14,325 to print and deliver 20,100 copies of Book Two, which was the only edition of Book Two ever printed. PUGH made arrangements to have 18,600 copies of the books delivered BCPS headquarters at 200 E. North Ave., Baltimore, MD, and another 1,500 of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, MD. The books were distributed to the respective locations on or about March 19 and 28, 2013. The books delivered to BCPS were stored at the City Warehouse.

UMMS had no knowledge that PUGH had delivered 1,400 of its copies of Book Two to her legislative office instead of giving them to BCPS. In so doing, PUGH unlawfully converted 1,400 copies to her own personal use without the consent of UMMS or BCPS.

### 3. The Fraudulent Delivery of Book Three to PUGH's Legislative Office

On or about January 24, 2015, PUGH negotiated the sale of 20,000 more Healthy Holly books to UMMS for $100,000. The title of the third book was *Healthy Holly: Fruits Come in Colors Like the Rainbow* ("Book Three"). As with the first two purchases, UMMS agreed to buy Book Three on behalf of, and for distribution to, school children in BCPS, and PUGH agreed to deliver them. During discussions with UMMS about the sale of Book Three, PUGH failed to disclose the fact that Books One and Two were not distributed to BCPS students in accordance with the terms of those purchases.

On or about January 26, 2015, BROWN sent an email with an attached invoice to UMMS noting that the invoice was "for the purchase of [Book Three] for the Baltimore City Public School System." On or about March 18, 2015, UMMS gave PUGH a $100,000 check payable to Healthy

Holly for the purchase of Book Three. PUGH negotiated the check on April 23, 2015, and deposited most of the proceeds of the sale into Healthy Holly's bank account.

On or about June 5, 2015 and October 2, 2015, PUGH paid a printing company a total of $15,275 to print and deliver 21,000 copies of Book Three, which was the only edition of Book Three ever printed. PUGH and BROWN made arrangements to have 19,500 copies of the books delivered to BCPS headquarters at 200 E. North Ave., Baltimore, MD, and another 1,500 copies of the books delivered to "Senator Catherine E. Pugh" at her legislative office located at 2901 Druid Park Drive, Suite 200C, Baltimore, MD. The books were distributed to the respective locations on or about August 25, 2015. The books delivered to BCPS were stored at the City Warehouse.

UMMS had no knowledge that PUGH had delivered 500 copies of its Book Three to her legislative office instead of giving them to BCPS. In so doing, PUGH unlawfully converted 500 copies of Book Three to her own personal use without the consent of UMMS or BCPS.

**B. The Fraudulent Resale of Books One, Two, and Three to Other Purchasers**

Beginning in or about October 2011, PUGH began selling to unwitting purchasers copies of Healthy Holly Books One, Two and Three, which had already been sold to UMMS and donated to BCPS. To that end, PUGH used Associated Black Charities, a Baltimore-based public charity ("Charity"), to facilitate the resale and distribution of the books to new purchasers. The new purchasers entered into an agreement with PUGH whereby they agreed to buy Healthy Holly books through the Charity to support a worthy cause. Neither the Charity nor the new purchasers knew that PUGH was double selling the books.

Pursuant to the Charity's agreement with PUGH, the Charity kept a percentage of the purchase price paid by the new purchasers, and forwarded the balance to PUGH. PUGH then had copies of the books delivered to the Charity, which, in turn, agreed to deliver the books to a worthwhile children's program on behalf of the new purchasers. BROWN facilitated the delivery of the books from either the City Warehouse or PUGH's legislative offices.

**1. The Resale of Book One to CareFirst**

On or about October 7, 2011, PUGH discussed the sale of Healthy Holly books with CareFirst, a nonprofit healthcare insurer based in the Baltimore-Washington, DC, area. As part of its community outreach program, CareFirst agreed to buy the books through the Charity for $7,000.

However, PUGH falsely represented to the Charity that CareFirst had agreed that she, PUGH, would receive $6,000 of the $7,000 donation, when CareFirst had made no such agreement. On or about October 24, 2011, CareFirst sent the Charity a check for $7,000. The Charity retained $1,000 of the payment and forwarded $6,000 to PUGH, which PUGH used to pay down a home equity line of credit. To fill the book order, on or about November 27, 2011, PUGH took 1,000 copies of Book One from the shipment of books that UMMS had purchased and donated to BCPS in June 2011. Neither UMMS nor BCPS authorized the fraudulent resale of those books to Carefirst. BROWN delivered the 1,000 copies of Book One to the Charity, which, in turn, delivered them to daycare centers.

On or about November 10, 2016, BROWN emailed CareFirst to solicit the purchase of "an additional 1000 Healthy Holly Books." CareFirst responded by asking BROWN to contact the Charity about submitting a formal request through its online application system and noting that it was "late in the year . . . [and] it may not be able to accommodate 1,000 books."

On or about April 5, 2017, BROWN emailed the Charity to determine if it had contacted CareFirst about buying additional books. The Charity advised BROWN that it had not and did not pursue the donation further.

**2. The Resale of Book Two to the Maryland Automobile Insurance Fund**

On or about August 27, 2013, PUGH called the President and CEO of the Charity to say that three organizations had agreed to purchase copies of PUGH's "second children's book." PUGH told the Charity that CareFirst had agreed to buy 1,000 copies; the Maryland Automobile Insurance Fund ("MAIF") had agreed to buy 1,000 copies; and a Chicago investment firm had agreed to purchase 400 copies.

On or about August 29, 2013, PUGH texted the Charity's CEO to confirm that MAIF would be sending a check to the Charity to buy "one thousans [sic] books." PUGH also confirmed that the Charity would "deduct $1,000" from the payment for itself and the balance would be given to PUGH via a check payable to Healthy Holly, which she would "pick up." Ultimately, MAIF paid the Charity $5,000 as a "charitable donation" for the purchase of only 556 copies of Book Two. The Charity kept $552 of the payment and gave PUGH the balance via a check for $4,448 payable to Healthy Holly, which PUGH deposited into Healthy Holly's bank account on October 4, 2013.

PUGH advised the Charity that she would deliver MAIF's books to daycare centers instead of having the Charity do it. However, the only source of 1,000 copies of Book Two to fill that order was the shipment of Book Two that UMMS had purchased and donated to BCPS in March 2013. Neither UMMS nor BCPS authorized the fraudulent resale of those books to MAIF.

**3. The Resale of Books One and Two to Ariel Investments**

On or about August 6, 2013, a member of PUGH's legislative staff helped coordinate the sale of 400 Healthy Holly books to Ariel Investments ("Ariel"), a Chicago-based investment firm. Ariel was a co-sponsor of the 2013 Black Corporate Director's Conference held on September 6-8, 2013, in Laguna Beach, CA. Ariel wanted to include a copy of the books in its "swag" gift bag to be handed out to conference attendees. PUGH told Ariel to order the books through the Charity's CEO.

On or about August 12, 2013, PUGH arranged for the delivery of 400 Healthy Books to Ariel, which included 200 copies of Book One and 200 copies of Book Two. A member of PUGH's legislative staff sent confirmation of the shipment to Ariel via email account "Catherine.Pugh@senate.state.md.us." A copy of each book, valued at $9 per book, was included in the gift bags that were handed out at the conference. The conference agenda listed "State Senator Catherine E. Pugh" as one of the panelists. The conference sponsors paid PUGH's travel and lodging expenses totaling approximately $4,664.

On or about September 12, 2013, PUGH sent a Healthy Holly invoice to Ariel seeking payment for the shipped copies of "Healthy Holly: Exercising is Fun!" and "Healthy Holly: A Healthy Start For Herbie." The invoice directed all inquiries to BROWN and requested that a check be made payable to "[the Charity] Attn: Healthy Holly." On or about September 26, 2013, a legislative staff member sent an email to Ariel stating, "Senator Pugh wanted to get an update for the payment that will be going to [the Charity] for the books." On or about October 4, 2013, Ariel sent a check to the Charity for $3,680. On or about October 17, 2013, the Charity forwarded the full amount to PUGH via a check payable to Healthy Holly, which PUGH deposited into the company's bank account on October 24, 2013.

To fill the book order for Ariel, PUGH took 200 copies of Book One from the shipment of books that UMMS had donated to BCPS in June 2011, and 200 copies of Book Two from the shipment of books that UMMS had donated to BCPS in March 2013. Neither UMMS nor BCPS authorized the fraudulent resale of the books to Ariel.

**4. The Resale of Book Two to CareFirst**

On or about December 3, 2013, and consistent with what PUGH had told the Charity in August of that year, PUGH contacted CareFirst about purchasing 1,000 copies of Book Two through the Charity for $7,500. Like she did in 2011, PUGH falsely represented to the Charity that CareFirst had agreed that she, PUGH, would receive $6,500 of the $7,500 donation, when CareFirst had made no such agreement. On or about February 12, 2014, CareFirst issued a $7,500 check to the Charity to buy the books. The Charity kept $1,000 of the payment, and forwarded the balance of $6,500 to PUGH via a check made payable to Healthy Holly, which PUGH deposited into the company's bank account on March 26, 2014. BROWN delivered the 1,000 copies of Book Two to the Charity, which, in turn, delivered most of them to youth-related organizations.

To fill CareFirst's book order, PUGH took 1,000 copies of Book Two from the shipment of books that UMMS had donated to BCPS in March 2013. Neither UMMS nor BCPS authorized the fraudulent resale of those books to CareFirst.

**5. The Resale of Books One, Two, and Three to the Kaiser Foundation**

On or about December 17, 2015, PUGH discussed the sale of Healthy Holly Books with the Kaiser Foundation Health Plan, Inc. ("Kaiser"), a nonprofit healthcare foundation with offices in Maryland. Kaiser agreed to purchase the books as part of its community outreach program, which included giving away free literature at events that promoted healthy lifestyles. On or about December 22, 2015, BROWN emailed Kaiser a Healthy Holly invoice seeking $25,000 for 5,000 unspecified Healthy Holly books.

On January 8, 2016, BROWN sent Kaiser an email reminding the company of the outstanding balance due and stating, "I would like to set up the shipment of books." Kaiser sent PUGH a $25,000 check payable to Healthy Holly on January 21, 2016, which PUGH deposited into the company's bank account on February 1, 2016.

On or about June 27, 2016, BROWN emailed Kaiser another Healthy Holly invoice seeking $25,000 for 5,000 more unspecified Healthy Holly books. On or about September 1, 2016, BROWN sent an email requesting an "updated status" for the outstanding payment and asking "where will the books be going to." On or about September 13, 2016, Kaiser sent PUGH a $25,000 check payable to Healthy Holly, which PUGH deposited into the company's bank account on September 19, 2016.

To fill the foregoing book orders totaling 10,000 books, PUGH and BROWN took approximately 1,000 copies of Book One from the shipment of books that UMMS had donated to BCPS in June 2011; approximately 1,000 copies of Book Two from the shipment of books that UMMS had donated to BCPS in March 2013; and approximately 7,500 from the shipment of books that UMMS had donated to BCPS in August 2015. Neither UMMS nor the BCPS authorized the fraudulent resale of those books to Kaiser. BROWN delivered the books to Kaiser's offsite storage facility.

**C. False Promises to Induce Advance Payments for Books Never Delivered**

**1. The Non-Delivery of Book Two to MAIF**

In or about July 2012, PUGH negotiated the sale of 1,000 copies of Book Two to MAIF via the Charity for $7,500. On or about July 10, 2012, BROWN drafted the invoice for the books. On August 20, 2012, the Executive Director for MAIF sent an internal memo authorizing the purchase of the books via the Charity using funds from the company's charitable-distributions budget. However, on or about August 24, 2012, MAIF sent PUGH a $7,500 check made payable to Healthy Holly instead of the Charity. PUGH deposited the check into Healthy Holly's account on September 7, 2012. The Charity did not receive a percentage of the sale. In addition, neither the Charity nor MAIF ever received the 1,000 copies of Book Two for further distribution to a charitable cause.

**2. The Non-Delivery of Book Three to a Maryland Trust Fund**

On or about December 14, 2016, a trust fund based in Maryland (the "Fund'), sent the Charity a check for $50,000, which the Charity allocated for the purchase of 5,000 copies of Healthy Holly books. However, prior to the Charity receiving any money from the Fund, PUGH learned that the Fund had planned to give the $50,000 donation to the Charity, and PUGH falsely represented to the Charity that the purpose of the Fund's donation was to purchase Health Holly books. Specifically, PUGH told the Charity that the Fund had agreed that she, PUGH, would receive $45,000 of the $50,000 donation, when, in fact, the Fund had made no such agreement.

On or about December 22, 2016, BROWN emailed an invoice to the Charity requesting payment of $45,000 for an "assortment of books," which took into account the price of the books minus the Charity's fee of $5,000. In the email, BROWN stated that he could "come pick up the check when ready." On December 23, 2016, in reliance on PUGH's misrepresentation, the Charity

sent PUGH a $45,000 check payable to Healthy Holly, which PUGH deposited into the company's bank account on December 28, 2016.

PUGH delivered 500 copies of Book Three to the Charity, which the Charity then distributed to an affiliate office for further distribution to youth-related groups. In reference to the other 4,500 books purchased with the Fund's donation, the Charity requested an explanation from PUGH about how the books were going to be distributed to insure that the Fund's donation would be tax deductible. On February 1, 2017, BROWN sent the Charity a letter claiming that "Healthy Holly LLC will be delivering 5000 [copies of] Healthy Holly: Fruit [sic] Come in the Colors Like the Rainbow [Book Three] to the Baltimore City Public Schools." The letter noted that the books would be delivered to the City Warehouse so the school system could "distribut[e] the books to their students."

Despite depositing Purchaser E's $45,000 into Healthy Holly's bank account, PUGH never delivered 5,000 copies of Book Three to the City Warehouse for distribution to BCPS students. Instead, PUGH kept the money and did not print any more copies.

**3. The Non-Delivery of Books Four and Five to Kaiser**

On or about October 16, 2017, the Director of Community Health for Kaiser had a conversation with PUGH about obtaining copies of Book Four, titled *Healthy Holly: Vegetables are not just* (sic) *Green*, to hand out at various community events. That same day, members of PUGH's mayoral staff sent an email to the Director discussing how the company could get copies of the book. The email also discussed Kaiser's request to have PUGH attend the company's upcoming community events to sign her books and to conduct a reading. On or about October 16, 2017, BROWN sent an email to Kaiser seeking a chance "to discuss the continuation of our partnership with the purchase of the upcoming Healthy Holly book."

On or about October 31, 2017, BROWN sent Kaiser an email with an attached invoice seeking payment of $14,000 for 2,000 copies of Book Four. On or about November 24, 2017, Kaiser sent PUGH a check for $14,000 made payable to Healthy Holly, which PUGH deposited into the Healthy Holly bank account on November 30, 2017. However, PUGH and BROWN never delivered the 2,000 copies of Book Four to Kaiser. In addition, one year later, on or about October 22, 2018, BROWN emailed a new invoice to Kaiser seeking $25,000 for an unpublished Healthy Holly book to be titled *Healthy Holly: Walking with My Family is Fun* (Book Five). On or about November 20, 2018, not realizing that Book Four had not been delivered, Kaiser sent PUGH a

$25,000 ACH payment to Healthy Holly's bank account to pay for 4,000 copies of Book Five. PUGH and BROWN never delivered copies of Book Five to Kaiser.

**4. The Non-Delivery of Books Four and Five to UMMS**

On or about October 17, 2016, PUGH negotiated the sale of 20,000 copies of Book Four to UMMS for $100,000. During discussions with UMMS about the sale of Book Four, PUGH failed to disclose the fact that the first three books were not distributed to BCPS students in accordance with the terms of those purchases. PUGH and BROWN never told UMMS about the fraudulent acquisition and use of those books over the preceding five years, including the diversion of the books to PUGH's legislative offices, the use of the books as promotional and political giveaways, and the resale of thousands of books to new purchasers for PUGH's own financial gain.

On or about October 17, 2016, BROWN emailed UMMS an invoice for 20,000 copies of Book Four on behalf of BCPS. On or about November 3, 2016, UMMS sent PUGH a check for $100,000 payable to Healthy Holly for the purchase and delivery of 20,000 copies of Book Four. PUGH deposited the check into Healthy Holly's bank account on November 9, 2016, part of which PUGH used to purchase a new house on December 13, 2016. As of April 2019, PUGH and BROWN never delivered the 20,000 copies of Book Four for which Healthy Holly had been paid.

On or about September 12, 2018, PUGH approached UMMS about buying 20,000 copies of a new Healthy Holly book (Book Five) for $100,000. During those discussions, PUGH failed to disclose the fact that the first four books were not distributed to BCPS students in accordance with the terms of those purchases. On or about October 12, 2018, BROWN emailed UMMS an invoice for 20,000 copies of Book Five. On or about November 14, 2018, UMMS sent PUGH a check for $100,000 payable to Healthy Holly for the purchase and delivery of 20,000 copies of Book Four on behalf of BCPS. On or about November 27, 2018, PUGH deposited the check into Healthy Holly's account. PUGH and BROWN never delivered the 20,000 copies of Book Five for which Healthy Holly had been paid.

**5. The Non-Delivery of Books to Grant Capital Management**

In or about March 2016, approximately one month before the mayoral primary election, PUGH contacted J.P. Grant, the owner of Grant Capital Management ("GCM"), a Maryland-based financing company that did business with Baltimore City. GCM had purchased 2,000 copies of Book One back in 2011 for $14,000. PUGH told Grant that she needed to raise more money for

her campaign and she asked for Grant's help. PUGH explained to Grant that she had been making money by selling her Healthy Holly books to various organizations that donated the books to BCPS students. PUGH asked Grant for $50,000 to purchase books for BCPS students. Grant understood that PUGH would use the money to produce and distribute the Healthy Holly books, with the balance of the money going toward her mayoral campaign. Grant knew that providing money to PUGH's campaign via PUGH's company was a violation of Maryland's election laws.

On or about March 7, 2016, BROWN went to Grant's residence and picked up a check for $50,000 payable to Healthy Holly. BROWN delivered the check to PUGH, and she deposited it into Healthy Holly's bank account on March 9, 2016. However, PUGH never used any of those funds to print or deliver Healthy Holly books for BCPS students.

In or about October 2016, approximately one month before the general election, PUGH told Grant that she wanted to buy a larger house so she could entertain people when she became mayor. PUGH had a specific house in mind and took Grant to see it. PUGH also told Grant that she needed money in order to buy the house. Grant asked PUGH how he could help. As in March 2016, PUGH suggested that Grant write a check to Healthy Holly, this time for $100,000. However, PUGH failed to disclose the fact that none of the funds provided by Grant in March 2016 were used to print and deliver books to BCPS students.

On or about October 13, 2016, Grant wrote a check from GCM's bank account for $100,000 payable to "Healthy Holly" with the notation "book donation" in the memo line of the check. As in March 2016, Grant understood from PUGH's representations to him that PUGH would use the money to produce and distribute Healthy Holly books, with the balance of the money going toward the purchase of a new house. On or about October 17, 2016, PUGH deposited the check into Healthy Holly's bank account. However, PUGH never used any of those funds to print or deliver Healthy Holly books for BCPS students.

**D. Failure to Disclose Financial Interest in Healthy Holly, LLC**

During her tenure as an elected State Senator in the Maryland General Assembly, PUGH served on the Senate's Finance Committee and the Senate's Health Subcommittee. Under Maryland law, state senators are required to disclose their financial affairs by annually filing under oath a financial disclosure statement with the Maryland State Ethics Commission. While serving as a State Senator, PUGH knowingly failed to disclose on her financial disclosure statements her ownership interest in Healthy Holly, LLC, during calendar years 2011 through 2016.

## II. Count Nine – Conspiracy to Defraud the United States

### A. The Use of Healthy Holly Money to Fund Straw Donations

PUGH announced her intention to run for mayor of Baltimore in September 2015. As PUGH's campaign aide, BROWN helped organize events and track campaign donations to the Committee to Elect Catherine Pugh.

In or about January 2016, PUGH told BROWN that she wanted to increase the number of donors the campaign publicly reported supported her before the next regularly scheduled disclosure of campaign finance reports. PUGH believed that the mayoral candidate supported by the greatest number of donors would have the best chance of winning the primary election on April 26, 2016. PUGH further believed that if the voters learned that PUGH had injected her own money into the campaign, PUGH would appear desperate and that would hurt her election chances. As a result, PUGH decided to use money in Healthy Holly's business account to fund straw donations, which is a violation of Maryland's election laws. In other words, PUGH wanted to give certain individuals funds with the express understanding that these individuals would then donate the funds to PUGH's campaign. The funds included money received from book sales.

To that end, PUGH wrote checks payable to BROWN from the Healthy Holly bank account. Instead of depositing the checks into a bank account, BROWN took the checks to the bank where Healthy Holly's account was located and cashed them at the teller's window, thereby acquiring untraceable cash to fund the straw donations. BROWN used the untraceable cash to fund money orders, debit cards and personal checks in the names of straw donors. The straw donations funded through the cashing-out scheme were submitted to the Committee to Elect Catherine Pugh.

In furtherance of the scheme, PUGH issued the following checks to BROWN prior to the mayoral primary election:

| DATE OF HEALTHY HOLLY CHECK | AMOUNT OF HEALTHY HOLLY CHECK |
|---|---|
| January 11, 2016 | $3,025 |
| January 13, 2016 | $6,000 |
| January 13, 2016 | $6,000 |

| March 9, 2016 | $10,000 |
|---|---|
| April 11, 2016 | $9,800 |

BROWN used most of the foregoing funds to make straw donations totaling approximately $35,800. The balance of the cash not used for straw donations was returned to PUGH. The straw donations were submitted in the names of BROWN's and PUGH'S family members, friends, and associates, including PUGH'S senatorial administrative assistant. Most of the straw donors allowed BROWN to use their names to make the illegal contributions and provided him with their bank account numbers.

### B. The Pretense of a Business Relationship between Healthy Holly and GBJ Consulting

Beginning in or about September 2016, state authorities began to question the source of the funds for some of the straw donations. To backstop their scheme in case state authorities discovered that Healthy Holly was the funding source, PUGH continued to issue checks to BROWN throughout 2016 to create the pretense of a legitimate business relationship between BROWN and Healthy Holly. In furtherance of the pretense, PUGH and BROWN signed an independent contractor agreement between Healthy Holly and GBJ Consulting. In addition, at PUGH's request, BROWN created a business ledger that misrepresented the Healthy Holly checks as payments for promotional services rendered by BROWN's company, GB Consulting, LLC, on behalf of Healthy Holly. Also at PUGH'S urging, BROWN created bogus GB Consulting invoices and backdated them. BROWN continued cashing out the checks at the teller window at PUGH's bank, but, instead of funding more straw donations himself, he delivered the cash to PUGH. In total, BROWN and PUGH cashed out approximately $62,100 of Healthy Holly checks during 2016, all of which went to straw donors or to PUGH.

On or about January 11, 2017, BROWN was charged with, and ultimately convicted of, violating Maryland's election laws for funneling $18,000 of the above-described straw donations to PUGH's campaign. After the charges became public, the Committee to Elect Catherine Pugh issued five checks in the names of three of the straw donors. The memo line on each of the checks stated "returned contribution." However, none of the persons in whose names the donations had been made received any of the returned money. Instead, PUGH instructed BROWN to use the money to pay for his legal defense in the pending state election-law prosecution, a case that had

legal implications for PUGH. PUGH picked the law firm that BROWN hired, assuring him that he would be okay because the attorney there would take care of him.

Pursuant to PUGH's request, BROWN arranged to have the five checks cashed, then used the money to fund multiple payments to his attorneys totaling approximately $18,000. BROWN did not cooperate with investigative authorities in the state prosecution, and state authorities were unable to identify Healthy Holly as the source of the funds for the straw donations.

**C. Backstopping the Fictitious Business Relationship to Evade Taxes**

In addition to creating fake documents to backstop the fictitious business relationship between Healthy Holly and GBJ Consulting, PUGH and BROWN used the bogus relationship to defraud the IRS in 2016. More specifically, they coordinated the information contained in their respective companies' tax filings to falsely represent the Healthy Holly checks as deductible business expenses to reduce PUGH's tax liability.

PUGH and BROWN told an accountant hired to prepare PUGH'S 2016 income tax return that the checks written to BROWN from the Healthy Holly bank account were payments for services provided by GBJ Consulting to Healthy Holly. As a result, PUGH's accountant issued an IRS Form 1099 – Miscellaneous Income to report $64,325 in payments to BROWN as expenses incurred during the ordinary course of Healthy Holly's publishing business. The form was sent to both the IRS and BROWN.

The false expense of $64,325 was also reported on PUGH's U.S. Individual Income Tax Return, Form 1040, for tax year 2016. Specifically, the expense was included on PUGH'S Schedule C for Healthy Holly in the expense category for "outside services." Deducting the false expense substantially reduced the income tax due and owing by PUGH.

Consistent with PUGH's treatment of the false expense, BROWN filed a U.S. Individual Income Tax Return, Form 1040, for tax year 2016 that listed the $64,325 of Healthy Holly payments as business income on his Schedule C for GBJ Consulting. Reporting the fictitious income on his return meant that BROWN would have to pay income taxes on it. However, to avoid paying taxes, BROWN deducted fictitious business expenses on GBJ Consulting's 2016 Schedule C in an amount that exceeded the falsely reported business income, thereby creating a nontaxable, net business loss. The fictitious business expenses included fake labor expenses for nonexistent employees. To substantiate the deduction of those labor expenses, BROWN issued

fraudulent Form 1099s in the names of various individuals who had never worked for GBJ Consulting.

## III. Counts ~~Three~~ Ten and ~~Four~~ Eleven – Tax Evasion

### A. Tax Year 2016

The sales of Healthy Holly books and other sources of income in 2016 resulted in approximately $322,365 of taxable income for that tax year, on which an income tax of approximately $102,444 was owed to the United States Treasury. However, PUGH willfully and deliberately took affirmative steps to evade IRS's ascertainment of income taxes owed for 2016, including filing a false U.S. Individual Income Tax Return, on Form 1040 (inclusive of Schedule C for Healthy Holly), in which she stated on line 43 of that filing that her taxable income for the calendar year was only the sum of $31,020, and that the amount of tax due and owing thereon as stated on line 47 was $4,168.

Furthermore, prior to filing the foregoing false Form 1040 under the penalties of perjury, PUGH told her tax preparer that the total cost for printing and graphic expenses for Healthy Holly in 2016 was $80,782 when, in truth and fact, the total cost was only $1,250. PUGH overstated that expense by approximately $79,532, which the tax preparer then included on Healthy Holly's Schedule C.

PUGH also told her tax preparer that the total cost for outside services to Healthy Holly was $79,745 when, in truth and fact, she overstated the total cost by approximately $64,325, the amount that Healthy Holly purportedly paid to GBJ Consulting. As previously noted, GBJ Consulting did not perform any work for Healthy Holly. However, PUGH wrote checks to BROWN to create false business expenses for purported outside services, which resulted in the issuance of IRS Form 1099 to GBJ Consulting. Based on PUGH's and BROWN's false representations about an ongoing business relationship between Healthy Holly and GBJ Consulting, the tax preparer expensed the purported GBJ Consulting payments on Healthy Holly's Schedule C.

PUGH's intentional reliance on the foregoing fraudulent expenses reduced the amount of taxes she owed for 2016. She further evaded taxes that year by intentionally not reporting certain income Healthy Holly received from the sales of books that year. Specifically, she advised her tax preparer that a $100,000 check from a book purchaser was a loan and, thus, not reportable as taxable income, and that a $45,000 check from the Charity for book sales was a loan repayment to

her, PUGH, and, thus, not reportable as taxable income. The combined total of $145,000 in unreported sales receipts was not included on Healthy Holly's Schedule C as business income, thereby fraudulently reducing PUGH' tax liability even more.

**B. Tax Year 2015**

PUGH also took affirmative steps to evade the ascertainment of income taxes in 2015. PUGH prepared and caused to be prepared, and signed under the penalties of perjury, a false and fraudulent 2015 U.S. Individual Income Tax Return, on Form 1040, which was filed with the Internal Revenue Service. In that false income tax return, she stated on line 43 that her taxable income for the calendar year was $39,001, and that the amount of tax due and owing thereon as stated on line 47 was the sum of $5,550. In fact, but for the affirmative steps PUGH took to evade the payment of taxes that year, and as PUGH then and there knew, her taxable income for calendar year 2015 was approximately $76,175, upon which she owed an income tax of approximately $14,940.

To reduce her tax liability for 2015, PUGH intentionally provided false information about Healthy Holly's book sales. Specifically, PUGH concealed from her tax preparer the receipt of a $100,000 check from a book purchaser. She concealed the check by not depositing it into Healthy Holly's bank account so her tax preparer could account for it. Instead, PUGH cashed the check at a bank teller window, and then deposited only $60,000 of the cash into the Healthy Holly account. She used the balance of $40,000 in cash to pay down the outstanding balances on a personal credit card and a home equity line of credit. Consistent with PUGH's plan, her tax preparer never learned about the receipt of the $100,000 check, so the tax preparer only reported the $60,000 as business income on Healthy Holly's 2015 Schedule.

---

I have read this Statement of Facts and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. I do not wish to change any part of it.

11/19/19
Date

Catherine E. Pugh
Catherine Elizabeth Pugh

I am Catherine Elizabeth Pugh's attorney. I have carefully reviewed every part of this Statement of Facts with her. To my knowledge, her decision to sign it is an informed and voluntary one.

11/19/19
Date

Steven D. Silverman, Esq.