**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**CRIMINAL CASE NO. DKC-19-0541**

**UNITED STATES OF AMERICA,**

v.

**CATHERINE ELIZABETH PUGH,**

**Defendant.**

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

**Martin J. Clarke
Leo J. Wise
Assistant U.S. Attorneys
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4800**

## <u>TABLE OF CONTENTS</u>

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

        A.      Stipulation to Statement of Facts and
                Advisory Guideline Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     The Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

III.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        A.      The Defendant Engaged in a Multidimensional Scheme to
                Defraud that Spanned More Than Seven Years . . . . . . . . . . . . . . . . . . . .  4

                1.      The Fraudulent Sale and Dissipation of Book One . . . . . . . . . . . . . . . .  5
                2.      The Fraudulent Sale and Dissipation of Books Two and Three . . . . . . . .  7
                3.      False Promises to Print and Deliver Books . . . . . . . . . . . . . . . . . . . . .  8

        B.      The Defendant Corruptly Solicited Funds from Purchasers
                Doing Business with State and City Government . . . . . . . . . . . . . . . . . . . .  10

        C.      The Defendant Deliberately Misused Her Publishing Business
                to Gain a Political Advantage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

        D.      The Misuse of Government Resources to Execute the Fraud . . . . . . . . . . .  14

        E.      The Defendant Laundered Proceeds of the Scheme to Defraud
                through Her Publishing Business to Fund Straw Donations
                to Her Mayoral Campaign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        F.      The Solicitation of Illegal Campaign Contributions from
                a Book Purchaser . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

                1.      The $20,000 Check Payable to 2 Chic Boutique . . . . . . . . . . . . . . . . . . .  17
                2.      The $50,000 Check Payable to Healthy Holly . . . . . . . . . . . . . . . . . . . . .  18
                3.      The $100,000 Check Payable to Healthy Holly . . . . . . . . . . . . . . . . . . . .  19

        G.      The Fraud Perpetrated upon the IRS was Also Longstanding
                and Sophisticated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

                1.      Hiding the Income Generated by Healthy Holly Sales
                        in 2015 and 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
                2.      Filing a False Tax Return for 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
                3.      Filing of a False Tax Return for 2 Chic Boutique in 2016 . . . . . . . . . . . .  22

H.       The Use of a Philanthropic Message to Defraud . . . . . . . . . . . . . . . . . . . . . . 24

I.       The Cover-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

          1.       Pugh Paid for Gary Brown's Lawyers to Keep Him Quiet . . . . . . . 25
          2.       Orchestrated Lies to the Public . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                    a.       Statements to the Press . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
                    b.       False Statements on Financial Disclosure Forms . . . . . . . . . . . 29
          3.       Pugh's Attempt to Prevent the Seizure of Her Cell Phone . . . . . . . 30

IV.     Sentencing Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| V. | : | |
| | | CRIMINAL NO.  DKC-19-0541 |
| CATHERINE ELIZABETH PUGH, | : | |
| Defendant. | : | |
| | : | |

...oooOooo...

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its counsel, Robert K. Hur, United States Attorney for the District of Maryland, and Martin J. Clarke and Leo J. Wise, Assistant United States Attorneys for said district, hereby submits its Sentencing Memorandum in the above-captioned case.

## I.      Introduction

In February 2017, federal law enforcement agents initiated a criminal investigation of then-Mayor Catherine Pugh.  On November 14, 2019, a federal grand jury returned an eleven-count indictment.  ECF No. 1.  One week later, on November 21, 2019, pursuant to a plea agreement, Pugh pled guilty to four counts of the Indictment:  Count One, conspiracy to commit wire fraud, in violation of 18 U.S.C § 1349; Count Nine, conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; and Counts Ten and Eleven, tax evasion for years 2015 and 2016, respectively, in violation of 26 U.S.C. § 7201.  ECF No. 12.  Pugh's sentencing hearing is scheduled for February 27, 2020 at 10:00 a.m.

### A.      Stipulation to Statement of Facts and Advisory Guideline Range

Pursuant to the plea agreement, Pugh stipulated to facts the government would have proven beyond a reasonable doubt had the case proceeded to trial.  ECF 12, Att. A at 5.  Consistent with

those facts, Pugh also stipulated to the applicability of various sentencing factors set forth in the U.S. Sentencing Guidelines ("USSG"). *Id.* In accordance with the Guidelines' grouping rules for multiple offenses, the agreed upon sentencing guideline factors are set forth below.[1]

### Count One (conspiracy to commit wire fraud)

| | |
|---|---|
| Base offense level (USSG §§ 2B1.1(a)(1), 2X1.1(a)) | 7 |
| Upward adjustment for **loss resulting from the offense** (more than $250,000 but less than $500,000) (USSG § 2B1.1(b)(1)(G)) | +12 |
| Subtotal | 19 |
| Upward adjustment for **sophisticated means** (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Upward adjustment for **abuse of a position of public trust** (USSG. § 3B1.3) | +2 |
| Upward adjustment for **misrepresentation of actions on behalf of a charitable or educational organization** (U.S.S.G. § 2B1.1(b)(9)(A) | +2 |
| Grouping - **multiple count adjustment** (USSG | +1 |
| Subtotal | 26 |
| Downward adjustment for **timely acceptance of responsibility** (USSG 3E1.1(a) &(b)) | -3 |
| **Final adjusted offense level** | **23** |

The applicable guideline range for an offense level of 23 and a criminal history category of I is **46-57 months of imprisonment.** In accordance with the sentencing guidelines and the statutory considerations under 18 U.S.C. § 3553(a), the criminal conduct to which Pugh has pled

---

[1] The parties' calculation of the final adjusted offense level and applicable guideline range is in accord with the Presentence Investigation Report ("PSR") issued by U.S. Probation.

guilty warrants **a guideline-sentence of 57 months of imprisonment**. For the reasons set forth below, the maximum sentence within the applicable guideline range provides an adequate and just punishment for Pugh's longstanding pattern of criminal conduct and serves to deter other would-be corrupt politicians from breaching the public's trust.

## II.    The Law

A sentence must be both procedurally and substantively reasonable. *United States v. Blue*, 877 F.3d 513, 517 (4th Cir. 2017), citing *Gall v. United States*, 552 U.S. 38, 41 (2007). Reasonableness "is not measured simply by whether the sentence falls within the statutory range, but by whether the sentence was guided by the Sentencing Guidelines and by the provisions of § 3553(a)." *Blue*, 877 F. 3d. at 517, quoting *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). As the Fourth Circuit noted,

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence. If the court imposes a sentence outside the guideline range, it should explain its reason for doing so.

*Green*, 436 F.3d at 455–56, citing *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Pursuant to § 3553(a), the Court should "impose a sentence sufficient, but not greater than necessary" after considering all of the statutory sentencing factors. 18 U.S.C. § 3553(a). The sentencing factors the Court must consider are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3

(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

*Id.*

## III.    Argument

The facts establish that Pugh deliberately engaged in a broad range of criminal acts while serving as Maryland State Senator and Mayor of Baltimore City.  She used the stature of those elected offices to solicit fraudulent book sales that generated substantial revenue for her publishing business, part of which she used to influence her 2016 mayoral election campaign in violation of state election laws.  With the assistance of Gary Brown, her longtime legislative aide and campaign worker, Pugh methodically expanded her illegal scheme and managed to conceal it from state and federal authorities and, most important, the citizens she served.  In short, over the course of seven years, Pugh corruptly devised and executed a fraudulent scheme to exploit her public office for private gain.

### A.    The Defendant Engaged in a Multidimensional Scheme to Defraud that Spanned More Than Seven Years

The defendant's scheme to defraud is remarkable in both its scope and duration.  Unlike some convicted fraudsters, Pugh's decision to con book purchasers was not an impulsive one, nor the desperate act of someone facing financial ruin.  Rather, it was a well-considered business decision to achieve multiple ends.  First, converting the books to her own use provided an almost endless supply of free inventory that maximized the profit she made from double-selling the books.  Second, choosing not to fill certain book orders yielded nearly a 100% profit on certain

transactions.  Third, the free inventory of books provided an endless supply of giveaways that she handed out at campaign and government events, thereby simultaneously promoting herself as both an author of children's books and a worthy candidate for elected office.

Pugh had an undergraduate degree and a master's degree in business and marketing, so she understood the entrepreneurial costs of starting a for-profit publishing business.  Indeed, in approximately October 2011, about four months after 20,000 copies of UMMS's Book One were moved to the Baltimore City Public Schools (BCPS) Warehouse (BCPS) (hereafter the "City Warehouse"), Pugh noted the high cost of producing books in her 3-year Healthy Holly business plan.  Ex. 1 (Healthy Holly Company Overview).  She calculated that it would cost $180,000 just to produce the books, not including hundreds of thousands of dollars more to pay for "staff", "consulting services," "office exp[enses]" and "marketing."  *Id*.

At that time, Pugh's annual salary as a state senator, as well as the money she made through her small marketing business (Catherine E. Pugh and Company, Inc.), did not provide enough capital for her to pursue her entrepreneurial dream of running a successful publishing business.  Consequently, to lower her costs and jumpstart the business, Pugh decided to steal the books that had been donated to Baltimore City schoolchildren.

### 1.      The Fraudulent Sale and Dissipation of Book One

There was only one edition of Book One (*Exercising is Fun*), and Pugh only printed 2,110 copies for herself.  The remaining balance of 20,000 copies was sold to UMMS on behalf of BCPS.  Ex. 2 (Summary of Books Sold).  On June 10, 2011, Pugh's copies of Book One were delivered to her Senate legislative office on Druid Park Drive, Baltimore.  *Id*.  On October 6, 2011, four months later, essentially all of those books (2,000 copies) were sold to Grant Capital Management ("GCM") for $14,000.  *Id*.  Multiple witnesses confirm that those books were, in fact, delivered to

Associated Black Charities on behalf of GCM.  **Thus, as of October 6, 2011, Pugh had no inventory of Book One left**.

Nonetheless, the next day, on October 7, 2011, Pugh sold another 1,000 copies to CareFirst for $7,000.  *Id*.  A few months later, Pugh sold 110 copies to the Women Legislators of MD and 50 copies to the St. Mary's Auxiliary for $880 and $400, respectively.  *Id*.  In 2013, Pugh sold 200 copies to Ariel Investments for $1,840.  In 2015, she sold 990 copies to Kaiser Permanente for $4,950.  *Id*.  Pugh never attempted to print a second edition of Book One to fill any of those orders.  In sum, Pugh used 2,350 copies that belonged to BCPS to fill the foregoing orders and unlawfully pocket a total of **$15,070**.

Pugh's decision in October 2011 to begin converting BCPS's copies of Book One to her own personal use and financial gain did not involve just double-selling.  She also began the regular practice of using those books as free giveaways at campaign events, government functions, and school visits.  The use of a stolen children's book as a promotional product to increase name recognition during and in between political campaigns is particularly egregious.  To make sure she always had ready access to the books, witnesses recounted to investigators how Pugh regularly demanded that her legislative staff and campaign workers stock her legislative offices and government vehicles with copies of Book One.  The net effect over a seven-year period was the dissipation of virtually all 20,000 copies of Book One purchased by UMMS on behalf of BCPS.

Beginning in March 2019, federal agents searched for any remaining copies of the Healthy Holly book series.  No copies of Book One were located at the City Warehouse.  However, 1,742 copies were recovered from various locations associated with Pugh, including 1,619 copies in the custody of a moving company that had removed the books from Pugh's legislative office in

Baltimore; 22 copies from Afra Vance-White, a Pugh staff member; 16 copies from Pugh's residence; and 84 copies from BCPS school No. 237.  Ex. 3 (Summary of Disposition of Books).

The foregoing chronology establishes that, of the 20,000 copies of Book One purchased by UMMS for $100,000 and delivered to BCPS, 2,350 were double-sold to unsuspecting purchasers and 15,908 were dissipated via giveaways (including the 1,742 copies recovered from Pugh-related locations).

<h3 align="center">2.     The Fraudulent Sale and Dissipation of Books Two and Three</h3>

Pugh improved upon her fraudulent scheme when she convinced UMMS to donate Books Two and Three to BCPS.  When Pugh printed the only edition of Book Two (*Healthy Start for Herbie*) to fill UMMS's $100,000 order for 20,000 copies, **she printed a mere 100 additional copies for herself** (for a total of 20,100 copies).  Ex. 2.  She delivered 1,400 copies of UMMS's order directly to her legislative office in Baltimore so she could readily resell or use them.  The balance of 18,600 copies was stored at the City Warehouse.[2]  *Id*.  Notwithstanding never having more than 100 copies of Book Two in her company's inventory, she successfully sold 3,756 copies to four unsuspecting purchasers for **$26,840** during a 3-year period between August of 2012 and December 2015.  *Id*.

In April 2019, agents recovered 1,393 copies of Book Two from the following locations: 1,289 copies from a moving company that had moved the books from Pugh's legislative office in Baltimore; 21 copies from Afra Vance-White; and 81 copies from Pugh's residence.  The remaining 16,407 copies of Book Two were dissipated via giveaways.

When Pugh printed the only edition of Book Three (*Fruits Come in Colors Like the Rainbow*) to fill UMMS's $100,000 order for 20,000 copies, **Pugh only printed an extra 1,000**

---

[2] Pugh's fraudulent intent to double-sell Book Two was apparent from the outset.  In an email she sent to the printing company on December 12, 2012, she stated, "Let's make that 18500 [for the] schools and 1500 [for] me."

**copies for herself** (for a total of 21,000 copies).  Ex. 2.  However, she delivered 500 copies of UMMS's order directly to her legislative office in Baltimore so she could readily resell or use them as if they were her own, and the balance of 19,500 copies was stored at the City Warehouse.  *Id.* Notwithstanding never having more than 1,000 copies of Book Three in her company's inventory, she successfully sold 12,250 copies to unsuspecting purchasers for **$87,500** during a 1-year period between December 2015 and December 2016.  *Id.*

Agents recovered 881 copies of Book Three :  156 copies from a moving company that had moved the books from Pugh's legislative office; 21 copies from Afra Vance-White; 100 copies from Tanya Bailey (another staff member); 502 copies from Pugh's residence; and 100 copies from BCPS school No. 215.  Agents recovered 8,588 from the City Warehouse.  Pugh dissipated the remaining 2,531 copies of Book Three via giveaways.

### 3.    False Promises to Print and Deliver Books

Based on discussions Pugh had with the CEO for BCPS in January 2011 and August 2012, she knew that school administrators were not going to allow Books One and Two to be distributed as part of the curriculum.  Instead, BCPS agreed to include them with other take-home materials for students because they lacked sufficient educational value.  However, as the foregoing facts show, Pugh and Brown quickly realized that the school system had not adopted a plan to systematically distribute and account for the donated books stored at the City Warehouse.  As discussed above, they capitalized on that fact to execute the first two aspects of the scheme to defraud, *i.e.*, the resale and giveaway of thousands of donated books.  Because of the first two aspects of the scheme, agents found no copies of Books One or Two left at the City Warehouse when they searched it in April 2019, and only 8,588 copies of Book Three.

Pugh did not need access to an inventory of books for the third aspect of her scheme. Like other advance-fee scammers, she falsely promised to print and deliver books commensurate with what purchasers paid her, and then simply kept their money. Pugh misrepresented her intention to provide books to almost every major purchaser: MAIF, 2012 and 2013 (1,556 copies); the Trust Fund, 2016 (4,500 copies); UMMS, 2016 and 2018 (40,000 copies); GCM and JPG, 2016 (approximately 30,000 copies); and Kaiser, 2015, 2017 and 2018 (6,510 copies).

A good example of Pugh's intention not to fill an order was when UMMS paid her $100,000 for a donation of 20,000 copies of Book Four to BCPS on October 17, 2016. Ex. 2. Despite having received $100,000 (twice her legislative salary), Pugh never printed the 20,000 copies. Months later, Pugh sold 5,000 copies of Book Four to Kaiser for $25,000. Unlike with UMMS, however, Pugh contacted the printer and ordered Kaiser's 5,000 copies, which were delivered on August 16, 2017, directly to Kaiser's distribution center. *Id.* She also ordered an additional 5,000 copies for herself, which were delivered to Pugh. *Id.* Remarkably, Pugh deliberately chose not to use that opportunity to ask the printer to print the 20,000 copies of Book Four that she still owed UMMS. Unlike Kaiser, which had its own distribution center, UMMS had to rely on Pugh's promise to ship the books directly to BCPS. Pugh exploited the fact that she could get away with not printing UMMS's copies but had to print Kaiser's. In addition, about a year later (September 12, 2018), she deliberately solicited and deposited *another $100,000* from UMMS for Book Five without fulfilling UMMS's prior order for Book Four. *Id.* Ultimately, like she did with the advance fees from other purchasers, Pugh spent most of the $200,000 without printing either Book Four or Five for UMMS.

Overall, Pugh's personal inventory of Healthy Holly books never exceeded 8,216 copies. Yet, after employing all three dimensions of her scheme, she was able to resell 132,116 copies for a total of $859,960, and she dissipated another 34,846 copies via giveaways.[3]

### B.   The Defendant Corruptly Solicited Funds from Purchasers Doing Business with State and City Government

As a career politician, Pugh understood the importance of avoiding conflicts of interest with companies and organizations that did business or sought to do business with State and City government. The annual financial disclosure forms she filed while serving in office were a constant reminder of the legal and ethical prohibitions against using her elected positions to engage in self-dealing for personal gain.[4]

Despite her awareness of the importance of avoiding even the appearance of a conflict of interest, Pugh regularly pitched her Healthy Holly books to representatives of companies and organizations that had ongoing or pending government contracts. For example, the Board of Estimates for Baltimore City ("BOE") is responsible for awarding contracts and overseeing all purchases made by the City. The mayor is one of five voting members of the BOE. Therefore, the mayor has substantial authority over the outcome of the bidding process. According to the minutes of the BOE, both CareFirst and Kaiser were awarded multi-year, multi-million dollar contracts to provide HMO and PPO medical plans for City government employees. Some of the contracts were pending and awarded before Pugh took office, and some were awarded afterwards. CareFirst and Kaiser currently provide HMO and PPO medical services to City employees.

---

[3] It is difficult to assess the value of the dissipated books due to the lack of sales in the retail market. At the retail price of $9 per book set by Pugh, the estimated loss due to dissipation would be $313,614. More conservatively, the lowest price Pugh ever charged a purchaser was $5 per book, resulting in an estimated loss from dissipation of $174,230.

[4] Pugh signed and submitted financial disclosure statements annually to the Maryland State Ethics Commission and/or the Baltimore City Ethics Board.

Similarly, the BOE regularly awarded GCM (J. P. Grant's company) the Master Lease Agreement for Baltimore City in order to finance the purchase or rental of equipment and communications devices.   GCM has been awarded the Master Lease Agreement since approximately 2003, and the BOE voted again to award it to GCM as recently as 2018.

The BOE awarded Associated Black Charities hundreds of thousands of dollars to provide an array of services, including serving as a fiscal agent for City workforce development grants and HIV medical services.  ABC currently serves as a fiscal agent to oversee the disbursement of grants from the multi-million dollar Baltimore Children and Youth Fund.

The University of Maryland Medical System is one of the largest healthcare service providers in Maryland.  Healthcare legislation can have a significant impact on its business, especially matters under consideration by the Health Subcommittee for the State Senate's Finance Committee.  Pugh served as chairperson for that committee from 2013-16 while also serving as a member of the Board of Directors for UMMS.  UMMS is headquartered in Baltimore.  UMMS and related entities have been awarding funding by the BOE, such as $100,000 to UMMS's Shock Trauma Center to help fund a violence prevention program.

While there is no evidence that Pugh attempted to extort or solicit bribes from any of the foregoing companies or organizations, the fact that she repeatedly and almost exclusively targeted them suggests that Pugh leveraged the power of her elected office to corruptly solicit money from companies and organizations that might be beholden to her.  None of the purchasers knew about her books until Pugh brought up the subject.

Corporate book purchasers with an interest in obtaining or maintaining a government contract represented 93.6% of all Healthy Holly books or $805,000.  To be clear, none of those purchasers told investigators that they had purchased the books because they felt coerced or

11

threatened by Pugh. Indeed, many of them readily agreed to buy the books because the theme of the books supported the goals of their community outreach programs. Furthermore, as an African-American female politician and author, some of the purchasers viewed Pugh as a role model to communities the companies were trying to serve.

However, most of the purchasers candidly admitted that agreeing to buy books from a politician like Pugh in an arms-length transaction was also a good business decision. Pugh was an influential person who could play a role in awarding future contracts or vote on legislation that could affect their businesses. Agreeing to buy books that matched their corporate missions made more sense than dealing with the potential consequences of rejecting her solicitations. Many of the purchasers acknowledged that they probably would not have purchased the books if Pugh had not been the author. In other words, her political influence was a significant factor in their decision.[5]

### C.     The Defendant Deliberately Misused Her Publishing Business to Gain a Political Advantage

Pugh's pattern of publishing and marketing Healthy Holly books reflects a persistent and focused effort to use her publishing business for corrupt purposes, including attempts to gain a political advantage over other candidates and influence elections. What may have started as a small side business in 2011, quickly became a source for illegal funds to supplement Pugh's lifestyle as an elected official and support her political ambitions.

For example, book sales closely tracked the various electoral cycles in which Pugh participated. Primary and general elections for the Maryland State Senate took place on September 14, 2010 and November 2, 2010, respectively. It was around that same time that Pugh first

---

[5] Many of the corporate purchasers and their employees also contributed to Pugh's senatorial and mayoral campaigns.

approached UMMS and BCPS representatives about buying Book One.  After conferring with the parties, Pugh issued the first invoice to UMMS on December 21, 2010; the letter of agreement was signed by UMMS on January 12, 2011; and two days later Pugh filed the Articles of Incorporation for Healthy Holly, LLC.

By early 2011, Pugh had also decided to run for mayor of Baltimore in the fall of that year, and Gary Brown joined her political campaign.  Pugh ultimately lost the contested primary election on September 13, 2011.  However, in the months before the election, Pugh acquired $100,000 from UMMS for Book One, and she gained unfettered access to the 20,000 copies stored at the City Warehouse.  The books arrived at the warehouse on or about June 10, 2011, approximately three months before the election.  Before physically removing the books from the warehouse to use as free promotional material, she tried to get school administrators to include the books with other take-home materials for thousands of children of would-be voters, but that never happened.

Also around the time of the 2011 mayoral election, Pugh approached CareFirst, Grant Capital Management and Associated Black Charities about buying and distributing copies of Book One.  CareFirst and GCM combined paid $21,000 for 3,000 copies, which, as noted above, included the fraudulent resale of some of the books UMMS had purchased just months earlier.

Prior to winning the general election on November 2, 2014, which allowed Pugh to maintain her State Senate seat, she acquired $100,000 from UMMS for Book Two and she began using the 20,000 copies as if they were her own.  Also leading up to that election, Pugh received a total of $24,960 from various other purchasers for the fraudulent resale of 3,116 copies of Books One and Two.

Pugh's strategy to use her publishing business as cover for the scheme reached its peak in years 2015 and 2016 when she ran for mayor a second time.  She announced her candidacy in

September 2015, and won the primary and general elections on April 26, 2016 and November 8, 2016, respectively.  She took office on December 6, 2016.  The fraudulent sales of Books Three and Four to UMMS prior to that mayoral election provided Pugh with $200,000 from UMMS.  In addition, the ongoing double-selling of UMMS's books at the City Warehouse provided another $200,000, and the inventory of free giveaways increased by 20,000 copies with the delivery and storage of Book Three on August 25, 2015, one month before she formally announced her candidacy.   In total, during the year preceding her candidacy and the subsequent year of active campaigning, Pugh deposited $400,000 of illegal proceeds into Healthy Holly's bank account and oversaw the dissipation of thousands of donated books for her personal and political aggrandizement.  Setting aside for a moment the advantage she gained by funding the separate straw donor scheme, the significant resources generated by the Healthy Holly scheme leading up to the contested election unquestionably provided a huge financial advantage for Pugh.

The scheme's financial impact on Pugh's political advancement beginning in 2010 did not end with her mayoral victory in 2016.  Her new salary of approximately $184,000, which was almost four times higher than her State Senate salary, was not enough to dissuade her from continuing the scheme while occupying City Hall.  In the two years following the mayoral election, Pugh fraudulently sold UMMS, Kaiser, and the Frederick Frank Trust Fund a combined total of 31,000 copies of Books Three, Four, and Five for $189,000, copies that were never printed or delivered, and she continued to deplete copies of the first three books stored at the City Warehouse.

### D.    The Misuse of Government Resources to Execute the Fraud

Integral to Pugh's scheme to defraud was the misuse of valuable state and local government resources.  Information obtained from Pugh's legislative and mayoral staff members, as well as a review of Pugh's and Brown's emails and texts, show that Pugh used government employees to

conduct Healthy Holly business during work hours.  Employees working at the Statehouse and City Hall made phone calls and sent emails about the sale and delivery of books.  They contacted printing companies, discussed pending orders, sent invoices, and forwarded drafts of the books to the illustrator.

Government vehicles driven by government employees transported books to events, and Gary Brown made book deliveries during work hours.  Pallets of boxes containing thousands of books were stored at the City Warehouse over a seven-year period at no cost to Pugh or Healthy Holly.  Boxes of books used as giveaways were routinely stored at Pugh's legislative offices in Annapolis and Baltimore, and copies were on hand at City Hall.  The use of these government-owned resources to facilitate her crimes and grow her company's bank account is particularly disturbing.

In addition to the foregoing misappropriation of government resources, the diversion of Pugh's time and energy as a State Senator and Mayor was the biggest misuse of taxpayer's money. In effect, Pugh's legislative and mayoral offices in Annapolis and Baltimore served as Healthy Holly's primary place of business.  She used the stature of those offices to promote the books, and she used the resources assigned to those offices to help manage and execute her for-profit business. The time Pugh spent on the job machinating about how to profit financially and politically from the Healthy Holly fraud was time not spent on executing the important duties of her offices.  The resulting cost from the damage done to the public's trust through the corruption of her elected positions is incalculable.

> **E.** **The Defendant Laundered Proceeds of the Scheme to Defraud**
> **through her Publishing Business to Fund Straw Donations**
> **to Her Mayoral Campaign**

Healthy Holly, LLC, was not just a guise to generate illicit proceeds to maintain Pugh's lifestyle and support her political ambitions.  As summarized in the Stipulation of Facts, Pugh also used the business to launder some of those proceeds to secretly fund straw donations to the Campaign to Elect Catherine Pugh.  This is example of how Pugh's deliberateness and long term planning added yet another dimension to the Healthy Holly scam.

In late 2015, months before the all-important Democratic primary in April 2016, Pugh conspired with Gary Brown to gain an unfair advantage over her fellow mayoral candidates.  To influence the outcome of the election, they decided to use Pugh's money on deposit in Healthy Holly's business account to fraudulently inflate the amount of political contributions made to her campaign.  To that end, Pugh issued Healthy Holly checks to Brown, which he then converted into untraceable cash to fund contributions in the names of straw donors, a violation of Maryland's election laws. Ex. 4 (Checks Issued to Brown).  Between January and April 2016, Pugh and Brown cashed out six Healthy Holly checks to fund at least eleven straw campaign contributions totaling $35,800, each one a separate violation of state law.  Ex. 5 (Summary of Straw Donations).

To backstop their plan and justify the issuance of the checks, Pugh and Brown concocted the story that Brown was an independent contractor doing work for Healthy Holly.  To bolster that story and avoid scrutiny, they continued cashing out another $26,300 of Healthy Holly checks well after the primary election.  Ex. 4.  Brown gave that cash back to Pugh, but she did not redeposit it into the Healthy Holly account, which suggests the strong possibility that Pugh may have used that cash to make more campaign contributions through other straw donors not known to Brown or to reimburse contributions that had been made during the campaign.  In total, at least $62,100 of Healthy Holly deposits were used to fund or hide straw donations.  Ex. 5.

**F.**     **The Solicitation of Illegal Campaign Contributions from a Book Purchaser**

**1.**     **The $20,000 Check Payable to 2 Chic Boutique**

In addition to using Healthy Holly to fund her campaign through straw donations as described above, Pugh directly solicited illegal campaign contributions from one of the book purchasers, J.P. Grant, the owner and CEO of Grant Capital Management. The solicitations took place during 2016, the year of the mayoral election, contemporaneous with Pugh's straw donor scheme.

The first of three solicitations took place in late January 2016, about three months before the primary election. Pugh asked Grant to meet her at a café a few blocks from 2 Chic Boutique ("2 Chic"), a consignment shop for women's clothing located on Washington Boulevard in Baltimore. Pugh was the majority owner of that business, and her business partners were three other women with ties to Baltimore City government.

Pugh told Grant that her mayoral campaign needed money and she wanted to know if Grant could help. When Grant asked what she needed, she responded with a request for $20,000 without denoting how she would spend it. Even though Grant had already contributed the maximum amount of $6,000 to her campaign, he agreed to give the campaign another $20,000 knowing it was a violation of state election laws. To conceal the contribution, Pugh asked Grant to write her a check payable to "2 Chic Boutique."

To conceal the transaction further, Grant decided to write the check from his wife's account, because it would draw less scrutiny coming from a woman. Grant presented the check to his wife, Judy Grant, and she signed it without knowing its purpose. Ex. 6 (Judy Grant Check). J.P. Grant delivered the check to Pugh at her senate office in Annapolis about a week or two later.

Similar to how Pugh used Healthy Holly funds and the company's bank account to conceal the source of the illicit proceeds to fund straw donations, Pugh laundered Grant's $20,000 through 2 Chic to fund additional straw donations to the Committee to Elect Catherine Pugh.  The check was deposited into 2 Chic's bank account at Harbor Bank on February 5, 2016, the same bank where Healthy Holly had its business account.  On February 25, 2016, two months before the primary election, at 9:30 a.m., Pugh called a branch of Harbor Bank to authorize a $6,500 debit from the 2 Chic account in order to fund a cashier's check.  Ex. 7 (Debit Slip); Ex. 8 (Desiree Johnson Cashier's Check).  The cashier's check was made payable to Gary Brown's mother, Desiree Johnson, who was waiting in the bank.  Johnson immediately cashed it.  It took fifteen minutes from the time of Pugh's phone call until the disbursement of cash.

Brown had accompanied his mother to the bank, but waited outside to get the cash.  Pugh and Gary Brown had already used Desiree Johnson as one of their straw donors a month earlier; however, that $6,000 straw donation was funded through the Healthy Holly bank account.  Because that donation was the maximum for a personal campaign contribution, Johnson could not be used a straw donor again.  Consequently, Pugh directed Brown to bring her the $6,500 in cash that he had just obtained from the 2 Chic account, and Brown complied.  Brown delivered the money to Pugh in an envelope with the understanding that Pugh herself would find a straw donor to make the campaign contribution using the untraceable cash.  The 2 Chic partnership spent the balance of the original $20,000 on various business expenses.

## 2. The $50,000 Check Payable to Healthy Holly

The second solicitation for an illegal campaign contribution occurred on March 9, 2016, about a month before the primary election.  As more fully set forth in the Stipulation of Facts, Pugh approached Grant for financial assistance for the campaign, but this time she couched the

request in terms of a philanthropic request to donate her books to Baltimore school children.  ECF No. 12, Att. A at 13-14.  Pugh described how she had made money by selling her Healthy Holly books to various organizations like UMMS, who in turn donated the books to the students.  *Id*. Grant understood that Pugh would use the net profit of the sale to help her campaign.  *Id*.   Pugh asked Grant to purchase $50,000 worth of books, which he agreed to do.  At Pugh's request, on March 7, 2016, Grant issued a personal check for that amount payable to Healthy Holly, LLC.  Ex. 9 (J. P. Grant Check).  Gary Brown picked up the check from Grant's house at Pugh's direction. Pugh spent $19,800 of those funds on straw donations through Gary Brown; $6,000 for a contribution in her own name; and $10,000 was transferred to the account of the Committee to Elect Catherine Pugh.

### 3.       The $100,000 Check Payable to Healthy Holly

The third request for money from Grant occurred in October 2016, about a month before the general election.  ECF No. 12, Att. A at 14.  Anticipating her mayoral victory, Pugh asked Grant for money to help her buy a larger house befitting a mayor.  *Id*.  Pugh suggested that Grant help her by making a book donation like he had done back in March of that year, which Grant again understood to mean that Pugh would use the net profit from the book sale to help pay for the house.  Pugh did not disclose the fact that she never used any of those funds Grant provided in March to print or deliver books for Baltimore schoolchildren.  At Pugh's request, on October 13, 2016, Grant issued a company check payable to Healthy Holly with the notation "book donation." Ex. 10 (GCM Check).  Like in March, Pugh did not use any of those funds to print or deliver books, but rather, spent it all on personal expenses including the purchase of a new house.

The criminality of the first two requests is clear.  The third request is tantamount to a solicitation of an illegal campaign contribution in violation of state law, because Pugh was a

candidate actively running for office who solicited undeclared money from a registered donor. The money was to help her financially during her candidacy, and she concealed that contribution within an unrelated book transaction.

In sum, Pugh was determined to do whatever was necessary to gain an unfair advantage over her mayoral rivals, including using a federal wire fraud scheme to facilitate repeated violations of state election laws. To that end, she deployed $61,200 of illicit funds on deposit in her Healthy Holly account to fund and hide the straw donor scheme. Concurrently, she solicited approximately $170,000 in campaign contributions directly from Grant and his company using Healthy Holly and 2 Chic Boutique as cover.[6] In total, believing campaign finance laws did not apply to her, she used the $231,200 in an attempt to influence the outcome of the mayoral election and buy a house suitable to that office, the majority of which were proceeds from the Healthy Holly scam.

### G.     The Fraud Perpetrated upon the IRS was Also Longstanding and Sophisticated

#### 1.     Hiding the Income Generated by Healthy Holly Sales in 2015 and 2016

The parties have stipulated that an upward adjustment for sophisticated means is warranted, not only for the execution of the Healthy Holly scheme, but also for the scheme to defraud the IRS and the evasion of taxes in 2015 and 2016. However, the facts underlying the reason for the upward adjustment go well beyond the bare minimum needed under the law for the adjustment to apply. The scope and duration of Pugh's evasive intent began well before 2015 and 2016, and the steps she took to conceal it are particularly egregious.

---

[6] As previously noted, Grant understood that the net profit of the book purchase would go to Pugh's campaign and subsidize the purchase of a new house. Assuming the same $5 per book price paid by UMMS, Grant purchased 30,000 books. The average total cost per book to print/produce Books One through Four was $.94 per book. At that cost, the net profit available to benefit Pugh's campaign had she printed the 30,000 copies would have been approximately $121,800.

As summarized more fully in the Stipulation of Facts, Pugh created an elaborate pretense of a business relationship between Healthy Holly and Gary Brown's company's, GBJ Consulting. ECF No. 12, Att. A at 15-17.  From Pugh's perspective, the pretense was necessary to deflect scrutiny from the Maryland Election Commission and law enforcement authorities lest they discover not only the straw donor scheme, but also the Healthy Holly scheme that she and Brown had been executing for half a decade.  If believed, the fiction of GBJ as an independent contractor for Healthy Holly would fully explain the series of checks written to Gary Brown during the mayoral election cycle.

To backstop everything, Pugh and Brown devised and maintained numerous bogus documents to give the false impression that they had been created during the course of a legitimate business relationship, including the following:  an independent contractor agreement; business ledger; and backdated consulting invoices.  Ex. 11 (Agreement); Ex. 12 (Ledger); Ex. 13 (Invoices).  They extended the ruse to their 2016 tax filings, which included phony information that overstated expenses and concealed the true purpose of the Healthy Holly checks.  The contrivance reflects Pugh's business acumen and misplaced ingenuity.

To bolster the false filings and make them match each other, Pugh and Brown synchronized the fictitious information on Schedule C forms for their respective businesses that were filed with their individual income tax returns.  For example, the purported fees paid to Gary Brown as listed on the 1099 and Schedule C filed by Healthy Holly aligned with what Gary Brown listed as income received by GBJ Consulting.  They also lined up with the made-up business records.  Such meticulous attention to detail to cover her tracks, including fabricating convincing business records and synchronizing multiple federal filings, speaks to Pugh's mendacity and her committed indifference to the rule of law in order to get ahead financially and politically.

21

### 2.      Filing a False Tax Return for 2012

Just like the Healthy Holly scheme, Pugh's plan to evade taxes did not happen overnight. It evolved over a course of years, starting with the filing of her tax return for 2012, which she did not file until 2015.[7] That year, she received a $100,000 payment from UMMS for Book Two. While she reported the payment as income on Healthy Holly's Schedule C, she deliberately concocted fictitious business expenses to offset that income and reduce the amount of taxes owed. Like her filings in 2015 and 2016 (which she filed in 2016 and 2018, respectively), those expenses grossly overstated her deductible expenses.

More specifically, she claimed $75,879 as deductible expenses against the $100,000 payment when, in fact, the business only had a total of $16,032 of legitimate expenses. Pugh brazenly overstated her expenses by $59,847, which greatly reduced the taxes she owed that year.

It is noteworthy that Pugh filed Maryland state tax returns in Years 2012, 2015 and 2016 knowing that they were largely based on the false calculations of adjusted gross income in her federal tax returns for those same years. In total, Pugh swore under the penalties perjury to the accuracy of six different tax returns filed on six different occasions over a four-year period, which is further evidence of her mendacity and indifference to the law.

### 3.      Filing of a False Tax Return for 2 Chic Boutique in 2016

In 2016, 2 Chic Boutique LLC, filed IRS Form 1065, U.S. Return of Partnership Income, which listed Pugh as the majority owner at 54%. Despite receiving the aforementioned $20,000 deposit from Judy and J. P. Grant, and despite spending all of it by year's end, the 2 Chic partners, including Pugh as the majority owner, did not report the receipt of the $20,000 as income.

---

[7] The evasive conduct discussed here was not charged in the Indictment because it took place outside the statute of limitations.

It is unlikely that the failure to declare the receipt and use of that money was an oversight, because it represented almost 80% of the company's receipts for that year. The deposit was by far the largest in the small company's history, and the company would have only survived a few more months without the benefit of that deposit. The 2 Chic bank account only had a balance of $961.78 when the $20,000.00 was deposited, bringing the account balance to $20,961.78 on February 5th, 2016. The money was used to pay expenses of the businesses, such as electric, cable, consignor payments, rent, etc., as well as the $6,500 cashier's check given to Desiree Johnson as noted above. There were no further significant deposits that year. In fact, the 2 Chic bank account had a negative balance of $301.54 nine months later on November 28, 2016.

On the business's 2016 tax return, the partners reported gross receipts of only $6,412, less cost of goods sold of $2,635, resulting in total reported income of $3,777. Against that income, they deducted the expenses paid with the $20,000 check as described above, which totaled $19,315. By not reporting the deposit of the Grant check, the $19,315 of total deductions gave the partnership an ordinary business loss of $15,538, which the partners shared, resulting in a possible reduction of taxable income on each of their individual tax returns.

If the $20,000.00 check had been reported, the 2 Chic business loss of $15,538 would have been a business gain of $4,462. This would have been the first and only year that 2 Chic made a profit, and it would have been distributed to the partners. In short, Pugh and her partners reported the expenses paid with the $20,000 deposit because it lowered their tax liability, but chose not to report the receipt of the $20,000 because it would have increased their tax liability.

Given the history of Pugh's tax evasion as chronicled above, the solicitation and expenditure of Grant's campaign donation is another example of her deceit and indifference to the law when it serves her financial and political ends.

23

**H.      The Use of a Philanthropic Message to Defraud**

The evidence overwhelmingly established Pugh's ongoing intent to deceive, a fact common to all four counts of the Indictment to which she pled guilty.  The deception and misrepresentations employed by Pugh to convince organizations to purchase her books relied heavily on the notion that the book was part of a broader effort being led by Pugh to solve children's health issues.  In her capacity as a legislator and political candidate, she spoke at civic events and government affairs about a "shared mission" and creating "partnerships" in order to increase healthy habits among children, especially inner-city schoolchildren.  At some of these events, she spoke one-on-one with potential book purchasers to tout the value of her books in this effort and passed out free copies.  It was a deliberate attempt to promote the sales of her books while engaging in political and government networking.  The books were simultaneously her personal, professional, and political calling cards.  As such, staff members always made sure there was a box of Healthy Holly books at every event.

Whatever sincere beliefs Pugh may have had about improving children's health, one thing is clear:  she deliberately capitalized on this theme for years to mislead organizations about the true purpose behind buying and "donating" her books to the cause.  Based on conversations with Pugh about how the books could help reduce childhood obesity and to whom she planned to distribute them, some book purchasers were led to believe that Healthy Holly was a non-profit enterprise that had aligned itself with BCPS.  Nothing Pugh told them remotely suggested that she was personally profiting from the sale and donations of the books, a material fact that would have prompted them to question their participation in the venture.  Nor did they have a clue that they were buying stolen goods.  Pugh's decision to collaborate with Associated Black Charities

("ABC") also contributed to the pretense that Pugh was spearheading a philanthropic project, as opposed to her personally getting 80% to 100% profit on the sale of each book.

One purchaser, the Frederick Frank Trust, had turned down Pugh's sales pitch only to discover later that their $50,000 donation to ABC was used to purchase 5,000 copies of Book Three.  As it turned out, when Pugh learned that the Trust was about to donate the money to ABC, she called ABC and falsely represented that the Trust wanted their donation to be used to purchase her book.  Not knowing any different, in December 2016, ABC applied the donation to the book purchase and sent Pugh $45,000.

The Trust only learned about the fraud when they saw a letter from ABC to Pugh asking her to confirm that she had used the money to purchase and deliver the books to a youth-related program.  Pugh had the gall to have Gary Brown respond by letter falsely stating that the books would be purchased and delivered to BCPS children.  Ex. 14 (Letter to ABC).  By that time, as Pugh well knew, UMMS's copies of Book Three (the only ones in existence) had already been stored at the BCPS warehouse and were fraudulently being resold and used as giveaways.  In any event, Pugh never printed or delivered any books on behalf of the Trust.

## I.     The Cover-Up

### 1.     Pugh Paid for Gary Brown's Lawyers to Keep Him Quiet

Pugh's contempt for the law was also evident in the various ways she attempted to hide her criminal misdeeds.  In addition to the creation of fraudulent documents to conceal the true purpose of the Healthy Checks issued to Gary Brown, Pugh successfully convinced Brown not to assist state officials who were investigating the straw donor scheme in January 2017.  When the Office of the State Prosecutor charged Brown with election law violations, Pugh's campaign decided to

return some of the contributions made by the alleged straw donors, which totaled $18,000.[8]   The straw donors cashed the returned checks and gave the cash to Brown who, in turn, tried to give the money back to Pugh.

Pugh had served as Brown's political mentor for years.  Just before the straw donor scheme became public, she helped orchestrate his nomination to fill the vacant seat in the Maryland House of Delegates created by her mayoral victory.  To protect herself from prosecution, Pugh gave Brown the $18,000 in returned contributions and urged to him to hire an attorney she identified as someone who will "take care" of him.  Brown took Pugh's advice, hired the attorney and ultimately pled guilty in state court without providing any information to the authorities about Pugh's role in the scheme or the use of Healthy Holly funds.

To protect her longtime co-conspirator further, Pugh made self-serving statements and even lied to the press during the course of his prosecution, all the while keeping Brown employed at City Hall, even after his conviction.  In response to Brown's indictment, Pugh stated that she was "saddened by the allegations . . . [but] Mr. Brown is presumed innocent while the investigations continue.  I have a mechanism in place to make sure that everything is done properly. We'll go back through the process, and make sure that every 'i' is dotted and 't' is crossed."[9]

At a press conference on January 11, 2017, the day Brown was charged, Pugh characterized the straw donations that she and Brown orchestrated as simply a "glitch," and further stated, "We know that things happen when we raise over $2 million . . . If there is anything wrong with the

---

[8] The campaign only returned $18,000 of the total $35,800 in straw donations because the state's investigation did not identify all the other straw donors, including the use of some of Pugh's relatives.
[9] Luke Broadwater, *Gary Brown, aide to Baltimore Mayor Pugh, charged with making illegal campaign contributions*, The Baltimore Sun, January 11, 2017, https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-gary-brown-20170109-story.html.

funds that we received, we will go back [and return checks]."[10]  When asked if she knew where the money for the straw donations came from, Pugh outright lied: "No.  I didn't handle the funds. That's not my job."[11]

On May 31, 2017, after Brown's conviction, in an attempt to further deflect attention from herself, Pugh said she would continue to stand by him.[12]  Feigning ignorance and a lack of concern about her own complicity, she also said that she had not bothered to look into the source of the funds for the illegal campaign contributions.[13]   She said, "As far as I'm concerned, - I have not read the transcripts, I don't know all of the particulars, I wasn't in court but – the Gary Brown that I know has been a good employee for years."[14]  When asked directly if she had looked into the source of the funds for the donations, she responded, "No, I have not," and when asked if she still stood by Brown, she responded emphatically, "Oh, I do."[15]  And in another brazen lie, Pugh told reporters, "Well, as far as I know, the campaign complied with election laws."[16]

### 2.     Orchestrated Lies to the Public

### a.     Statements to the Press

In early March 2019, the news media started to report about the potential conflict of interest created by UMMS entering into a no-bid book deal with Pugh, a member of the UMMS Board of Directors.  On March 14, 2019, Pugh gave a statement to the press to downplay the matter.  Using the same lofty language she used in her sales pitches, Pugh talked about how her books "educate,

---

[10] Fern Shen, *Pugh praises aide charged with making illegal campaign donations,* Baltimore Brew, January 11, 2017, https://baltimorebrew.com/2017/01/11/pugh-praises-aide-charged-with-making-illegal-campaign-donations.
[11] *Id.*
[12] Yvonne Wenger, *Mayor Pugh calls aide found guilty of election violation 'a good employee,' stands by him,* The Baltimore Sun, May 31, 2017, https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-pugh-gary-brown-20170531-story.html.
[13] *Id*.
[14] *Id.*
[15] *Id*.
[16] *Id*

elevate and inspire our young people to be the best they can be and achieve their full potential."[17] She then lied about the net profit she earned from each book transaction stating, "The net profit to my company after illustration, printing and shipping costs amounted to approximately $20,000" for each book UMMS purchased.[18]   In fact, Pugh's net profit per book sold to UMMS was approximately $81,000, four times higher than she claimed, not to mention the money she received from fraudulently reselling them and their value as promotional giveaways.

During a phone interview on March 20, 2019, Pugh used numerous falsehoods to try to quell the story.  She said, "All my income is reported to the IRS and everything is filed . . . I don't know what witch hunt y'all are on, but it's done.  I've got 1099s and I pay my taxes and everything is filed."[19]  In another brazen lie, Pugh told the reporter that she had not "sold her Healthy Holly books beyond those she provided for the UMMS deal . . . [and] most of the books had gone to schools and day care centers."[20]  She noted how "Healthy Holly is not a book company . . . [but rather] a company promoting healthy lifestyles for children."[21]

With increasing calls for her to resign, Pugh held a press conference at City Hall on March 28, 2019.  Employing her educational and business background in marketing and public relations, the staged rebuttal sought to shift the spotlight away from growing reports about thousands of books gone missing by highlighting Pugh's virtuous concern for children's health issues.  Pugh described the book deal with UMMS as a "shared mission" to reduce childhood obesity, and she displayed Healthy Holly baby accessories, including bibs and blankets, to emphasize her plans to

---

[17] Luke Broadwater, *Baltimore Mayor Pugh: $100,000 book deal with University of Maryland Medical System was aboveboard*, The Baltimore Sun, March 14, 2019, https://www.baltimoresun.com/politics/bs-md-pugh-statement-20190314-story.html.
[18] *Id.*
[19] Kevin Rector & Doug Donovan, *Baltimore Mayor Pugh says she paid taxes on book sales, calls inquiries a 'witch hunt,'* The Baltimore Sun, March 20, 2019, https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-pugh-on-books-20190320-story.html
[20] *Id.*
[21] *Id.*

spread the message through such merchandising.[22]  Ex. 15 at 1 (Transcript of Press Conference).

Pugh handed out paperwork proving that Books One through Three had been printed, so she had

not absconded with the money.  She planned to make "arrangements to retrieve" the remaining

books still at the City Warehouse "to make them available to our children in our community."[23]

*Id*. at 3.  Remarkably, as the press conference ended, Pugh feigned deep concern about the

whereabouts of the rest of UMMS's books stating, "I do hope that we find out from the school

system where the rest of the books are."[24]  *Id*. at 4.

The foregoing statements to her constituents and the public at large was a blatant attempt

to beguile the press and cover her tracks, especially the press conference.  It was a public relations

ploy steeped in lofty language about empowering children; the same theme she used to promote

her books and close a sale.  The transparent attempt to change the narrative and deflect further

scrutiny was devoid of honest contrition.

**b.      False Statements on Financial Disclosure Forms**

As a State Senator representing the 40th District, Pugh was required to file under oath an

annual financial disclosure statement with the Maryland Ethics Commission to disclose her

financial affairs, including all interests in any corporations.   On the statements filed for years 2011

– 2016, Pugh disclosed her ownership in Catherine E. Pugh & Co. and 2 Chic Boutique, LLC.

However, despite making hundreds of thousands of dollars from Healthy Holly, LLC, during those

same years, Pugh chose not to disclose her ownership interest in the company.  The decision not

to acknowledge the existence of Healthy Holly for six straight years is further evidence of Pugh's

---

[22] Ian Duncan & Doug Donovan, *Baltimore Mayor Pugh apologizes for 'Healthy Holly' deal but admits some books being delivered only now*, The Baltimore Sun, March 28, 2019, https://www.baltimoresun.com/politics/bs-md-ci-pugh-press-conference-20190328-story.html.
[23] *Id*.
[24] *Id*.

measured approach to executing and concealing her scheme to defraud to insure its profitability during a key period in her political life.

### 3.     Pugh's Attempt to Prevent the Seizure of Her Cell Phone

On April 25, 2019, FBI and IRS agents executed a federal search warrant at Pugh's residence.  They also had a search warrant to seize and search her personal Samsung cell phone.  The agents knocked on the door and Pugh let them in.  She was the only person in the house.

The agents explained why they were there, and they asked to see her cell phone.  Pugh took the agents upstairs to her master bedroom where she retrieved a red cell phone that she identified as her personal cell phone.  The agents seized the phone.

Upon closer inspection, the agents learned that the red phone was not her persona phone, but rather, a City-issued iPhone.  When the agents explained that the warrant was for her personal "Samsung" cell phone, Pugh said she did not have it.  She told the agents that she had given the Samsung phone to her sister when she was in Philadelphia.  An agent advised Pugh that he was going to place a call to the Samsung phone.  He then dialed the phone number assigned to the Samsung.

Almost immediately, the agents heard a vibrating noise emanating from her bed.  Pugh became emotional, went to the bed and began frantically searching through the blankets at the head of the bed.  As she did so, agents starting yelling for her to stop and show her hands.  One of the agents grabbed her left shoulder and pulled her away from the bed.  As he did so, agents could see that her left hand was empty.  However, in her right hand, the one she removed from under the bed pillow, was the Samsung personal cell phone, which was still vibrating from the call the agent had just placed.  The agents took custody of the phone.

A short while later, Pugh acknowledged she had lied to the agents about the whereabouts of her phone.  Pugh's lie and futile attempt to silence the phone to prevent its seizure is indicative of her lack of respect for the law and, more broadly, her past efforts to hide longstanding criminal misconduct.

### IV.    Sentencing Recommendation

The chronology of events since 2011, comprising Pugh's seven-year scheme to defraud, multiple years of tax evasion, election fraud, and attempted cover-ups, including brazen lies to the public, clearly establishes the deliberateness with which she pursued financial and political gain without a second thought about how it was harming the public's trust.  It was not rash behavior.  Rather, it was a recurring pattern of well-executed steps that built on each other, becoming more audacious and complex leading up to the mayoral election.

As an educated businesswoman and successful politician, Pugh had countless opportunities for self-reflection, occasions when she could have checked her moral and ethical compass and chosen to change course.  She did the opposite, and chose to double down on a path of rampant criminal deception to fulfill her ambitions.

From the very start, Pugh quickly realized that there was no need to print more than a negligible number of books for herself because the scheme to defraud worked.  The recurring misrepresentations to UMMS that their book donations helped a worthy cause provided all the books Pugh would ever need to supplement her legislator's salary and give her the political edge she was looking for.  No one ever questioned her integrity or the source of the books.  After all, she was a former city council woman, state delegate, state senator, and rising political star.  No one would ever suspect that a person of her stature was selling stolen books, much less books that had been donated to schoolchildren.  She took advantage of this by specifically seeking out

potential buyers who might benefit financially if Pugh was politically successful, thus corruptly leveraging her political title and government office.

The worthy theme and message of the books, and Pugh's professed motive for selling them, overcame whatever hesitation a purchaser may have felt.  The problem of childhood obesity perfected Pugh's deception.  During her sales pitches, she virtuously exhorted the books as part of the solution to childhood malnourishment and poor health.  Passing out free copies to potential voters and their children helped cement her claim as the candidate of change.  If Pugh ever truly believed that to be the case, the money and power she gained from years of fraudulent sales and deceptive tactics corrupted that ideal and replaced it with a depraved notion of what public service means.

Pugh's criminal conduct was extremely unfair to the hard working government employees, civic activists, and religious leaders who tried to find a foothold in what seemed like an avalanche of bad news about the City, including entrenched crime rates.  Dedicated people worked side by side to communicate a message of hope that might spark a much-needed renaissance for the City, the economic engine of the State.

Unfortunately, Pugh's conduct unquestionably added to the City's problems.  The financial consequences from the negative national attention, and the enormous costs to the City in time, resources, and manpower in order to deal with her sudden absence, are quite significant.  But the greatest harm is the damage done to the public's trust and faith in its government.  As in all public corruption cases when an elected leader's criminal conduct while in office is exposed, the biggest victim here is not the book purchasers, the Department of Treasury or the Maryland State Board of Elections.  Rather, it is the citizens of Baltimore and the State of Maryland whose faith and trust in government has been breached.

The Court's statutorily prescribed role at sentencing is not only to see that justice is served but to serve as a bulwark against future corruption by imposing a sentence that will deter other would-be corrupt politicians, fraudsters, and tax evaders from taking advantage of the public.   A reasonable sentence in this case is one that holds Pugh accountable for her years of continuous criminal activity and helps restore the public's trust in government.   Consistent with Guideline sentencing principles and the factors under § 3553, a sentence of 57 months imprisonment reinforces the notion that serious criminal acts committed by high-level elected officials while in office will be fairly and adequately addressed.   A sentence of 57 months incarceration is the appropriate sentence in this case.

Respectfully submitted,

Robert K. Hur
United States Attorney


By:   _____/s/_____
      Martin J. Clarke
      Leo J. Wise
      Assistant United States Attorneys
      Office of the United States Attorney
      District of Maryland

CERTIFICATE OF SERVICE

This is to certify that on this 13th day of February 2020, a copy of the foregoing

*Government's Sentencing Memorandum* was electronically filed and made available to counsel

of record.

_____/s/_____
Martin J. Clarke
Assistant United States Attorney