**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **CASE NO.: DKC-19-00541** |
| | ) | <u>UNDER SEAL</u> |
| CATHERINE E. PUGH | ) | |
| | ) | |

<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING
AND REQUEST FOR VARIANT SENTENCE**</u>

SILVERMAN THOMPSON SLUTKIN & WHITE, LLC
201 N. Charles Street, 26th Floor
Baltimore, Maryland 21201

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

I.      Preliminary Statement ……………………………………………………      1

II.     Ms. Pugh's Background and Character …………………………………...      2

     a.   Family and Early Life ………………………………………………      2

     b.   Hard Work ………………………………………………………...      6

     c.   Education and Early Working Career ………………………………      8

     d.   Getting Noticed …………………………………………………...      9

     e.   Teaching and Publishing ……………………………………………      10

     f.   Television Success ………………………………………………..      13

     g.   Becoming an Author ………………………………………………      14

     h.   Ms. Pugh's Dedication to Public Service and the City of Baltimore ..      15

III.    Sentencing Factors …………………………………………………….…...      24

     a.   The Offense Conduct ……………………………………………..      25

     b.   The Advisory Sentencing Guidelines ……………………………..      27

     c.   Ms. Pugh's Personal History and Characteristics Support Leniency ..      30

     d.   The Psychological Impact of this Case on Ms. Pugh ………………      35

     e.   A Sentence of One Year and One Day Would Afford Adequate
        Punishment and Deterrence ………………………………………      39

IV.     Conclusion ……………………………………………………………...      43

Catherine E. Pugh, by and through her counsel Steven D. Silverman, Andrew C. White, Abigail E. Ticse, and SILVERMAN THOMPSON SLUTKIN & WHITE, LLC, offers the following memorandum in aid of the Court's determination of the appropriate sentence.

## I.    **PRELIMINARY STATEMENT**

Ms. Pugh comes before the Court humbled, penitent, and remorseful.  She acknowledges that her criminal conduct was serious and betrayed the values she spent a lifetime advocating and pursuing.  Ms. Pugh accepted responsibility for her actions by pleading guilty shortly after being charged with the offenses at issue.  She also resigned from her position as the Mayor of Baltimore City when she was aware that a federal investigation was ongoing.  She has thoroughly expressed her regret and remorse.

Ms. Pugh is paying a tremendously heavy price for her crimes.  Her actions have caused significant pain, embarrassment, and shame for her and her family.  The consequences are lifelong and cannot be undone.  She has ruined a reputation that took a lifetime to build, and foreclosed any future elected public service.  Having spent much of her life serving her Baltimore City community and the State of Maryland in a myriad of ways, she is now too ashamed to spend any time in the community that she loves.

Under the terms of Ms. Pugh's plea agreement, she has agreed upon a Sentencing Guidelines range of 46 to 57 months, driven primarily by an enhancement for total losses. However, the advisory Guidelines are but one factor to be considered by the Court in fashioning a sentence that is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment and deterrence.  18 U.S.C. § 3553(a).

In following this procedure, we respectfully request that the Court impose a sentence of one year and one day incarceration, followed by a period of home detention and supervised release.  We

respectfully submit that this sentence is sufficient, but not greater than necessary, to achieve the statutory sentencing objectives.

Among those § 3553(a) factors relevant to this sentencing:

- Ms. Pugh's criminal conduct was an uncharacteristic deviation from an otherwise law-abiding life dedicated to serving others. Ms. Pugh's conduct should be considered against the backdrop of a life of sustained, impressive accomplishments to benefit the community and underprivileged persons.

- As many courts and commentators have recognized, the Guidelines range for fraud significantly overstates the seriousness of the offense. This is particularly true here, where the conduct differs markedly in scope and intensity from that of many other more traditional fraud prosecutions.

- Ms. Pugh has endured intense public shaming that has caused her tremendous psychological and physical harm.

- The collateral consequences that Ms. Pugh has suffered as a result of her offenses – including the loss of a career in public service, the stigma of forever being branded a felon, and being publicly disgraced – are severe and permanent. They ensure that Ms. Pugh will never reoffend.

- Society will gain no benefit from imposing a lengthy period of incarceration as suggested by the sentencing guidelines. Ms. Pugh is nearly 70 years old with no prior record and decades of positive public service. Recently, the United States Congress enacted the First Step Act, which specifically encourages courts to utilize home confinement for elderly offenders who pose no danger or risk of recidivism. Thus, a short period of incarceration is suitable here. Significantly, such a sentence would provide Ms. Pugh with the opportunity to pay her debt to society and still have the opportunity to continue doing good works and contributing to the betterment of others.

## II.  MS. PUGH'S BACKGROUND AND CHARACTER

### a.  Family and Early Life

Ms. Pugh is 69 years old. She is a successful business woman, effective legislator, and longstanding community leader who has always possessed a deep and abiding work ethic and a passion for community service.

Born in Norristown, Pennsylvania in 1950 as Catherine Crump, Ms. Pugh was the second born of seven children and the oldest girl. The family lived in a modest townhouse in Philadelphia

and had an equally modest income.



The Crump household in Philadelphia, Pennsylvania (third from the right)

Ms. Pugh's father, James Crump, served honorably in the United States Army and, upon leaving military service, worked until his retirement as a laborer at the Ehret Magnesia Manufacturing Company ("Ehret Magnesia") located in nearby Valley Forge, Pennsylvania.[1] Ehret Magnesia manufactured asbestos pipe insulation and related asbestos products. Mr. Crump also worked reupholstering and repairing furniture on the side. Ms. Pugh's mother, Addie Crump, worked as a stay-at-home mother to her seven children until going back to school to become a licensed practical nurse.

James and Addie Crump instilled in their children a strong work ethic and taught their children to value education. Addie Crump taught all seven of her children to read and write even before they were old enough to enter formal schooling. She also provided additional homeschooling for her children in the hours after the school day had ended.

The family home, though small, contained numerous school desks and chairs where Ms. Pugh and her siblings worked before and after school. According to Ms. Pugh, her father always

---

[1] Founded in 1897, Ehret Magnesia achieved commercial success with Thermalite and Durocel, signature brands of asbestos pipe insulation. After combining several limestone mining operations located in what is Pennsylvania's Valley Forge National Historical Park, Ehret Magnesia operated an asbestos manufacturing plant on site from the 1890s to the 1970s. James Crump ultimately died from exposure to asbestos while working at Ehret Magnesia.

had the *"World Book Encyclopedia"* in the house so that he could answer all of the children's questions.  Steeped in this family education, Ms. Pugh excelled in school, skipping the seventh grade.

The Crump family was also very religious.  Every Sunday the family walked together and attended church at the nearby Second Antioch Baptist Church.  The family was very much involved in the life of the church; both Addie and James, as well as their seven children, all served at various points in time on the church's Usher Board.  After church, Ms. Pugh's family regularly went to her aunt's house, where they would spend time with their cousins.  Below are two pictures – the first is a picture of Ms. Pugh with her siblings and cousins on a typical Sunday after church.  The second is a picture of James and Addie Crump at their wedding in 1948.




Ms. Pugh (second from left) with her siblings and cousins          Wedding of James and Addie Crump in 1948

Ms. Pugh's older brother, James Crump, was born in 1949.  Shortly after high school, he joined the Army and thereafter worked for CSX Railroad until his retirement.  He now lives in Georgia.  In a letter submitted to the Court (*see* **Exhibit A**), James recounts his childhood with his younger sister and describes the Crump household as the two grew up together:

> ***We might have grown up in an average neighborhood, but our parents saw us as anything but average. When our parents found out the elementary school we attended was discarding the old school furniture they went the[re] and came back with four school desks. We set them up in the back room of our house to create the school environment that would enable us to stay focused on our class work, if we had any questions about our homework our Mother would remind us of why they bought the World Book encyclopedia. Catherine was an excellent student in school, she was a A,***

4

*B, honor roll student. She kept me on my toes because of how close we were in school, and in age eleven months apart. She kept me focused on my academics, outside of my sports activities. Our Mother would enter or volunteer us in any amateur talent program that the church or school would have. We would sing different gospels on stage. Catherine and I practiced and played the piano about three years together, we would see Mr. Brown our piano teacher every Saturday morning from nine to ten a.m. preparing for our piano recitals. Along with doing our chores around the house, we would do our homework, and Catherine and I would practice our piano lessons for one hour everyday. We came from a good home, spiritual, family oriented, and very disciplined. Our parents were very proud of Catherine.*

Ms. Pugh's younger brother, Ardell Crump, also served honorably in the Army and went on to work as a circulation manager for a number of newspapers, including the Daily News and Enquirer in Philadelphia. Ardell now lives in West Virginia.

Ms. Pugh also grew up with four younger sisters. Delphine Crump Arrington, born in 1957, was a high school track star and graduated from Temple University. ████████████

██████████████████████████████████.

Thomasena Crump was born in 1954. ████████████████████

██████████████████████████████████████████

██████████████.

Loretta Crump, Ms. Pugh's third sister, ███████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████████████████.

Ms. Pugh's youngest sister, Addie Crump Jackson, graduated from Temple University in 1988 and was inducted in the school's basketball hall of fame in 1999. She was employed for many years as a high school teacher and basketball coach at Bensalem High School in Pennsylvania. ██

██████████████████████████████████

███████████████████████████████████████████

███████████████████████. Addie's daughter now lives with Ms. Pugh while she attends graduate school in Baltimore.



Ms. Pugh and her siblings Loretta, James,
Delphine, and Addie in the 1990s

### b. Hard Work

Ms. Pugh learned the importance of productivity and hard work from her parents at an early age. She took her first job at only fourteen years old, working as a waitress at a diner in Philadelphia while still attending high school at Overbrook High School. Incredibly, she worked at the diner from 11 p.m. until 7 a.m. on Friday, Saturday, and Monday nights. She also worked as a babysitter for families in her neighborhood. As was the family custom, Ms. Pugh contributed half of her earnings to the family to help defray household expenses.

At the age of 15, Ms. Pugh was accepted as a member of the Distributive Education Clubs of America ("DECA"), a competitive program for high school and college students. According to its website,

> Distributive Education Clubs of America (DECA) is a youth organization for American and Canadian high school and college students interested in business, marketing, management, and entrepreneurship. The major goals of the organization are to prepare students for careers in business and marketing; to develop the

leadership abilities, self-confidence, and citizenship of DECA members; to engender an understanding of the free enterprise system; and to foster in its members a healthy competitive spirit, high standards of business ethics, and proper social and business etiquette. DECA works in cooperation with high school and college marketing and business education programs.

*See* Harry A. Applegate, *Youth Organizations,* STATEUNIVERSITY.COM (2002), https://education.stateuniversity.com/pages/2564/Youth-Organizations-DISTRIBUTIVE-EDUCATION-CLUBS-AMERICA.html.

As part of the DECA program, Ms. Pugh gained employment at Bonwit Teller & Co. in Philadelphia.[2]  In the DECA program, she attended high school in the mornings and worked at Bonwit Teller in the afternoons, learning about business management and also serving as a live clothing model at the store.  Ms. Pugh worked and attended school through the DECA program throughout her remaining high school years.  In 1967, at the age of 17, Ms. Pugh graduated from high school and her family thereafter moved to the suburbs of Trevose, Pennsylvania.




Ms. Pugh's high school graduation            The Crump residence in Trevose, Pennsylvania

After the Crump family moved to Trevose, Ms. Pugh immediately started a new job as a secretary at Betz Laboratories, a specialty chemical products manufacturer in the town.  To ensure that she could attend and afford college, she also took a second job at a nursing home where she

---

[2] Bonwit Teller & Co. operated a chain of high-end luxury department stores in major cities in the United States, including a landmark store in Philadelphia.

helped care for elderly and sick patients.  Ms. Pugh worked long hours at these jobs, typically working at the nursing home from 11 p.m. until 7 a.m., and thereafter at Betz Laboratories from 8:30 a.m. until 4:30 p.m.  She kept these jobs for approximately one year as she saved money for college.  In 1969, Ms. Pugh was accepted as a student at Morgan State University in Baltimore.  She was the first in her family to attend college.

### c.   Education and Early Working Career

Ms. Pugh first came to Baltimore in February of 1969 when she arrived as a student at Morgan State.  She immediately gained employment as a typist for the student government and as an office manager for the school's basketball coach.  She also was accepted onto Morgan State's cheerleading squad.  She later participated in a work study program which allowed her to work at Hecht Company for half of the day while attending college.  Ms. Pugh graduated from Morgan State with a Bachelor's degree in Business Administration in 1973 at the age of 23.

After graduation in 1973, Ms. Pugh worked as a credit analyst at Equitable Trust Bank in Baltimore.[3]  She stayed in the job for one year, until 1974 when she gained an opportunity to work for a fledgling minority organization in Baltimore, the Council for Equal Business Opportunity ("CEBO").  According to the Baltimore City Archives, CEBO's mission was to provide professional counseling to new and established minority businesses in the Metropolitan Baltimore area.  The program extended free technical assistance and program information to minority group applicants.  Ms. Pugh was one of five professionals initially hired at CEBO, and she was instrumental in providing African American business owners in Baltimore with access to business assistance and funding.  While working at CEBO, Ms. Pugh also became certified by the University

---

[3] She also married Phillip Pugh in Baltimore that year.  The marriage only lasted two years, and she no longer has any relationship with her ex-husband, though she still has a very close relationship with her ex-mother in law.

of California as an Economic Development Specialist.  In her position at CEBO, Ms. Pugh was able to help dozens of fledgling minority businesses in Baltimore obtain the assistance and funding they needed to survive and compete.  Notably, while working at CEBO, Ms. Pugh entered the Masters of Business Administration program at Morgan State and would attend classes at night after working all day.

### d.    <u>Getting Noticed</u>

In 1975, then-Baltimore Mayor William Donald Schaefer had taken notice of Ms. Pugh's work at CEBO and approached her and offered her a position in his cabinet as the Director of the Citizen's Involvement Program.  Ms. Pugh instantly accepted the job and began working as a cabinet-level official.  In this capacity she worked with neighborhood leaders in Baltimore to establish neighborhood watch programs across the city.  She also initiated the Women's Crusade Against Crime – a program that advocated for legislation protecting female victims of sexual assault.  Ms. Pugh, through her own initiative, also made regular appearances on Baltimore Channel 45, delivering crime prevention tips to the local Baltimore community.  She remained in this role until 1978.

Even while working for Mayor Schaefer and attending night classes, Ms. Pugh, in 1977, became a co-anchor, working with then news director Kweisi Mfume, of what was then a start-up radio station operating on the campus of Morgan State, WEAA.  WEAA still broadcasts today from the school.  According to its website, WEAA "strives to be the preferred station for a new generation of students, civically-active members and community-minded underwriters who value our role as 'The Voice of the Community,' now and for decades to come."  *See* WEAA.ORG 88.9 FM, https://www.weaa.org/node/1 (last accessed Feb. 10, 2020).  WEAA is predominantly directed toward African American listeners and is well-known for its programming related to societal issues such as racism and politics.  WEAA stands for "We Educate African Americans."  *Id.*

### e.  **Teaching and Publishing**

After she graduated with her M.B.A. in 1977, Morgan State University invited Ms. Pugh to join the school's full-time faculty as a professor teaching Marketing and Introduction to Business. She left her job in Mayor Schaefer's cabinet and began teaching full time at Morgan State. Though she later transitioned to a position as an adjunct professor, she remained on the Morgan State faculty until 2008.

Based on her experiences at CEBO, WEAA, and Morgan State, Ms. Pugh noticed what she described as a void in global and national news reporting directed to the African American community. So, as with so many other projects she envisioned, Ms. Pugh sought to fill this void for her community. Writing initially under the name Liz Crump, she founded the newspaper *African American News & World Report* in 1979. She served as the editor, publisher, and photographer of this newspaper until 1984. Incredibly, Ms. Pugh self-funded the newspaper by personally approaching companies like COX Cable, the Baltimore Orioles, Kraft Foods, Harborplace, and SuperPride Supermarkets, and gaining the financial support that got the newspaper up and running. The *African American News & World Report* was instrumental in facilitating a strong local network throughout the African American community within Baltimore, while also focusing on national and global news. Ms. Pugh was absolutely dedicated to the newspaper and she worked hard to provide news content relevant to the African American community. Because the paper operated on a very tight budget, Ms. Pugh did much of the reporting and writing herself, travelling long distances to personally report on events. For example, she and four of her staff drove to North Carolina in November of 1979 to report about a Ku Klux Klan rally and to Florida to cover the Miami race riots

in 1980.  Below are pictures of early editions of the newspaper, which was published until 1984.



Weekly issues of *African American News & World Report*

While still publishing the *African American News & World Report,* Ms. Pugh also worked as a news reporter for WMAR TV in Baltimore from 1980 to 1982.  After leaving WMAR TV in 1982, Ms. Pugh accepted a position as a professor teaching night classes at the Strayer Business College in Baltimore.  She later rose to become the Dean and Director of the night school, and later the Dean and Director of the entire school.  Ms. Pugh remained at Strayer until 1987.



Ms. Pugh's Strayer Business College ID badges

In 1984, while Ms. Pugh was still working at Strayer Business College, the publisher of the *Baltimore Sun*, J. Reginald Murphy, contacted her and asked her to write for his newspaper.  Ms. Pugh initially declined the offer because she wanted to be her own publisher.   Mr. Murphy, recognizing her successful background in publishing, thereafter agreed to allow Ms. Pugh to create and publish regular supplements to the *Sun* paper.  In 1985, the *Baltimore Sun* printed its first ever independent supplement published by Ms. Pugh.   The supplement, which focused on reporting

positive news about the African American community, was an instant success.   The supplement regularly sold out all copies and was published in the *Sun* five times a year.   Ms. Pugh designed the supplement to help bridge the racial gap in Baltimore City by providing primarily white readers with current, positive news about the African American community.   Ms. Pugh is still today the only independent contractor who has ever published a news supplement in the *Baltimore Sun*.

 

Supplements from the *Baltimore Sun* written and published by Ms. Pugh



A letter from the editor, Ms. Pugh



Ms. Pugh with Mayor Kurt Schmoke at an event hosted by the *Baltimore Sun*.

Meanwhile, in 1988, Ms. Pugh started her own consulting, marketing, and public relations business, C.E. Pugh & Company, for which she was the chief executive officer and president.

From 1991 until approximately 1994, Ms. Pugh also worked as the Director of Communications for the 9,000 member Bethel African Methodist Episcopal Church.   In that position, she was responsible for the church's television and media coverage. She was also responsible for organizing special events at the church – for example in 1993 Ms. Pugh organized the Baltimore premier of "L.A. Law" star, Blair Underwood's film, "The Second Coming," at the Senator Theater.  The film was created after the first Rodney King trial and was about the second coming of a Messiah of color.


"The Second Coming"


From left to right: Ms. Pugh's friend, Betty; Actor Blair Underwood; Bishop Reid; Lady Marla Reid; Actress Lola Falana; and Ms. Pugh at the Senator Theater in 1993

**f.   Television Success**

In 1992, Ms. Pugh was asked by her close friend and business associate, Dorothy Brunson, the first ever African American woman in the United States to own television and radio stations, to work at WGTW 48, a Philadelphia television network.  Ms. Brunson had purchased WGTW 48 after a lengthy bidding process, beating out Sinclair Broadcasting, among others, competing to buy the station.  Ms. Pugh, though living and working in Baltimore, agreed to commute to and from Philadelphia to create and host a show on WGTW 48 called "Another View."  The program focused primarily on policy issues within the black community in Philadelphia.  Ms. Pugh also assisted and

advised Ms. Brunson in starting television and radio networks throughout the United States.[4]



During this time, from 1995 to 1998, Ms. Pugh also organized and ran the Saturday Academy program for the NAACP in Baltimore, then-headed by Kweisi Mfume. The Saturday Academy allowed parents and children in the sixth through eighth grades to travel to different campuses each year and take classes related to science, technology, and math.

### g.  Becoming An Author

In addition to this multifaceted career in business, education, radio, newspaper, and television, Ms. Pugh also found time to write books. In 2005, she published her first book, *Mind Garden: Where Thoughts Grow*, a collection of poems and prose.



Of particular note is the following poem she wrote entitled "Politician", a poem that reflects

---

[4] Ms. Brunson sold WGTW 48 to Turner Broadcasting Service in 2004 and the station is still on the air today.

her commitment to public service:

> *It was different for me…for I had come to serve…*
> *Filled with courage and a lot of nerve…*
> *I didn't need to be scripted or told what to say…*
> *For it is inside of me and not a part in a play…*
> *I could answer any question…ease any concern…*
> *For I was sharing what I knew and what I had learned…*
> *When they would ask what should we do about the schools…*
> *I'd answer up the drop out age and change the rules…*
> *When they'd ask about solving the crime in the streets.*
> *I answered neighborhood watch and police walking beats…*
> *Then there was the concern of the boarded up homes…*
> *And how so many seniors were now living alone…*
> *I thought of ways to reconfigure neighborhoods…*
> *And offer dollar houses and turn the bad into good…*
> *I wanted to build senior communities…*
> *A place where they'd be safe and feel free…*
> *I said drug treatment needed to be shared…*
> *With the counties around us who had land to spare…*
> *I wanted to expand our economic base…*
> *Build more garages and a more attractive place…*
> *Did we win?  Did we lose?  Who did the voters choose?*
> *And would you do it again…if you knew you would not win…*
> *And the answer that keeps coming back to me…is now others know what I believe…*
> *And the lives I touched…and the things I learned…and the people I met…makes my heart*
> *yearn…not only to do it again…but to aim…for the victory…the win…*
> *For the vision I have…that others now know…could allow our city to prosper and grow…My*
> *dream is to unite our community and that others would appreciate our diversity…*
> *It is the hope I cling to and a future I see…so keep the faith…and Believe in me…*
> *THANK YOU*

In 2008, she combined her passions – writing, fitness, and assisting the community – and

began publishing a series of children's books, *Healthy Holly*, advocating for children's health and

combatting childhood obesity through exercise and healthy diets.  The first book of the series,

*Healthy Holly: Exercising is Fun*, was published in 2008.

### d.  Ms. Pugh's Dedication to Public Service and the City of Baltimore

Ms. Pugh's career in elected public service started in 1999 when she was elected to the

Baltimore City Council to fill the empty seat in the 40th District vacated by then-Council President,

Sheila Dixon.  She served in that position until 2004.  In 2005, Ms. Pugh was appointed by then-

Governor Robert Ehrlich to fill an open seat in the House of Delegates in the Maryland General Assembly where she served until 2007.  Ms. Pugh then won a seat in the State Senate where she served until 2016.  She served as the State Senate Majority Leader from 2015 to 2016, and led countless initiatives and passed over 100 bills.  She was also responsible for diversifying the financial management of Maryland's forty billion dollar state employee pension portfolio, increasing black and other minority fund management from $300 million to $4.2 billion. Additionally, as a Senator, Ms. Pugh awarded over one million dollars in senatorial scholarships to Baltimore City youth in her district.  These scholarships had a tremendous and powerful impact on many lives of young Baltimore residents.  She also served as the president of the National Black Caucus of State Legislators, and as chairperson of both the Legislative Black Caucus of Maryland and the Women's Caucus of Legislators in Maryland.

In 2015, while still serving as a State Senator, Ms. Pugh entered the race to become the Mayor of Baltimore City.  During this time, she worked at her typical breakneck pace – waking at 4 a.m. to run in the dark before work, and not returning to her home until midnight, sleeping only a few hours each night.  Each day included numerous demanding public appearances and private meetings related to her work as a Senator.  In addition to the hundreds of public appearances and private meetings, Ms. Pugh also prepared for and participated in nearly seventy debates, all while continuing to contribute to her community.

Ultimately, Ms. Pugh was elected as the Mayor of Baltimore City in 2016.  She continued to maintain a very busy schedule.  In fact, it became more demanding.  *See* Luke Broadwater and Ian Duncan, *Baltimore Mayor Catherine Pugh's First-Year Agenda Overwhelmed By City Violence,* THE BALTIMORE SUN (December 1, 2017), http://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-pugh-year-in-review-20171128-story.html (noting that Ms. Pugh attended ten different meetings and events with business leaders, fellow officials, and community members on a

normal Tuesday in December of 2017); *see also* Sample Schedules (private information removed) attached as **Exhibit B**.

During her career in public service, Ms. Pugh dedicated a significant amount of time to serving on different community boards, advisory committees, and charitable organizations, including the Baltimore Design School, the Center for Urban Families, and the Maryland Center of Arts and Technology. She has also been a member of numerous organizations designed to help the public, including assisting the Maryland State Drug & Alcohol Abuse Council to develop a plan to prevent and treat drug and alcohol abuse.

Ms. Pugh's accomplishments for the City exceeded those of even the most dedicated public servants. She spearheaded many different initiatives and achieved major permanent accomplishments for Baltimore City that have made the City safer, brought residents closer, increased the City's revenue, and created amazing places for students to learn and grow. Of particular note, Ms. Pugh founded the Baltimore Design School, a public school for grades 6 through 12 that focuses on fashion design, architecture, and graphic design, and provides young students an opportunity to discover and develop skills that will lead to rewarding careers in Baltimore. The school opened in 2011 and the first students started in 2013. It is one of the few schools in Baltimore that has a 99% graduation rate.



The first day of the 2017 school year



Baltimore Design School

According to Fred Lazarus, President Emeritus of the Maryland Institute College of Art and chair of the Board of the Baltimore Design School, Ms. Pugh was insistent on opening the school. He writes:

> *About 15 years ago, Catherine came to me when I was President of MICA to ask me to help her start a Baltimore City Public school focused on Fashion Design. She had visited a similar school in New York and was convinced that young girls who were interested in fashion would be motivated by this kind of a school and through it build self confidence and become engaged in their academics. Because of my schedule, I turned her down three times, but she did not give up and after being asked the fourth time, I said yes. She and I engaged a few others, decided the school should have a broader focus and include graphic design and architecture, wrote a proposal for the school, convinced Dr. Alonzo and the school board of the merits, and opened the Baltimore Design School a decade ago.*

> *Today this school, located in a renovated building in Station North, has over 500 students from every zip code in the city, the high school is ranked by the State as 4th best in the city behind City, Poly and the School for the Arts, a 100% of the graduates are accepted to either a 2 or 4 year colleges and it is truly changing lives. This school would not exist if it were not for Catherine's passion, determination and hard work. She had the vision, she helped us raise the money to buy and renovate a long derelict building and start the school, and to recruit an outstanding board. I and all the students and their families are indebted to her.*

*See* **Ex. A**.   The school has been a remarkable success. *See* BALTIMORE DESIGN SCHOOL, https://baltimoredesignschool.com/ (last accessed February 10, 2020).   Ms. Pugh's other accomplishments include:

- **Started the Baltimore Marathon in 2001.**   The marathon recently attracted 27,000 participants to the city and generated nearly $30.5 million dollars in revenue.  After the first year, $1,000,000 of the profits generated by the marathon were used to buy classroom supplies and other materials for children.

 

- **Founded the Fish Out of Water Project** in 2001, a public art exhibit that successfully promoted Baltimore tourism, civic pride, and raised substantial funds for youth arts programs.  The project brought in hundreds of thousands of dollars to Baltimore City.





An example of a fish for the project          Councilwoman Pugh and Governor O'Malley

- **Initiated the Need to Read Campaign**, designed to improve the reading skills of Baltimore City residents.

- **Launched a teen business challenge** encouraging Baltimore youth to start businesses. *See* Luke Broadwater and Ian Duncan, *supra.*

- **Created the "job mobile motor coach bus."** This bus traveled through inner city neighborhoods and was equipped with computers so that people would have an equal and fair opportunity to submit employment applications. *See Mayor Pugh and Office of Employment Development Unveil New Mobile Workforce Center*, CITY OF BALTIMORE (July 12, 2018), https://mayor.baltimorecity.gov/news/press-releases/2018-07-12-mayor-pugh-and-office-employment-development-unveil-new-mobile.



- **Created a program to employ the Baltimore City youth** and held job fairs that attracted more than 4,000 attendees.  *See* Luke Broadwater and Ian Duncan, *supra.*



19

- **Successfully sought to have over 6,000 new street lights installed** throughout the City to promote resident safety.

- **Signed Baltimore's polystyrene ban** and the Healthy Beverages for Children's Meals bill, making Baltimore the largest city to pass legislation making kids' meal beverages healthier.

- **Helped to completely renovate the Shake and Bake Entertainment Center** on Pennsylvania Avenue, providing a new roller skating rink and bowling alley for the residents of Baltimore.



- **Raised Maryland's high school dropout age from 16 to 18 years old** and eliminated the 90-day waiting period between dropout and GED testing.

- **Created a special certification for experts**, including lawyers and architects, that permitted them to teach at City public schools about their professions without having to obtain a state teaching license.

- **Expanded night and weekend hours at the recreation centers** throughout the City, providing young people with a safer place to spend their time.

- **Closed the $130 million budget gap in the public-school system** and was able to obtain additional funding for schools, including for after school programs.  *See* Luke Broadwater and Ian Duncan, *supra*.

- **Obtained free tuition for first-generation high school graduates** who desired to attend Baltimore City Community College; students who completed their two-year degree program at Baltimore City Community College were able to attend Coppin State University to pursue a Bachelor's degree tuition free.

 

- **Removed numerous Confederate monuments** from public display in the city.

- **Created nearly 6,000 new jobs in 2017 alone**, dropping unemployment rates throughout Baltimore City to 5.2%, the lowest in nearly a decade.  *See* Luke Broadwater and Ian Duncan, *supra*.

- **Introduced legislation called the "Healthy Working Families Act"**, an Act that would provide Maryland workers with earned paid sick leave and alleviate the need for workers to choose between taking care of their families or losing gainful employment.

- **Helped pass the Civil Marriage Protection Act**, ending the exclusion of gay and lesbian couples from marriage.

- **Founded the Neighborhood Impact Investment Fund**, a fund dedicated to delivering capital and promoting inclusive growth in Baltimore's historically disinvested neighborhoods.

- **Created 44 Opportunity Zones,** more than any other U.S. city, spurring the flow of private investment and federal funds into distressed communities.

Ms. Pugh has also received hundreds of awards and recognitions for her initiatives and service to the community, including but not limited to:

- NAACP "Benjamin L. Hooks Keeper of the Flame Award," 2001

- Baltimore Reads "Outstanding Leadership, Dedication, and Support," 2002-2007

- NAACP/NASA Saturday Scholars Academy "Coordinator Director," 2004

- Clean Air Partners "Leadership and Long-term Commitment to the Environment," 2004

- National Coalition of 100 Black Women "Torchbearer Award," 2005

- Delta Sigma Theta Sorority Inc. "Delivering Justice Serving the Public and Taking the Lead Award," 2007

- National Association of Securities Professional "Excellence in Public Policy and Pension Fund Leadership," 2008

- Mount Lebanon Baptist Church "Benefactor Award," 2008

- Coalition to End Childhood Lead Poisoning "Legislative Advocacy Leadership Award," 2008

- Maryland State Conference of Branches Youth and College Division "Legislator of the Year," 2009

- Minority Business Summit "Women of Influence Award," 2009

- Greater Baltimore Committee "President's Award," 2009
- U.S Coast Guard "Leadership Award," 2009
- Greater Baltimore Committee "Achievement Award," 2009
- Maryland State Retirement and Pension System "Pacesetter Award," 2009
- Advocates for Children and Youth "Appreciation for Sponsoring Legislation," 2010
- Daily Record "Maryland's Top 100 Women," 2010
- MVFA "Humane Legislation Champion Award," 2010
- Lambda Kappa Mu Sorority Inc. "Community Service Award," 2011
- American College of Cardiology "Legislator of The Year," 2011
- Maryland State Medical Society "Legislative Award," 2011
- Humane Society of the United States "Humane State Legislator Award," 2012
- Maryland/DC Society of Clinical Oncology "Commitment to Cancer Care," 2012
- Legislative Black Caucus of Maryland "Outstanding Commitment and Leadership to Financial Securities," 2012
- The ARC Baltimore "Public Service Award," 2013
- Park Heights Community "Community Service Award," 2013
- Maryland Minority Contractors Association "State Legislator of the Year," 2013
- National Black Caucus "Crystal Gavel Award," 2014
- Baltimore Teacher Network "Beacon of Light Award," 2015
- Rainbow Push Coalition "Lifetime Achievement Award for Public Policy Advocate Leader," 2015
- Maryland Legislative Agenda for Women "Legislative Leadership Award," 2016
- Daily Record "Maryland's Top 100 Women." 2016
- Maryland Black Caucus Foundation "Outstanding Legislative Leadership Award," 2016
- Chesapeake Climate Action Network "Climate Champion Award," 2016
- National Coalition of 100 Black Women "Torchbearer Award," 2017
- Money Baltimore "Outstanding Commitment to Minorities and Small Business Award," 2017
- Morgan State University "Distinguished Achievement Award," 2017
- Maryland-Washington Minority Company Association "Most Inclusive Mayor for Minority Business," 2017
- National Forum for Black Public Administrators "National Leadership Award," 2017
- Partner America "Small Business Advocate Award," 2017

- Saint Frances Academy "Community Service Award," 2017

- BW Associates "Samaritan Courage Award," 2017

- Baltimore Design School "Founders Award," 2017

- Islamic Circle of North America "Exceptional Public Service Award," 2017

- Korean American Community "Dedication Commitment and Sacrifice Award," 2017

- National Association of Black Hotel Owners, Operators, and Developers "Chairman's Award," 2017

- Iota Phi Theta Fraternity, Inc. "Dedication and Commitment to Service," 2018

- YearUp Baltimore "Urban Empowerment Award," 2018

- Mayor's Scholars Program Recognition, 2018

- United State Conference of Mayors "Recognition for Outstanding Commitment to Financial Education," 2018

- Metropolitan United Methodist Church "Certificate of Appreciation for Outstanding Public Service," 2018

- U.S Chamber of Commerce "Diversity Warrior Award," 2019

- Maryland Historical Trust "Preservation Award," 2019

- City Wide Youth Development "Entrepreneurs Making and Growing Enterprises Award," 2019

- Marcia Lamb "Inner City Innovation Award"

- National Kidney Foundation "Community Health Advocacy Award"

- Pro Bono Resource Center of Maryland "Dedication to Access to Justice Award"

- American Federation of Teachers National Education Association "Recognition for Being a Champion of Public Education"

- Greater Baltimore Black Chamber of Commerce "Lifetime Achievement Award for Working and Advancing the Growth of Business Opportunities for African American's in Maryland"

Ms. Pugh's amazing and tireless involvement in countless academic, charitable, civic, and professional organizations is a testament to her dedication to Maryland and the City of Baltimore. In her own words from an article published by Strayer University in 2017, Ms. Pugh recounted her love for her job as Mayor of Baltimore: **"I'm in my dream job, and this is where I want to be. I'll be here until this city becomes the greatest in America."** *See Leading Strayer Campus to Leading the City of Baltimore*, STRAYER UNIVERSITY (January 18, 2017),

23

https://www.strayer.edu/buzz/leading-strayer-campus-leading-city-baltimore (emphasis added).

### III.  <u>SENTENCING FACTORS</u>

Ms. Pugh comes before this Court having pled guilty to fraud, conspiracy, and tax evasion charges, in violation of 18 U.S.C. §§ 1349, 371 and 26 U.S.C. § 7201.  This memorandum is submitted in an effort to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 543 U.S. 220 (2005).

The Court is no doubt aware of the broad ramifications of *Booker* for this proceeding.  In *Booker*, the Supreme Court restored this Court's ability to fashion a sentence tailored to the unique circumstances of each case and each criminal defendant by requiring courts to consider factors other than the sentencing range prescribed by the United States Sentencing Guidelines.  Thus, although this court must still take the Guidelines into account, *Booker* rendered the Sentencing Guidelines advisory.  *See Gall v. United States,* 552 U.S. 38, 46 (2007); *see also United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007).  The Sentencing Guideline range is no longer binding on the Court, but is only one of several factors in § 3553(a) to be considered in determining the sentence.  *Booker*, 543 U.S. at 245-46; *see also Nelson v. United States*, 555 U.S. 350, 351 (2009) (*per curiam*); *Spears v. United States*, 555 U.S. 261, 263 (2009) (*per curiam*).

In considering the § 3553(a) factors, the Sentencing Guidelines are to be given no more or less weight than any other factor.  In addition, the Guidelines are not to be given any "presumption of reasonableness."  *Rita v. United States*, 551 U.S. 338 (2007).  The "overarching" command of § 3553(a) is the Parsimony Clause, which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  *Kimbrough v. United States,* 552 U.S. 85, 101 (2007) (quoting *Gall,* 552 U.S. at 46, 49).

In *Pepper v. United States*, 562 U.S. 476 (2011), the Supreme Court held that a sentencing

court may consider factors prohibited by the advisory Sentencing Guidelines and may use such factors to reach a just and appropriate sentence even if it results in a dramatic deviation from the Guidelines' recommended sentence.

The result of the post-*Booker* era is a movement away from adherence to Guidelines sentences of lengthy incarceration, and toward individualized sentencing, in which the District Court is empowered to impose a just sentence based on the unique characteristics of the defendant and the full nature and circumstances surrounding the offense.  As stated by Justice Sotomayor writing for the Court in *Pepper*, this is a return to the federal judicial tradition of sentencing that "punishment should fit the offender and not merely the crime."  *Pepper*, 562 U.S. at 487-88 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

We respectfully submit that a measured consideration of the § 3553(a) factors supports a sentence of incarceration for one year and one day, followed by a period of home confinement.

### a.  <u>The Offense Conduct</u>

There is certainly no dispute that the pending charges are very serious.  It is important to remember, however, that this case does not involve physical violence, firearms, narcotics or any danger to the community at all.  Moreover, unlike almost all other fraud related cases seen in this Court, this case did not begin with a malicious intent or design to hurt others.  As the Government will agree, the initial sale of the Healthy Holly books to University of Maryland Medical Systems ("UMMS") was borne out of a completely altruistic and sincere motive by Ms. Pugh to help fight childhood obesity and was not a purported swindle of money driven by greed.  Indeed, in hindsight, it is apparent that had Ms. Pugh received proper professional guidance and advice, the sale and distribution of Healthy Holly books could easily have been accomplished in a perfectly appropriate manner.

It is also noteworthy that many books sold to purchasers were, in fact, delivered to children

in Maryland, Virginia, and the District of Columbia.   *See* Erin Dietsche, *Kaiser Permanente Embroiled in Baltimore Mayor's Book Scandal That Led Her to Resign,* MEDCITY NEWS, May 5, 2019,   https://medcitynews.com/2019/05/baltimore-mayor/. ("In comments sent via email on May 6, a Kaiser spokesman said the organization has purchased *Healthy Holly* books since 2015 and distributed them to families and kids in Maryland, Virginia and the District of Columbia.").   And Ms. Pugh herself regularly used the Healthy Holly books in her many visits to schools across Baltimore City.

 

 

Reading with students at various Baltimore City schools

With respect to the victims in this case, the Government has informed counsel that many of the persons and entities that purchased the books are not seeking restitution.   And the largest purchaser of the books, UMMS, has admitted that none of its officials read any of the books prior to

purchase.[5]   Moreover, State auditors complained in a recent report that UMMS officials obstructed their investigation into the sale of the books.  As a Legislative Auditor reported:

> **Throughout this [auditing] process the Corporation [UMMS] has delayed and hindered our work by repeatedly failing to make employees available and failing to provide requested information on a timely basis.**

*See* Kevin Rector, *State Auditors Say UMMS 'hindered' Their Investigation Sparked By Baltimore Mayor's 'Healthy Holly' Scandal*, THE BALTIMORE SUN, Nov. 19, 2019, http://www.baltimoresun.com/politics/bs-md-pol-umms-audit-delay-20191119-qurd3d7xovaldgnkafu4wrlysu-story.html (emphasis added).

Accordingly, we respectfully submit that this case presents a "one off" from the fraud-cases typically seen by this Court and warrants a significant downward variance from the advisory Guidelines range.

### b.  The Advisory Sentencing Guidelines

There is no disagreement among Ms. Pugh, the probation office, and the government over the applicable guidelines calculation.  Specifically, that the base offense level is seven (7), pursuant to U.S.S.G. § 2B1.1(a)(1).  An additional twelve (12) levels are added pursuant to § 2B1.1(b)(1)(G) because the loss in this case is more than $250,000 but less than $500,000.  Two additional points are added pursuant to § 2B1.1(b)(10)(C) because the offense involved sophisticated means.  Two additional points are added pursuant to § 3B1.3 because Ms. Pugh abused a position of public trust in a manner that facilitated the commission or concealment of the offense.  Two additional points are added pursuant to § 2B1.1(b)(9)(A) because the offense involved a misrepresentation that Ms. Pugh was acting on behalf of a charitable or educational organization.  One additional point is

---

[5] *See* Morgan Eichensehr and Ethan McLeod, *Audit Finds UMMS Officials Did Not Read the "Healthy Holly" books Before Buying Them*, BALTIMORE BUSINESS JOURNAL, Dec. 13, 2019, https://www.bizjournals.com/baltimore/news/2019/12/13/audit-finds-umms-officials-did-not-read-the.html.

added for grouping of the charges pursuant to § 3D1.  Thus, the correct adjusted offense level in this case is twenty-six (26).

Ms. Pugh has, both through her actions and words, fully accepted responsibility for this offense in a very timely manner.  Accordingly, her advisory Guideline level is reduced by three (3) points, resulting in an adjusted offense level of twenty-three (23).  Because Ms. Pugh has no criminal history at all, the resulting advisory Guideline range is 46 to 57 months.

Notwithstanding the Guidelines calculation, we respectfully submit that a substantial variance is warranted here because the Guidelines methodology in this fraud case places a disproportionate reliance upon the loss table set forth in § 2B1.1.  Ms. Pugh's advisory Guidelines range is driven largely by a 12-point increase based on the loss table.  For good reason, numerous courts have critiqued this methodology.

Indeed, federal courts have criticized the fraud guidelines as being "fundamentally flawed." In a recent sentencing opinion in *United States v. Mark Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 26, 2018),[6] U.S. District Judge Nicholas Garaufis stated:

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. It is

---

[6] This opinion is attached as **Exhibit C**.  The Court in that case added (regarding the fraud guidelines) that:

> many in the legal community urge the Sentencing Commission to write this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators. The problems with the loss enhancement have been evident since the inception of the Guidelines. In 2004, then-District Judge Gerald Lynch generously called the loss enhancement a "questionable" aspect of the guidelines. *United State v. Emmenegger,* 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). He identified all of the problems with this scheme: the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on. *Id.* at 427-28. These concerns have continued unabated.

*Id.* at *4.

no wonder that Judge Stefan Underhill, concurring in a recent Second Circuit opinion, called the loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring)[. …] **Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less <u>solely</u> responsible for a white-collar offender's Guidelines sentence.** Accordingly, Judge Underhill opined that, **because the loss Guideline "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices ..., district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides."** *See Corsey*, 723 F.3d at 379 (op. of Underhill, J.). I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. **That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.**

(Emphasis added); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account … and effectively guaranteed that many such sentences would be irrational on their face.").

Additionally, in 2013, the American Bar Association ("ABA") assembled a task force to evaluate reforms needed in the sentencing of federal economic crimes. The task force proposed an overhaul to the Guidelines that shifted the emphasis away from loss figures, and recommended that where a defendant has zero criminal history points and the crime was not "otherwise serious," the offense level should be no greater than ten and "a sentence other than imprisonment is generally appropriate." *See* A REPORT ON BEHALF OF THE AMERICAN BAR ASSOCIATION CRIMINAL JUSTICE SECTION TASK FORCE ON THE REFORM OF FEDERAL SENTENCING FOR ECONOMIC CRIMES 2 (A.B.A. Crim. Just. Sec., 2014) *available at* https://www.americanbar.org/content/dam/aba/ publications/criminaljustice/economic_crimes.pdf.

The Guidelines are drastically overstated for economic crimes:

> The Sentencing Commission was supposed to ensure "the general appropriateness" of probationary sentences for first-time offenders unless they commit "crime[s] of violence or ... otherwise serious offense[s]." Instead, it unilaterally declared in 1987 that every theft, tax evasion, antitrust, insider trading, fraud, and embezzlement case is "otherwise serious," and thus no more eligible for a sentence of probation, even when committed by a firsttime offender, than would a crime of violence.

*United States v. Leitch*, No. 11-CR-00039 JG, 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28, 2013).

In this case, we submit that a straight application of the 2B1.1 Sentencing Guidelines is inappropriate given that: (1) the arrangement started altruistically; (2) the offense did not involve any violence or danger to persons; (3) Ms. Pugh has otherwise led an exemplary life of service to others; and (4) the unique circumstances that have already resulted in a severe punishment.

### c.   Ms. Pugh's Personal History and Characteristics Support Leniency

Ms. Pugh has absolutely no criminal record.  But even beyond that, her life story is quite simply remarkable.  As discussed above, she was raised in very modest circumstances by hard working parents.  She began working long hours at menial jobs *at the age of fourteen* to help support her family, and yet she rose up to become the founder of a newspaper and a design school, the Dean of a business school, a Maryland State Delegate, Maryland State Senator, and the Mayor of Baltimore.  She built this amazing career solely through determination and long hours of hard work.  Despite the tremendously embarrassing sequence of events that form the basis of the charges in this case, Ms. Pugh is determined to again be a strong contributor to her community.  She is an amazing person who has accomplished more in her 69 years of life than most could in a hundred lifetimes.  But even good people make bad decisions and none of us should be judged by our worst act on our worst day.

*Ms. Pugh is determined not to let this case define her*.

We have provided the Court with a remarkable series of letters from those who know her best.  *See* **Ex. A**.  These letters of support attest to Ms. Pugh's character and integrity.  She is

universally described as a generous person dedicated to helping others and devoted to public service. The letters contain numerous anecdotes about Ms. Pugh that, frankly, describe her better than any words laid out in a sentencing letter or a Presentence Report. We would like, however, to highlight a few of the remarks for the Court's consideration.

Dr. David Wilson, President of Morgan State University, has known Ms. Pugh for nearly ten years. He describes Ms. Pugh as "a good person with a good heart, a positive spirit and an individual who cares immensely about the welfare of those less fortunate." He writes:

> *What I have come to respect about Mayor Pugh is her tremendous love for her family, the city of Baltimore-every block of it-and her love of being the city's mayor. She has often said that was her dream job. On several occasions, Mayor Pugh would have a conversation with me about her desire to significantly reduce the crime in Baltimore City and the strategies that she was employing to do that, and I can recall one conversation, in particular, where she was teary eyed as she spoke about the "squeegee kids." Mayor Pugh saw those kids as her own children and regaled with stories of how she would stop for conversations with them, buy clothing for them, buy them food and even arrange for some of them to get jobs with organizations around the city. She had the same approach to the homeless population in our city, oftentimes picking individuals up off the street in her mayoral vehicle, driving them to homeless shelters to ensure they did not freeze at night and that they could enjoy a decent bath, change of clothes and good night's sleep.*

Maya Jackson, Ms. Pugh's niece and daughter of Addie Crump Jackson, is a current graduate student in Baltimore. She describes Ms. Pugh as an excellent role model who worked tirelessly to help her family and members of her community. She writes:

> *My aunt has repeatedly played a key role in my life at various crucial moments. Although my parents always pushed education, they often struggled to present themselves as role models and lead by example. While my mother was physically and emotionally unavailable during my freshman year of high school, my aunt would often travel two-hours to visit my sister and I on the weekends. She would take us shopping to make sure we were clothed. She would check our homework. Ultimately, she made sure we were pushing forward rather than giving up. Unaware of how busy she was, I didn't understand how much these efforts illustrated her character. My aunt was barely sleeping. She would intentionally take the train so she could use that time to work on various projects and tasks she had going on with Baltimore city. She was going above and beyond not because she had to, but because she wanted to and because she cared.*
>
> *Similarly, during my undergraduate career, my mother and father were both often*

31

*unavailable. My sister was a Penn State student while I was at student at Temple University. Lacking guidance, my aunt would often invite us to senator hearings in Annapolis. She allowed my sister to stay with her during winter and spring breaks to explore her career interests. It was my aunt who drove me to my first internship interview. My aunt took me to all her events during the summer of 2016 so I could meet different attorneys to help solidify my interest in law school. My aunt is who I confide in during these stressful law school days.*

*Outside of what she's done for me, being in Baltimore allowed me to realize my aunt does not just go above and beyond for family, but for the city of Baltimore. Visiting my aunt after late nights in the library, I was fortunate enough to see what goes on beyond news reports. I was able to see everything she does outside her regular duties. I remember her talking about a young boy who was often seen in the street instead of school. My aunt went from simply telling him to go to school, to taking him to school, to placing him in a safer home and better school.*

*Listening to my aunt's stories and watching her work endlessly for the city as a whole and individually with some of Baltimore's most vulnerable citizens reminded me of a talk we had during my undergraduate career. I remember sitting in the car with her for an hour. I was upset because I felt unclear about what I wanted to do with my life. I remember my aunt telling me to be unclear is okay. I remember her telling me she never knew exactly what she wanted to do, but that she just knew she wanted to help people. It was my time during my 1L year where I watched and listened to my aunt talk about her plans for the city that I realized losing sleep did not matter because my aunt was doing exactly what she said she wanted to do years ago.*

Dr. Tyrone Powers, a former Maryland State Trooper and former Special Agent with the

Federal Bureau of Investigation, has known Ms. Pugh for nearly 20 years.  He writes:

*Ms. Pugh has unselfishly and faithfully served the citizens of this nation, Maryland, and more specifically, the citizens of Baltimore City. I have heard her compassionate thoughts, hopes and plans to make Baltimore a safe and better city. She has lamented over the pain of so many. Throughout my years of knowing Ms. Pugh, I have observed her sincere and effective efforts to help increase the life chances for disadvantaged people from all walks of life – especially for youths who live daily with a sense of hopelessness. She has worked diligently to guide them away from a life of crime and steer them towards real and tangible opportunities. I have observed her cry when young people went astray, lost their lives or lost their freedom to harsh realities of prison. Even after resigning from office, even in her state of regret and mental and physical distress – she has remained concerned about others. She remains haunted day and night by the pain and misfortune of so many people. Having been a public servant for over two decades, she remains dedicated to making people's lives better. Catherine Pugh still wants to be and can be a significant part of the solution in our city and in our communities.*

Richard Rowe, a friend and colleague of Ms. Pugh's for over 25 years, describes Ms. Pugh

as an "upstanding, righteous and exceptional person" who is a "principled and caring member of the

32

community." He further describes her as someone:

> *who would go the extra mile to serve the needs of others, support her colleagues and volunteer her time unselfishly. Moreover, due to the fact that a lot of my work, over the years, has been directed at addressing the life-affirming needs of underserved youth and families, Ms. Pugh never hesitated to support my efforts and she also served as a committed and caring mentor to a number of the young women that participated in my program. Thus, it is for this reason that I am totally proud to write this character reference letter for Catherine Pugh.*

Piccola Winkey, neighbor and friend of Ms. Pugh's for over 24 years, describes Ms. Pugh as

"one of the most compassionate and humble people" that she knows.  She writes:

> *I have watched how she encouraged my two older children as well as many others to achieve higher education and goals. … She encourages children as well as adults to push themselves to be the best version of themselves.*
> *…*
> *In 24 years of knowing Catherine, I have cried on her shoulders for many life adversities. On July 31, 2002, I gave birth to my youngest daughter. When my daughter was born, she was diagnosed with having down syndrome. I was devastated, causing me to fall into a deep depression. After being discharged from the hospital, Catherine visited me bearing gifts and words of encouragement. A few weeks later, Catherine rallied all of the neighbors to have a block party to introduce the new baby. This is the type of kindness she not only had for me, but many others.*
>
> *Catherine always took time out of her very busy schedule to listen to my concerns. I remember talking to her about my concerns of my daughter's bus aides. After listening to me, she drafted a bill that was later made into a law.*

Drake Winkey moved across the street from Ms. Pugh in 1996 when he was just a child.  He

describes Ms. Pugh as "an amazing person and asset to the communities in which she has served."

He writes:

> *My first job as a teenager was cutting her grass. When I look back on it, I did not do a great job, but she kept me doing it because it was important for me to understand the power of entrepreneurship and honest work, and that was more important than her having the best lawn in the neighborhood. Ms. Pugh has always been a selfless servant for the state of Maryland and the city of Baltimore, not because of the things that she has done on a major scale but because she has always thought about the little people, the people that others might think to be insignificant.*

Paulette Walker Johnson, a Professor Emeritus at Virginia State University and long-time

friend and former Morgan State University classmate and teammate of Ms. Pugh, writes:

> *Since leaving Morgan State [Ms. Pugh's] entire life has been dedicated to public*

*service. Her outstanding work ethic, social skills and people oriented leadership style allowed her to accomplish great things for her family, community and her constituents. Cathy has been known to put the health and well being of others before herself.*

Ardell Crump, Ms. Pugh's brother, describes Ms. Pugh as an "exemplary daughter" and "dedicated sister." He adds:

*Cathy set an example by being an Honor student throughout school. Providing the example on how we should proceed. She never got in trouble. No smoking, no drinking of alcohol, no drugs and no teen pregnancy. Not even a traffic ticket. She is the first to go and graduate from College from amongst our many cousins. In graduating from Morgan State University to Newspaper owner to TV show host to business entrepreneur and politician Cathy's character never came under question. Cathy has been an example for all her family and friends to mirror. Cathy's Morals and ethics have been what has led her to be the confidant each of us her siblings have tapped into for direction. In difficult times whether it been work, financial help or personal life.* ██████████████████████████████████████

██████████

...

*This whole ordeal has had Cathy extremely remorseful. Cathy has never tried to intentionally defraud or enrich herself dishonestly. Healthy Holly was not about making a profit but about addressing an obesity issue in our society.*

James Crump, Ms. Pugh's brother, recounts his childhood with Ms. Pugh and writes:

*Catherine has always been very supportive of our three younger sisters,* ████████ ██████████ *Catherine has provided and has taking them in when there was no place for them to stay. Catherine has paid their rent whenever they were behind. Catherine is like a Mother to them, as of late she has been very attentive to our baby sister's daughters providing a place for one while she is attending law school. Catherine has always been a champion of people, helping in communities, through education, worship, motivation, she is one I know who will always give to those who need a helping hand, a listening ear, and words of encouragement. It is a difficult concept for an outsider to understand, but it comes from what is inside us.*

In viewing Ms. Pugh's life from a larger context, this is clearly the lowest point in an otherwise amazing and exemplary life devoted to serving others. The continued support of family and friends, however, reveals the type of successful and dedicated person that she is. This support also shows that she is not a person who will be back before the Court ever again in a negative way and who does not pose any threat to others. *See United States v. Howe*, 543 F.3d 128, 137 (3rd Cir. 2008) (relying on numerous factors to support a downward variance including that the defendant

"led an honorable and lawful life until this point and had no prior criminal history," and "was a 'well-regarded member of his community'"). Despite this case, Ms. Pugh is still a good and decent person and remains dedicated to helping others. As Judge Rakoff of the Southern District of New York stated:

> **But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'**

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 93 (2d Cir. 2008) (emphasis added).

Ms. Pugh is now coping with the realities of her actions and the effects on the community and her family. She has fully admitted her conduct and she has done so at the earliest possible moment in this case. By her actions, she has avoided a prolonged trial, spared limited Government and judicial resources, and closed an unfortunate and regrettable chapter in the history of this City. And while there is undeniably a need to punish the Defendant for her actions, this punishment should be tempered by who she is and what she has done before this case, as well as the immense and very public punishment she has already suffered as a direct consequence of the charges in this case.

### d. The Psychological Impact of this Case on Ms. Pugh

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████







We respectfully submit that Ms. Pugh has suffered and continues to suffer in an immense and extraordinary way.  Simply locking her up for a period of time prescribed by the Sentencing Guidelines would not promote the overall goals of federal sentencing.  In fact, such a sentence would ███████████████████████████ further hinder her ability to rebuild her life and to once again meaningfully contribute to society.

### e.   **A Sentence of One Year and One Day Would Afford Adequate Punishment and Deterrence**

Ms. Pugh deeply regrets engaging in the charged conduct and has fully accepted responsibility. She has acknowledged that what she did was unlawful and pled guilty immediately. Along with her guilty plea, she resigned as Mayor of Baltimore City, ending a lifelong dedication to public service under a cloud of shame and humiliation.

Ardell Crump, Ms. Pugh's brother, describes the mental and physical toll that this case has taken on his sister. He writes:

> *This whole ordeal has had Cathy extremely remorseful.*
> *…*
> *The humiliation of stepping out of office because the community has lost confidence in her due to the media portrayal of these circumstances are punishment enough for someone who has served and loved the community as she has. Imprisonment and loss of pension is harsh in my opinion. I have never seen Cathy so distress[ed] and second guessing herself as these times have presented. Cathy has not eaten or slept properly since theses tribulations have unfolded. I have prayed with and have consoled her as much as I can. Cathy has taken full responsibility for all actions that have led to today. The impact has and is hindering her emotional and physical wellbeing.*

See **Ex. A**. Dr. David Wilson, President of Morgan State University and friend of Ms. Pugh writes:

> *One thing is certain from interactions I have had with Catherine Pugh: she understands the tremendous mistake she made which has resulted in the loss of the job that she has coveted for years. Her mistake has taken a toll on her health and her overall well-being.*

See id. Richard Rowe, Ms. Pugh's friend and colleague of over 25 years, states:

> *[S]he has shown remorse, suffered tremendous pain and shared with me and others feelings of sorrow, shame, self-accusation, and has accepted responsibility for committing the crimes she has been charged with.*

See id. Ocola Keelan, Ms. Pugh's friend of over 50 years, describes Ms. Pugh as remorseful and adds:

> *One of the things stated by Catherine pertaining to this case is that she takes full responsibility for all that has led to this day and anything that has her name on it. She has suffered mentally, physically, and emotionally. She is very remorseful as she continues to express her desire to be the best person she can be.*

*See id.*

Ms. Pugh is regretful, remorseful, and extremely disappointed in herself. She understands that this conviction will forever change her future and how she is perceived. She has continuously tortured herself over the failure on her part and the effect it has had on her community, friends, and family.

One of the most important purposes of sentencing is to "protect the public from further crimes." 18 U.S.C. § 3553(a)(2)(C). As a result of her conduct, it is clear that Ms. Pugh cannot under any circumstances engage in this type of conduct in the future. Because of the massive publicity and anger generated by the community in this case, Ms. Pugh has become a pariah. Her picture has been spread across the country and in all corners of the internet. For weeks, there were members of the media camped out on her front lawn live-streaming her every action. She could not even leave her own home. *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (considering the "incalculable damage" from "tremendous media coverage" including that the defendant was "portrayed as the face of public corruption"). She has been publicly humiliated and faces a unique and tremendous uphill battle to rebuild any semblance of a life after she finishes serving her sentence in this case. She will never again be able to serve as an elected official.

Ms. Pugh's fall from grace, public humiliation, and front-page national disgrace are powerful and significant punishments. She has already paid an extraordinary price for her conduct. As a result of her actions, she has lost everything that she has and everything she worked toward. She will be saddled with forfeiture and restitution orders that will hamper her financially for the remaining years of her life. She will lose her house and everything that she owns.

It is evident that Ms. Pugh has also lost any chance that she had to continue to serve as an elected public figure for her community. Ms. Pugh will have a very limited ability to earn income in the future. She will go from being an accomplished member of the community to being without a

home and without any assets. Ms. Pugh will not have a house to return to when she is released from incarceration. She does not enjoy the benefit of having family nearby and able to help with the issues that will inevitably arise as one gets older. At this point, it is uncertain what the future holds for Ms. Pugh.

Frankly, the irreparable collateral consequences of her conviction will adequately "reflect the seriousness of the offense" in this case. *See United States v. Speed Joyeros*, 204 F. Supp. 2d 412, 440-41 (E.D.N.Y. 2002) (applying a downward departure warranted as a result of defendant's loss of business and effect on income and assets).

Furthermore, a sentence of one year and one day will adequately deter others from engaging in similar conduct. When the Guidelines first came into effect in 1987, the United States Sentencing Commission stated that it sought to ensure that those who committed non-violent financial crimes received "short but definite periods of confinement." FIFTEEN YEARS OF GUIDELINES SENTENCING:  AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 56 (U.S. Sentencing Comm'n, 2004) *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf. As the 1987 Guidelines stated, "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes." U.S. SENTENCING GUIDELINES MANUAL ch. 1, pt. A, § 4(d) (1987). Indeed, empirical research shows that, while "increases in severity in punishment do not yield significant (if any) marginal deterrent effects," certainty of punishment does have a deterrent effect. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006); *see also*, Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:  Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-49 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity," and "there is no decisive evidence

to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Ms. Pugh has never been arrested before this case and does not pose any danger to the community. There is no need to protect the public from further crimes by her, and a lengthy period of incarceration would not only *not* further the purposes of sentencing, but it would be a detriment to society.

Ms. Pugh is 69 years old and her age, combined with her current mental state and notoriety, would result in higher costs of, and greater challenges to, achieving safe incarceration. According to a 2015 report issued by the Office of the Inspector General, Bureau of Prisons ("BOP") institutions are not suited for older inmates. *See* Office of the Inspector General: U.S. Dep't. of Justice, *The Impact of An Aging Inmate Population on the Federal Bureau of Prisons* (February 2016), https://oig.justice.gov/reports/2015/e1505.pdf. The report found that the BOP has limitations on its ability to house elderly inmates and incurs a greater cost to do so. Specifically the "physical infrastructure of BOP institutions cannot adequately house aging inmates." *Id.* at i-ii. Similarly, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. *Id.* at i. The report further concluded that aging inmates (50 years and older) engage in fewer incidents of misconduct while incarcerated, and provided statistical evidence that older criminal defendants have "a lower rate of re-arrest once released." *Id.* at iii.

Furthermore, the report stated that "the limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates," including mental health care. *Id.* at i-ii, 17, 22-23. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

Likewise, the newly enacted First Step Act specifically states that the BOP "**shall**, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph." 18 U.S.C. § 3624(c)(2) (emphasis added).  The program evidences Congress's intent to encourage home confinement for elderly offenders that pose no danger or risk of recidivism.  Accordingly, a sentence of one year and one day is more than sufficient; it exceeds the Congressional intent behind the First Step Act.

### IV.    CONCLUSION

Ms. Pugh has become a tragic figure – an inspiring person dedicated to helping her community who is now a disgraced, unemployed felon, and who has lost everything that she had. We submit that, under the unique circumstances of this case, Ms. Pugh's immediate acceptance of responsibility, her age and ████████████████ and her entire life's dedication to public service, the Court should impose a sentence of incarceration for one year and one day.  Such a sentence, coupled with the loss of her entire career, the public dishonor, and serious economic loss that she has and will continue to suffer, would result in a significant punishment for Ms. Pugh's actions. This sentence also balances the competing goals of sentencing as set forth in 18 U.S.C. § 3553 and is more than adequate, but not greater than necessary, to accomplish those goals.

We respectfully submit that Ms. Pugh has suffered and continues to suffer in an immense and extraordinary way.  Simply locking her up for a period of time prescribed by the Sentencing Guidelines would not promote the overall goals of federal sentencing.  In fact, such a sentence would ████████████████████████ and further hinder her ability to rebuild her life and to once again meaningfully contribute to society.

Dated: February 13, 2020                    Respectfully submitted,

                                            _____*/s/*_____
                                            Steven D. Silverman (Federal Bar No. 22887)
                                            Andrew C. White (Federal Bar No. 08821)
                                            Abigail E. Ticse (Federal Bar No. 20215)
                                            SILVERMAN THOMPSON SLUTKIN & WHITE, LLC
                                            201 N. Charles Street, 26th Floor
                                            Baltimore, Maryland, 21201
                                            (410)-385-2225 (t)
                                            (410)-547-2432 (f)
                                            ssilverman@silvermanthompson.com
                                            awhite@silvermanthompson.com
                                            aticse@silvermanthompson.com