Neutral

As of: February 10, 2020 8:09 PM Z

# United States v. Johnson

United States District Court for the Eastern District of New York

April 26, 2018, Decided; April 27, 2018, Filed

16-CR-457-1 (NGG)

**Reporter**
2018 U.S. Dist. LEXIS 71257 *

UNITED STATES OF AMERICA -against- MARK JOHNSON, Defendant.

**Subsequent History:** Decision reached on appeal by United States v. Johnson, 2019 U.S. App. LEXIS 27478 (2d Cir., Sept. 12, 2019)

**Prior History:** United States v. Johnson, 2017 U.S. Dist. LEXIS 190968 (E.D.N.Y., Sept. 21, 2017)

## Core Terms

sentence, enhancement, Guidelines, factors, deterrence, fine, calculation, trades, white-collar, traders, amount of loss, frontrunning, obstruction, recommend, argues, commit

**Counsel:** [*1] For Mark Johnson, Defendant: Frank Harold Wohl, John R. Wing, Patrick Paul Garlinger, Ramya Kasturi, Lankler Siffert & Wohl LLP, New York, NY; Joshua Evan Dubin, Joshua E. Dubin, Esq., P.A., Fort Lauderdale, FL.

For USA, Plaintiff: Jacquelyn M. Kasulis, LEAD ATTORNEY, United States Attorneys Office, Brooklyn, NY; Lauren Howard Elbert, LEAD ATTORNEY, United States Attorney's Office, EDNY, Brooklyn, NY; Blake Goebel, United States Department of Justice, Washington, DC; Brian R. Young, Dept. Justice CRM Division, Washington, DC; Carol L. Sipperly, Department of Justice, Dc, DC; Julia Nestor, U.S. Attorney's Office for the Eastern District, Brooklyn, NY.

**Judges:** NICHOLAS G. GARAUFIS, United States District Judge.

**Opinion by:** NICHOLAS G. GARAUFIS

## Opinion

**SENTENCING MEMORANDUM**

NICHOLAS G. GARAUFIS, United States District Judge.

This sentencing statement concerns Defendant Mark Johnson, who was convicted on eight counts of wire fraud and one count of conspiracy to commit wire fraud following a jury trial. (See Jury Verdict (Dkt. 182).) The court assumes familiarity with the history of this case and the allegations against Johnson, which are set forth in past opinions by this court. (See, e.g., May 22, 2017, Mem. & Order (Dkt. [*2] 61) at 1-5; see also Dec. 13, 2017, Order (Dkt. 192) at 2 (discussing Johnson's trial))

**I. OFFENSE LEVEL**

I agree with the Probation Department's suggested offense level of 29. In computing this offense level, I considered all documents submitted by both sides, including all memoranda of law, the Probation Department's Presentence Report (or the "PSR") and its addenda to the PSR, as well as letters from the Government and the defendant objecting to the PSR.

The base offense level for Johnson's crime of conviction is seven. U.S. Sentencing Guidelines Manual [U.S.S.G.] § 2B1.1(a)(1). This figure is undisputed.

Johnson receives a two-level enhancement based on his supervisory role in the offense. U.S.S.G. § 3B1.1(c). This figure is undisputed. I find that this enhancement is proper largely for the reasons stated by the Government in its Memorandum: Johnson was a supervisor in the relevant chain of command at HSBC and clearly exercised decision-making authority and control over the Cairn transaction. (See Gov't Mem. (Dkt. 217) at 18-20.)

Johnson also receives a two-level enhancement based on his abuse of a position of trust. U.S.S.G. § 3B1.3. Johnson objects to this enhancement. He argues that the Government's theory of the case at trial implicitly [*3] incorporated an allegation that he violated a duty of trust and confidence, thus precluding an additional imposition based on this factor. (See Def. Mem. (Dkt. 222) at 49-50.) Although it is undisputed that "[o]ne of the central issues in this case was whether HSBC and Cairn Energy PLC, its client, had a 'relationship of trust and confidence'" (Def. Mem. at 20), that issue did not form an element of an offense for which Johnson was convicted. The Second Circuit has cautioned against double counting the abuse-of-fraud enhancement where, for example, the Government has sought to impose it because a victim relied on the defendant's representations, a necessary element of virtually all fraud offenses. See United States v. Huggins, 844 F.3d 118, 126 (2d Cir. 2016). By contrast, the abuse-of-trust enhancement is proper for Johnson because he was accorded discretion by Cairn and abused his position of quasi-fiduciary status. See id. at 124. These factors are not elements of the base offense, even if the Government's case at trial incorporated the position of trust that Johnson abused. The enhancement is proper.

Johnson also receives a two-level enhancement for obstruction of justice. U.S.S.G. § 3C1.1. Johnson objects to this enhancement as well. The PSR sets out two reasons [*4] for which this enhancement is warranted: Johnson's testimony that neither he nor anybody under his supervision gave Cairn false or misleading information concerning the transaction; and his testimony as to why he tipped other traders at HSBC. (Presentence Report ("PSR") ¶ 33.) See U.S.S.G. § 3C1.1, cmt. n. 4(B). The Government adds another reason warranting this enhancement: Johnson's testimony as to the meaning of various code words employed during the trade. (See Gov't Mem. at 27-28.) In order to apply the obstruction enhancement based on perjury, I must "find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Thompson, 808 F.3d 190, 194-95 (2d Cir. 2015) (per curiam) (quotation marks omitted) (quoting United States v. Agudelo, 414 F.3d 345, 349 (2d Cir. 2005)). These allegations are well supported by the PSR and the Government's letter in response to Johnson's objections to the PSR, which the Probation Department adopted in the First Addendum to the PSR. (See PSR ¶ 33; First Addendum to the PSR at 4 (using the Government's letter recounting "specific examples of false testimony provided by the defendant at trial" as support for the obstruction enhancement).) I find the Government's recounting of Johnson's [*5] false testimony to be "sufficiently detailed and explicit" to merit the application of this enhancement. See United States v. Johns, 324 F.3d 94, 98 (2d Cir. 2003) (stating that the district court may adopt the findings of the PSR to support an obstruction enhancement where "the findings of the PSR were sufficiently detailed and explicit"). Johnson's lengthy arguments to the contrary are unavailing.

Finally, Johnson will receive a 16-level enhancement for the loss—or, in this case, gain—caused by his conduct. U.S.S.G. § 2B1.1(b)(1) & cmt. n.3(B). Under this provision, the court must enhance the defendant's offense level based on the amount of loss caused; or, if the amount of loss "reasonably cannot be determined," the court is directed to use "the gain that resulted from the offense." Id. I note that, although I am using the approximate "gain that resulted from the offense as an alternative measure of loss," id., I will refer to the resulting enhancement as the "loss enhancement." Cf. United States v. Martoma, 48 F. Supp. 3d 555, 562 (S.D.N.Y. 2014) (using USSG 2B1.1's instructions as to loss estimation for the purposes of determining the amount of gain). The PSR and the Government both argue for the use of gain as an alternative measure of loss. (See Gov't Mem. at 8.) Johnson argues that his conduct did not cause Cairn to suffer any loss, so [*6] no loss enhancement is proper.

According to the Government, the court should calculate this enhancement based on the total amount of profit that HSBC made on the Cairn transaction "because Cairn would never have enlisted HSBC to engage in the transaction at all had it known how it would be executed and how dishonest HSBC and its staff would be." (Gov't Mem. at 15.) Under the Government's theory, the total amount of gain falls between $3.5 and $9.5 million, leading to an 18-level enhancement. I do not agree with the Government's calculation method. While the Government is right to argue for the inclusion of a $3,137,022 gain based on the profit that the HSBC traders collectively realized from the illegitimate frontrunning trades, the causal connection between the criminal conduct for which Johnson was convicted and the approximately $4.2 million in profit that HSBC made on the deal is too attenuated to support this enhancement. The Government has not proven by a preponderance of the evidence that that no profit would have resulted from the Cairn transaction but for Johnson's fraudulent behavior, nor has it rebutted the argument that HSBC likely would have made that profit on the Cairn [*7]

transaction even without engaging in deceptive conduct.

On the other hand, Johnson would exclude the gain realized by the HSBC traders as a result of the frontrunning trades from the loss enhancement altogether because he argues "there is no evidence whatsoever that these trades caused any harm to Cairn." (Def. Reply (Dkt. 229) at 21.) First, Johnson is correct that the district court may only use gain as an alternative measure of loss if there was an actual loss. See United States v. Romano, 794 F.3d 317, 339 (2d Cir. 2015) (citing U.S.S.G. § 2B1.1 cmt. n.3). As the Government points out, though, factual findings relating to loss need only be proven by a preponderance of the evidence. See United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009). Here, I agree with the PSR that it is more likely than not that Johnson's "efforts to ramp up the price at the fix succeeded in raising the price" (PSR ¶ 29), thus causing Cairn to sustain an economic loss. This conclusion is additionally supported by the testimony of Frank Cahill, the London-based HSBC trader who executed the deal, that his objective in trading was to increase the price of the British Pound, something which I believe likely had an impact on the spot price used to fill Cairn's order. (See Gov't Mem. at 9-10.) Johnson argues that the Government's position is "not [*8] supported by evidence," but this is not so. (See Def. Reply at 8.) Rather than simply establishing "the normal way a fix trade works," as Johnson characterizes the Government's argument (id. at 12), the Government marshaled evidence at trial establishing that the Cairn transaction in particular was not conducted according to the normal procedures to fix trades, and that the fraud for which Johnson was convicted likely caused Cairn to pay an inflated price. Johnson argues that the inflated fix price resulted from an example of "the standard execution of fix transactions by large banks" (id. at 17), but the jury found that Johnson executed this transaction in a wholly abnormal fashion. The Government has proven by a preponderance of the evidence that Cairn suffered a loss and that such a loss was caused by Johnson's conduct of conviction, so a loss enhancement is proper.

I also reject Johnson's contention that, even if Cairn suffered a loss, the court should still decline to apply a loss enhancement. As I already stated, because the loss in this case is difficult to quantify, the court relies on an approximation of gain, as permitted by comment note 3(B) to Guideline 2B1.1. I agree with the PSR that the approximate gain created as a result [*9] of the front-running trades is the proper measure of gain to apply in this case. (PSR ¶ 29; Addendum to the PSR at 1.) As the Government notes, the sum of the gain realized by the front-running traders is proper under Guideline 1B1.3, which directs the court to look at "all acts and omissions of others" pursuant to "jointly undertaken criminal activity" such as this. (Gov't Mem. at 16 n.7.) That the

defendant did not realize these profits personally is of no moment as far as the loss enhancement is concerned. See United States v. Falcioni, 45 F.3d 24, 28 (2d Cir. 1995). The $3.1 million figure suggested by the PSR falls within the range of $1.5 to $3.5 million, so a 16-level enhancement is proper. U.S.S.G. § 2B1.1(b)(1)(I).

In conclusion, Johnson's total offense level is 29. Because the defendant has no criminal history, he receives no further enhancements.

## II. SENTENCE

In determining the sentence, in addition to the legal documents mentioned before, I have considered over 120 letters that were submitted in support of the defendant by his family, friends, and colleagues.

### A. Guidelines Recommendation

For an offense level of 29, the Guidelines recommend a sentence of 87-108 months. Before applying my independent determination of what sentence best fits Johnson's circumstances, as mandated by 18 U.S.C. § 3553, I believe [*10] it is important for him and the public to understand what that sentence means and how the Guidelines arrived at a recommendation of over seven years in prison for this crime.

The base offense level for Johnson's crime of conviction—fraud—is only 7. Even adding his obstruction and role-in-the-offense enhancements, the resulting offense level would only be 13, for which the Guidelines recommend no more than 18 months in prison. So how did we progress from an offense level that caps the amount of time in prison at a year and a half, to one that sets a minimum prison time of approximately five times that figure? The answer lies in the loss enhancement.

As I have already discussed, I have determined Johnson's sentence based on a loss enhancement of 16, a signifier that he gained between $1.5 and $3.5 million as a result of his crime. Calculating this figure with particularity is not necessary; a "reasonable estimate" is all that the Guidelines require. U.S.S.G. § 2B1.1 cmt. n.3(C). Neither Probation nor the Government contends that this gain was actually personal to Johnson—the $3.1 million figure represents the profits that eleven HSBC traders in New York and London (including Johnson) realized from frontrunning trades [*11] that they placed ahead of the 3 p.m. fix on December 7, 2011. Although Cairn suffered a loss, and HSBC incurred a gain, HSBC has paid Cairn full restitution. (Deferred Prosecution

Agreement (Dkt. 8 in No. 18-CR-30 (E.D.N.Y.)) ¶ 8.) In addition, HSBC has paid a monetary penalty of $63 million and $38 million in disgorgement. (Id. ¶¶ 7-8.) The victims, insofar as they were injured financially, have undoubtedly been made whole, and then some.

The upshot of all this is that, despite these qualifiers, the Guidelines would have this court place Johnson in jail for almost a decade without batting an eyelash simply because of the sizeable profit from the frontrunning trades. The Guidelines do not ask the court to consider the duration of the criminal activity, Johnson's mens rea, the character of the loss, or any other factors that might allow the court to impose a sentence based on Johnson's worth. No, the threefold increase in Johnson's offense level does not come as a result of any of these significantly more important considerations.

As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best [*12] fit the crime, nor any approximation of the moral seriousness of the crime. It is no wonder that Judge Stefan Underhill, concurring in a recent Second Circuit opinion, called the loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb." United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring); see also United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission ... effectively guaranteed that many such sentences would be irrational on their face."). Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence. Accordingly, Judge Underhill opined that, because the loss Guideline "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices ..., district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." See Corsey, 723 F.3d at 379 (op. of Underhill, J.). I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. That this situation [*13] continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

Many in the legal community have urged the Sentencing Commission to right this grievous wrong, and today I add my name to that lengthy list of judges, practitioners, scholars, and other commentators. The problems with the loss enhancement have been evident since the inception of the Guidelines. In 2004, then-District Judge Gerard Lynch generously called the loss enhancement a "questionable" aspect of the Guidelines. United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). He identified all of the problems with this scheme: the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on. Id. at 427-28. These concerns have continued unabated.[1] Three years ago, the Sentencing Commission underwent the process of amending the fraud Guideline but left the loss-enhancement provision untouched. Representing the American Bar Association, James E. Felman, a prominent federal criminal defense lawyer, urged the Commission to overhaul [*14] the fraud Guideline to "reduce the unwarranted emphasis on both loss and multiple specific offense characteristics that, alone and especially in combination, tend to overstate the seriousness of many offenses." Mark W. Bennett et al., Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform, 102 Iowa L. Rev. 939, 979 (2017) (citing James E. Felman, Chairman, Am. Bar Ass'n Criminal Justice Section, Testimony on Behalf of the American Bar Association Before the United States Sentencing Commission for the Hearing on Proposed Amendments to the Federal Sentencing Guidelines Regarding Economic Crimes 9 (Mar. 12, 2015))). He was not alone in urging the Commission to right this obvious wrong. See Daniel S. Guarnera, A Fatally Flawed Proxy: The Role of "Intended Loss" in the U.S. Sentencing Guidelines for Fraud, 81 Mo. L. Rev. 715, 717 n.9 (2016). Still, though, the Commission persisted in sticking to its flawed methodology for tabulating white-collar sentences. I hope that the next time the Commission considers this issue anew—which will hopefully be before too long—it takes more seriously these thoughtful criticisms and creates a sentencing structure for white-collar crimes that does not simply double down on the United States's obsession with over-punishment.

A year and a half [*15] ago, Judge Jon Newman, writing for a unanimous panel of the Second Circuit, remarked that the concept of the loss enhancement might make some sense if the calculation were flipped; that is, rather than starting with a low base level for the amorphous crime of "fraud" and then adjusting upward in leaps and bounds based on the amount of loss, the Commission could have "select[ed] a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss." United States v.

---

[1] See, e.g., Corsey, 723 F.3d at 379-82 (op. of Underhill, J.); Gupta, 904 F. Supp. 2d at 351; United States v. Parris, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.); United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, J.).

Algahaim, 842 F.3d 796, 800 (2d Cir. 2016). But this is not what the Commission did. In light of the anomalous approach undertaken in the context of loss enhancement, the Second Circuit urged sentencing courts to consider the "unusualness" of this enhancement in its determination of a reasonable sentence, id. (citing Kimbrough v. United States, 552 U.S. 85, 101, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007)), permitting the imposition of a non-Guidelines sentence if "the significant effect of the loss enhancement" is not in proportion to "the low base offense level." Id.; see also Corsey, 723 F.3d at 379 (op. of Underhill, J.) ("Although the District Court used the intended loss amount correctly for purposes of calculating the Sentencing Guidelines range, the Court erred by failing to [*16] dramatically discount that calculation when weighing the section 3553(a) factors against the totality of the circumstances of this case."). Following the command of the Second Circuit, the court chooses that path today.

I take seriously my responsibility under Supreme Court and Second Circuit precedent to determine an independently "reasonable" sentence based on an "individualized application of the statutory sentencing factors" in § 3553. United States v. Dorvee, 616 F.3d 174, 184 (2d Cir. 2010) (citing Gall v. United States, 552 U.S. 38, 46-47, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007)). Where application of the loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more heavily on the § 3553 factors. See Corsey, 723 F.3d at 380-82 (op. of Underhill, J.). Because the defendant's Guidelines sentence of 87-108 months is overwhelmingly due to the loss enhancement, and because I would find such a sentence well out of proportion to his appropriate sentence, I look closely at the § 3553 factors to guide the court to a reasonable sentence.

**B. Section 3553 Factors**

Under § 3553, the court must consider the following factors in imposing a sentence: the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for [*17] the offense; the need for the sentence to afford adequate deterrence; and the need to protect the public.

1. Deterrence

Perhaps the most important factor the court must consider is how a sentence will deter future criminal conduct. See 18 U.S.C. § 3553(a)(2)(B). In weighing the deterrent value of a sentence, the court must examine both general and specific deterrence. General deterrence is the effect a sentence has on the public's likelihood to engage in the type of activities that led to the defendant's conviction; specific deterrence is the effect a sentence has on the defendant's propensity to commit further crimes of this nature. I believe that the sentence I will impose on this defendant satisfies both types of deterrence.

The need for general deterrence is particularly acute in the context of white-collar crime. See United States v. Peppel, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks omitted)). As Judge Weinstein has observed, "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative [*18] to the severity of the punishments that may be imposed." United States v. Stein, No. 09-CR-377, 2010 U.S. Dist. LEXIS 16745, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010). Thus, "[a] serious sentence is required to discourage such crimes." Id. While the below-Guidelines variance of this sentence makes it clear that there is a range of opprobrium deserved by felony white-collar offenses, and that Johnson's crime may fall at the lower end of that spectrum, let me be clear: any amount of prison time is a serious amount of prison time. In addition, the court will impose a substantial fine.

With this sentence, the court makes it clear that all defendants who commit fraudulent acts—even where, as here, those acts do not directly harm the public interest, and the scope and duration of the fraud are limited—are subject to serious sanctions. A prison sentence and fine, combined with the expense and emotional harm that have resulted from this prosecution, and the disgrace of having been convicted of a felony, should be sufficient, the court believes, to effect general deterrence for crimes of this nature.

As for specific deterrence, I am confident that Johnson will never again be able to commit large-scale financial fraud. Upon his return to the United Kingdom, it is highly unlikely that he will work again [*19] as an FX trader, or anything similar. I assume that financial institutions will never again trust him to particulate in the financial-services industry, handling multi-billion-dollar financial transactions, nor should they.

2. Other Factors

Consideration of the other § 3553 factors also justifies a downward variance: namely, Johnson's standing as a first time offender and the brevity of the instant offense. I also believe that a departure is warranted under § 3553(a) based upon his medical condition, British citizenship and residence, unusual circumstances as a foreign national and based upon the likely professional consequences he will face as a result of his job loss, conviction and imprisonment. Additionally, the letters I

received from Johnson's family, friends, and colleagues make it clear that Johnson has a strong history of community involvement, including working with young people with adjustment issues. This record speaks well of Johnson and was important for my consideration. Taken together, these factors reinforce my decision that a relatively brief prison sentence is necessary to effect deterrence, but that anything greater risks being excessively punitive. A non-Guidelines sentence might [*20] not suffice for a more dangerous offender, to punish a crime of greater moral opprobrium, or in other contexts that more clearly warrant a substantial period of incarceration; here, however, such concerns do not lead me to conclude that substantial imprisonment is appropriate.

Finally, the factors in 18 U.S.C. § 3552(a) support my decision to impose a fine. According to the PSR, Johnson has the financial resources to pay a fine, which will not impose a significant burden upon him or his family given their substantial savings. (See PSR ¶¶ 75-78; Second Addendum to the PSR (Dkt. 231).) This evidence supports the conclusion that he is able to pay the fine I am imposing on him.

Johnson seeks a noncustodial sentence with no fine. (Def. Mem. at 54-81.) His arguments are well taken, but at their root seek to upset the fact that a jury of his peers found him guilty beyond a reasonable doubt on nine counts alleging fraud and conspiracy. The jury's verdict must be honored.

### III. CONCLUSION

After applying these factors to the defendant's case, I find that the appropriate sentence is as follows: a prison sentence of 24 months; a $300,000 fine, payable immediately; a $900 Special Assessment, also due immediately; and [*21] five years of post-incarceration supervised release. The 24-month sentence is, as noted previously, a significant downward variance from the Guidelines range of 87-108 months' imprisonment A $300,000 fine is above the Guidelines recommendation for conviction on one count of fraud, yet well below the nearly $1.5 million that I could fine Johnson based on his nine-count conviction.

SO ORDERED.

Dated: Brooklyn, New York

April 26, 2018

/s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District Judge

**End of Document**